Davis, Judge,
delivered tbe opinion of the court:
Through this Congressional reference[1] we are asked to pass upon still another phase in a continuing dispute over a famous tract of land — Section 36, Township 30 South, Range 23 East, in the Elk Hills of Southern California — a dispute which has remained alive for three generations. As before, the controversy centers on the issue of whether Section 36, which is now concededly oil-bearing, was known to be mineral land in January 1903.
The problem arose because Congress, in the Act of March 3, 1853, 10 Stat. 244, 246, granted to the then new State of California, out of the public lands, Sections 16 and 36 for school purposes — with certain exceptions, among which were “mineral lands.” Minkig Co. v. Consolidated Mining Co., 102 U.S. 167 (1880). The Act made no provision for determining what part of these sections, if any, was to be excluded from the grant on the basis of minerality; there was no provision for the issuance of patents or for any comparable action by the Interior Department to evidence the transfer of title to the State. If the land was not excluded, title would automatically pass upon the Department’s approval of the survey of the area. United States v. Wyoming, 331 U.S. 440, 443-44 (1947); West v. Standard Oil Co., 278 U.S. 200, 208-09 (1929); Wyoming v. United States, 255 U.S. 489, 500-01 (1921).
Although the surface of the statute excludes all “mineral lands,” the Supreme Court has construed it, along with comparable legislation, as barring only those lands known to be mineral at the time of the survey (or when title otherwise passes), and not lands thereafter discovered or adjudged to be mineral.[2] It is also settled that oil and gas are “mineral” *4 within the meaning of such Congressional legislation excepting mineral lands from federal grants. Burke v. Southern Pacific R.R., 234 U.S. 669, 676-79 (1914).
The area of Township 30, including Section 36, was surveyed by the Federal Government in 1901, and the Interior Department approved the survey on January 26,1903. The surveyor returned all of the lands covered by his survey, including Section 36, as mineral . This designation was not binding; it was more in the nature of a warning to prospective purchasers from the State that, in the eyes of the Federal Government, California had not acquired title to the land under the 1853 Act. Initially acquiescing in the surveyor’s return, California applied, early in 1903, for lieu land to replace Section 36, but in 1905 the State — apparently changing its mind as to the character of Section 36 — sought to substitute other base lands for the lieu land it had selected. In 1909, California sold Section 36. In the same year, one of the purchasers in turn conveyed his part of the land to Carman and Fairbanb. It is the latter’s estate which is the plaintiff here.
Meanwhile, the Federal Government was developing its own position on Section 36 and the nearby lands. For some time before the approval of the survey, lands in that region (Kern County, California) had been suspended from disposition as agricultural land “until further orders,” because of a petition (known as the “Miners’ Petition of 1899”) claiming that much of the area was mineral. Late in 1903 (after the approval of the survey returning Section 36 as mineral) the General Land Office directed an agent (Ryan) to examine the lands covered by this withdrawal. As a result of his recommendations, Section 36 (among others) was relieved from suspension in April 1904. In 1908, after some further study by the Geological Survey, lands including Section 36 were again temporarily withdrawn, pending a more definite classification. In 1909, the Geological Survey concluded that much of the land, including all of Township 30 (thus covering Section 36), was oil land. The Interior Department then withdrew the township (and other areas) from all forms of disposition. President Taft approved this withdrawal in 1910, placing the land in a petroleum reserve. *5 By an Executive Order of September 2,1912, the President put the township in Naval Petroleum Reserve No. 1, “for the exclusive use or benefit of the United States Navy.”[3]
In January 1914 the General Land Office directed the institution of administrative proceedings against California (and its transferees) to consider whether Section 36, among other lands, was known to be mineral on January 26, 1903 (the date of the approval of the survey). These proceedings limped along until June 1921 when Secretary Fall dismissed them without deciding the issue of minerality. In February 1924, Congress, spurred by the oil controversies of the early 1920’s (see footnote 3, supra), directed the Secretary to begin proceedings to establish the Government’s title to Section 36. 43 Stat. 15 (1924). Administrative proceedings were again commenced in May 1925. The Standard Oil Company of California, which claimed ownership of parts of the section and leased other parts (including the portion now claimed by plaintiff),[4] sought to enjoin these renewed proceedings on the theory that Secretary Fall’s action in 1921 had terminated all control by the Interior Department over the land. The Supreme Court held otherwise in 1929 (West v. Standard Oil Co., 278 U.S. 200) and the administrative proceedings were then resumed. Ultimately, in January 1935, Secretary Ickes, reversing decisions of the Register who had presided at the hearings and of the Commissioner of the General Land Office, ruled that Section 36 was known to be mineral on January 26,1903.
The United States then brought suit against plaintiffs’ predecessor (and others) to quiet the Government’s title to the Section. Rejecting a plea by the defendants for a de novo trial on the facts, the Southern District of California held that the administrative determination was binding since it was supported by substantial evidence and in accord with the law. United States v. Standard Oil Co., 20 F. Supp. 427 (1937), 21 F. Supp. 645 (1937). This judgment was affirmed, in a divided vote, by the Court of Appeals for the *6 Ninth Circuit. 107 F. 2d 402 (1939). The Supreme Court denied certiorari on January 29, 1940, 309 U.S. 654.
Some twenty years earlier, litigation involving nearby sections in the Elk Hills had come to a similar conclusion. The United States sued to cancel a patent issued to the Southern Pacific, in December 1904, for lands in Township 30, including two sections immediately adjoining Section 36 {i.e., Sections 25 and 35); the ground of the action was that the company had fraudulently misrepresented that the lands were non-mineral.[5] After a judicial trial, the District Court held for the Government and ordered cancellation of the patent. The Court of Appeals reversed, but in 1919 the Supreme Court reinstated the District Court’s decision. United States v. Southern Pacific Co., 251 U.S. 1. The Court ruled that the lands were in fact mineral and were known to be such when the Southern Pacific applied for the patent. The particular area reverted to the Federal Government at that time.
Mr. Fairbank (plaintiff’s decedent) and plaintiff did not stop with the final termination, in 1940, of their administrative and judicial efforts to obtain the areas of Section 36 in which they claimed an interest. Unlike the Southern Pacific, there was no hint of fraud or overreaching on their part; Fairbank and his partner 'had purchased in good faith from the State of California. Monetary relief was ultimately sought from Congress. The main ground offered was that Mr. Fairbank (and the others interested in Section 36) had never had a de novo judicial trial of the issue of the miner-ality (as of January 1903) of Section 36. In April 1956, a bill was introduced in the House of Eepresentatives to grant the Fairbank estate such monetary relief. On May 21,1956, the House of Eepresentatives referred the bill to this court under 28 U.S.C. §§ 1492 and 2509, with the request that our findings and conclusions should cover “de novo the question whether such land was known mineral land on January 26, 1903.”
The petition filed pursuant to this reference asks $15,000,-000 for losses and expenses incurred as a result of Fairbank’s *7 being deprived of the part of Section 86 to which he asserted title. The court directed that a separate trial be had, in the first instance, on the issue of whether the claimed land was known to be mineral on January 26, 1903. A trial de novo on that question was held before Trial Commissioner Saul Richard Gamer. The entire record of the administrative hearing in the Interior Department, culminating in Secretary Ickes’s ruling of January 1935, was received in evidence, as well as a comparable administrative record on Section 16 of Township 30. In addition, both sides presented oral testimony and documentary exhibits.
Commissioner Gamer has rendered a most comprehensive, careful, and detailed report in which he has thoroughly canvassed the history of the controversy and the subsidiary facts bearing in any way on the mineral character of Section 36. On the basis of the whole record he has also drawn elaborate factual conclusions as to the state of knowledge in 1903, actual and potential, as to the minerality of the Section. Plaintiffs have excepted to none of the commissioner’s findings. The defendant has filed certain minor exceptions which we have considered.[6] It is fair to say that the parties have accepted the heart of the commissioner’s findings, and almost all of the rest. We, too, accept and adopt, with a few modifications, the helpful and ably-drawn findings as the basis for our determination.
The commissioner’s findings, which are now the court’s, conclude, as the result of the de novo trial, that: (i) Section 36 is undoubtedly mineral land, in the sense that it contains oil of sufficient quantities for development (finding 66); (ii) Mr. Fairbank and the great mass of those interested in oil lands in that part of California, at that time, did not believe, in January 1903, that Section 36 contained oil capable of development, but these views were not based on adequate scientific studies (finding 67); (iii) a few practical operators, likewise untutored in the relevant science, did believe that the Elk Hills area (of which Section 36 forms a part) might well turn out to be valuable (finding 67(f)) ; (iv) *8 there were reasonable grounds for competent geologists, in January 1908, to recommend to a client-operator the purchase of Section 36 and the making of expenditures to drill for oil with the prospect of a profitable commercial venture (finding 68); (v) it would have been equally reasonable for a competent geologist to recommend against the purchase and development of Section 36 (findings 68, 69); and (vi) it would have been reasonable for an interested oil operator, in January 1903, to adopt either set of recommendations (finding 71).
These ultimate findings, carefully balanced as they are, necessarily stir the problem of the precise meaning of the legal rule that land must be known to be mineral before it is excluded from the grant. Once the basic findings are accepted, as the parties and the court all do, this legal issue becomes the major focus of the case. But since this is a Congressional reference coming after extensive litigation on the same subject, it is also important that we discriminate between those legal issues which are open and those which have already been finally decided. The resolution of the House of Eepresentatives referring the matter here speaks of a de novo inquiry into the question of whether the land was known mineral land on January 26, 1903. But that resolution of a single branch of Congress is not a statute and does not seek to change the applicable rules of law or to set aside the doctrines of res judicata and collateral estoppel. Insofar as the House of Eepresentatives asks our views on the claim as a legal one, we cannot ascribe to the resolution of reference any effect on the governing rules of law. In that context, the request for a de novo inquiry must be limited to a suggestion that the court make a de novo investigation of the facts. On the other hand, to the extent that we are asked to consider the claim in its “equitable” facets — -with the somewhat special meaning which has heretofore been given that term in Congressional reference cases — we are freer to comment upon the content and application of the legal rules which would control the legal claim.
It is clear that, at the present time, plaintiffs have no legal claim. Any cause of action for just compensation for the worth of the lands taken from them was long since barred *9 by the six-year statute of limitations, 28 U.S.C. § 2501, when the bill on their behalf was introduced in the House of Representatives in April 1956. In addition, any legal claim would be precluded by the doctrine of collateral estoppel. The litigation in the 1930’s specifically determined, as between plaintiffs and the Federal Government, that Section 36 was known to be mineral in January 1903. Under the principles of collateral estoppel which normally govern suits in this and other federal courts, that issue could not now be reopened, even if we might reach a different conclusion than did Secretary Ickes and the courts which reviewed his decision. Commissioner v. Sunnen, 333 U.S. 591 (1948).
The request by the House of Representatives that we find the facts de novo does not improve plaintiff’s position— insofar as its claim is a legal one. The burden of the plaintiff’s argument is that the estate is entitled to prevail as a matter of law “unless Section 36 was commonly supposed by those who were acquainted with it to be mineral, on January 26,1903.” We have found as a fact that the great majority of interested persons did not so regard Section 36 at that time. The insuperable difficulty, however, is that the Ninth Circuit, in the earlier case, rejected the very legal standard which plaintiff presents to us today. The Court of Appeals said (107 F. 2d at 415):
It was not necessary to show that appellants [plaintiff’s decedent and the others in the same class] themselves, in 1903, believed the land to be valuable for oil, or that there was unanimity of contemporary opinion to that effect. The erection of such standards would require, in the one case, proof of fraud, and, in the other, proof of conditions pointing so unerringly to the existence of valuable oil deposits as to be the equivalent of actual discovery. Nor, as we understand the rule laid down in the controlling decisions, need it be shown that contemporary belief was such as to prompt a willingness immediately to risk money in the exploitation of the land. .
This pronouncement refusing to accept plaintiff’s contention is binding on us, under the principle of collateral estop-pel, to the extent that we are asked to uphold the claim as a legal one.
*10 The end-result, for a legal claim, would be the same if we were to measure the facts we find today against the standard affirmatively used by the Ninth Circuit in deciding minerality — a standard which collateral estoppel likewise demands that we accept. In that opinion, the court (10T F. 2d 414-415) applied the test of whether the known conditions in January 1903 were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end; the court also said, as indicated by the portion of its opinion quoted above, that there need not be a “willingness immediately to risk money in the exploitation of the land.” This test of known minerality is adequately met by Section 36, under the facts found by Commissioner Gamer and now adopted by the court. The ultimate finding (finding 71 (a)) is that it would have been reasonable for a prudent operator in January 1903 to acquire the land for ultimate oil development on a commercial basis. That finding fits the Ninth Circuit’s rule, which is phrased in terms of a reasonable belief.[7] It does not detract from the effectiveness of the finding that we also decide that it would have been equally reasonable for such a prudent operator to leave Section 36 severely alone (finding 71 (b)). The Ninth Circuit’s criterion simply requires the existence of a reasonable belief, based on known and observable conditions, that the land could be developed profitably. That belief is not required to be overwhelming or dominant, so long as it is reasonably grounded.
Accordingly, we hold that plaintiff has no legal claim, whether the case be viewed on the record before the Ninth Circuit in 1939 or on the record now before us. The Fair-bank estate is barred both by limitations and by collateral estoppel. Years ago, its Claim was litigated in the federal courts and found wanting. The rulings in that earlier case dispose of plaintiff’s legal claim.
The resolution of the House of Representatives also seeks our consideration of whether plaintiff has any extra-legal equitable demands upon the United States. As for equitable *11 reasons to remove the bar of limitations (see 28 U.S.C. § 2509), we say only that there is no explanation why plaintiff waited from January. 1940, when the earlier litigation ended, until April 1956, when the relief bill was introduced, to seek legislative relief. Sixteen years is a long delay. However, we do not stress this point because the major argument in plaintiff’s petition and in the committee report accompanying the resolution (H.E,. Eep. No. 2124, 84th Cong., 2d Sess.) for a determination by this court is that plaintiff has never heretofore had a judicial assessment of the evidence bearing on the mineral character of Section 86, since the District Court and the Ninth Circuit both accepted the administrative findings. Today, we make such de novo judicial findings. Under them, as we have already pointed out, plaintiff would not be entitled to prevail according to the legal standard adopted by the Court of Appeals in 1989. If the District Court had held a de novo hearing and rendered the same findings we now do, the Ninth Circuit would still have ruled in favor of the Government. Plaintiff has not been hurt by the failure to grant Mr. Fairbank a de novo trial in the earlier litigation. The estate has, therefore, no equitable right to relief on that ground.
Plaintiff also asserts, in effect, that the legal test promulgated by the Ninth Circuit was erroneous and should not be followed. Although Congress has enacted no legislation altering or erasing that rule, either generally or for this particular case, we shall assume the liberty — in passing upon the equitable aspect of plaintiff’s demand — of discussing the Ninth Circuit’s legal standard; such a reconsideration may fall within the de novo inquiry the House of Eepresentatives has sought from us.
We do not agree with plaintiff that the Ninth Circuit erred in its rule of law. Its criterion seems to us the same as that of the controlling Supreme Court decisions.[8] The highest Court, as we observed at the beginning of this opinion, held in the latter part of the 19th century that mineral lands have to be known to be valuable for minerals, at the critical time, *12 to be excluded from a Government grant. Deffeback v. Hawke, supra, 115 U.S. 392, 404-05 (1885). This position was taken “to prevent any doubt being cast upon titles to lands afterwards found to be different in their mineral character from what was supposed when the entry of them was made and the patent issued” (id. at 405). In Diamond Coal & Coke Co. v. United States, 233 U.S. 236 (1914), the Court explored more precisely what it meant by “land known at the time to be valuable for its minerals.” Mr. Justice Van Devanter’s opinion said that “there is no fixed rule that lands become valuable for coal [the mineral in that case] only through its actual discovery within their boundaries” (id. at 249). Rather, “it must appear that the known conditions at the time * * * were plainly such as to engender the belief that the land contained mineral deposits of such quality and in such quantity as would render their extraction profitable and justify expenditures to that end” (id. at 239-40). The Court pointed to evidence giving the coal company “reasonable ground for believing” that the land in question could be mined profitably (id. at 244), and the opinion recited with approval the Government’s expert’s view “that when the known surroundings are such that practical coal men would invest in particular lands for coal mining, or advise others to do so, those lands are to be deemed coal lands, even though coal has not as yet actually been disclosed within their limits” (id. at 245). Elsewhere, the opinion refers to conditions which “were open to common observation, and were such as would appeal to practical men and be relied upon by them in making investments for coal mining” (id. at 248-49). The emphasis was all upon the reasonable estimates of practical, knowledgeable operators.
This teaching was applied by the Supreme Court to Township 30, and to oil, in United States v. Southern Pacific Co., supra, 251 U.S. 1 (1919). In that suit to cancel the railroad’s patents to portions of Township 30, including two sections immediately adjacent to Section 36, the Court declared that lands are known to be valuable for oil when “the known conditions at that time were such as reasonably to engender the belief that the lands contained oil of such qual *13 ity and in such quantity as would render its extraction profitable and justify expenditures to that end” {id. at 13-14). The Court summarized the Government’s evidence as showing “that an ordinarily prudent man, understanding the hazards and rewards of oil mining and desiring to engage therein for profit, would be justified in purchasing the lands for such mining and making the expenditures incident to their development, and in that a competent geologist or expert in oil mining, if employed to advise in the matter, would have an ample warrant for advising the purchase and expenditure” {id. at 13) .[9] Again, the theme pervading the opinion is that the reasonable belief of informed oil-men, founded on the known and observable conditions, is decisive.
It is explicit or implicit in these two Supreme Court opinions — Diamond Coal and Southern Pacific — that (a) the actual discovery of oil is not essential; (b) there need not be a firm conviction or firm proof that oil is present; (c) the overriding standard is the reasonableness of a belief that the land contains oil which can be developed commercially; (d) this is an objective test, based on the known and observable conditions as they should be evaluated by practical, prudent, informed business men; (e) uninformed speculation or inadequate investigation or appraisal is not a substitute for proper inquiry; and, finally, (f) the actual state of the knowledge or belief of local or otherwise interested operators is not determinative.
There can be no question, we think, that the Diamond Coal and Southern Pacific decisions, together with their underlying principles, establish the governing rules for Section 36. In West v. Standard Oil Co., sufra, 278 U.S. 200, 218 (1929), in which the Supreme Court cleared the way for the administrative proceedings ending with Secretary Ickes’s determination in 1935, the Court referred to the significant question to be decided as “the known mineral character of the land within the meaning of the decisions in Diamond Coal Co. v. United States, 233 U.S. 236 and Southern Pacific Co. v. United States, 251 U.S. 1.”
*14 Plaintiff, however, denies that these two Supreme Court opinions announce an objective test based on observable conditions. Those were fraud cases and the Court held no more, plaintiff says, than that the two companies subjectively knew, when the patents were issued, that the lands were mineral. The answer is that the opinions do not yield to so restrictive a reading. Since the cases did involve fraud, the Court might have confined its holdings to instances of actual guilty knowledge. But it went further. In both decisions the opinions, so it seems, deliberately chose to state the test in broad objective terms — stressing “observable geological and other physical conditions”; “conditions [which] were open to common Observation”; the reactions of the “ordinarily prudent man, understanding the hazards and rewards of oil mining and desiring to engage therein for profit”; “external conditions upon which prudent and experienced men in the oil mining regions are shown to be accustomed to act and make large expenditures”; “known conditions” which “reasonably engender the belief that the lands” contain oil of commercial character. It would contradict the Court’s basic rationale for us now to say that Diamond Goal and Southern Pacific stand for the proposition that minerality depends on the subjective knowledge and belief of the claimant or others in the area. Similarly, it is clear to us that the opinions were written to establish a general rule of minerality, and not merely a special holding applicable to fraud cases alone. The Supreme Court recognized this in West v. Standard Oil Co., supra (a non-fraud case like plaintiff’s), when it observed that the rule of Diamond Coed and Southern Pacific controlled the administrative proceedings on Section 36.
The history of Congress’s attitude toward federal mineral lands gives the clue, we think, to the Supreme Court’s adoption of this objective standard of reasonable grounds engendering a belief that minerals are there and can be developed. For the most part, Congress has been careful to preserve federal mineral lands for the public or for private exploitation under special legislation pertaining to mineral lands. *15 Mining Co. v. Consolidated Mining Co., 102 U.S. 167, 172-75 (1880); United States v. Sweet, 245 U.S. 563, 567-74 (1918); United States v. Union Pacific Railroad Co., 353 U.S. 112, 115-16 (1957). See, also, Oklahoma, v. Texas, 258 U.S. 574, 599-602 (1922) ; Charleston Mining Co. v. United States, 273 U.S. 220 (1927). At the same time, in order to protect the unsuspecting grantee or entryman, the rule has developed that lands not known to be mineral at the time of patenting (or like event) cannot be deemed to be excluded mineral lands. See supra. To harmonize both of these goals— preservation of the special public interest in lands which are mineral in fact, as well as protection of the private holder of land which was once public — it is fitting to utilize the objective test chosen by the Supreme Court. That standard safeguards the public interest in a double way: first, by excluding lands reasonably believed to contain valuable minerals capable of development the formula retains all or most of the territory likely to be worth the separate treatment Congress envisaged; second, a more nearly accurate judgment will be obtained by using as the measuring stick the belief of a knowledgeable operator based on objective conditions, and not the subjective guesses of the interested but unskilled. On the other hand, the private grantee or purchaser is protected by this objective external standard because, presumably, he too can apply it at the critical time to evaluate the character of the land he is about to obtain. The validity of his title is more readily ascertainable than if it depended on the subjective consensus of the half-informed. And if there be doubt as to which interest, public or private, merits greater consideration, the “established rule” is that “land grants are construed favorably to the Government, that nothing passes except what is conveyed in clear language, and that if there are doubts they are resolved for the Government, not against it.” United States v. Union Pacific R.R., 353 U.S. 112, 116 (1957).
The Ninth Circuit’s opinion in the earlier proceeding fully conformed to the rulings in, and principles of, the Diamond Coal and Southern Pacific cases. Plaintiff has no just com *16 plaint on that score. Our detailed findings show, too, that, if the matter had come before us for initial consideration, we would have been compelled by the Supreme Court’s decisions to reach the same result as the Ninth Circuit. Oil men who were prudent, informed, and experienced could reasonably have believed it worthwhile to acquire and develop Section 36. That is enough, even though others in the same class would have reacted adversely. We do not summarize all the considerations, pro and con, which are set forth in the findings. But it is significant that the only competent geologist who, after careful survey and investigation, actually reached a conclusion, at the time, concerning lands in the immediate vicinity of Section 36 — a geologist for Southern Pacific — thought that the lands were prospective oil territory (finding 68(d)). It is also telling that in the Southern, Pacific case the Supreme Court decided, on the basis of a judicial trial, that neighboring lands of Township 30, including two sections next door to Section 36, were mineral in character. The record in that case differed, of course, from the present record, but the major facts about the Elk Hills on which the Supreme Court largely relied are not disputed. Hindsight is not the test, and we do not invoke the rich oil history of the Elk Hills, of Township 30, and of Section 36. That development, however, sprang from geological and other conditions which “were open to common observation.” Diamond Goal, 233 U.S. at 248. If properly appraised as of January 1903, these observable characteristics could reasonably have “engender [ed] the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end.” Southern Pacific, 251 U.S. at 13-14.
In sum, it is our judgment that plaintiff has neither a legal nor an equitable claim against the United States on account of Section 36.
This opinion and the findings of fact incorporated herein will be certified by the Clerk to the House of Eepresentatives pursuant to House Eesolution No. 488, 84th Congress, 2d Session.

*0

*17 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Bichard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:

History of the Case

1. By section g of the act of March 3, 1853 (10 Stat. 244, 246), Sections 16 and 36 in each township in the State of California were, with certain exceptions, granted by defendant to the State for public school purposes.[10] The parties are agreed that, under the law as subsequently established by the courts, this grant did not include lands known to be mineral upon the effective date of the grant, which was the effective date of the statute as to all such lands theretofore officially surveyed and, as to unsurveyed lands, upon the date the official survey was subsequently accepted and approved by the Commissioner of the General Land Office. The act further provided for the making of such surveys.
2. In 1901 defendant caused certain of its land located in Kern County, California, to be surveyed in accordance with the provisions of said act of March 3,1853. Included in this survey was Section 36, Township 30 South, Eange 23 East, Mount Diablo base and meridian in said county. (For convenience, said section will hereinafter sometimes be referred to simply as Section 36, and townships and ranges will be abbreviated as “T.” and “K.”) On January 26, 1903, the Commissioner of the General Land Office approved the survey.
3. The plaintiff estate claims that the deceased Charles O. Fairbank had an ownership interest in certain parts of Section 36. It is claimed that said Fairbank and one Frank J. Carman, also deceased, each owned, through agreements between them, an undivided half interest in fee simple to 158.82 acres of land, consisting of lots 5, 6, 7, 8, 11 and 12, in Section 36. On February 8, 1909, there was issued by the State to one Mason Buffington a Certificate of Purchase of *18 certain lands in Section 36, including said lots, the sale price being $1.25 an acre, and the lands being described as “Lands sold by the State for which no patent has been issued * * On August 21,1909, Buffington granted to Carman an option to purchase the aforesaid lots for $20 an acre, the option to be exercised on or before April 1,1910, “or as soon thereafter as he [Buffington] may be able to secure patent from the State of California * * The patent from the State was granted to Buffington on January 20,1910, and on January 25,1910, Buffington conveyed said lots to Carman. The first relationship of record between Carman and Fairbank with respect to said lots was created by a quitclaim deed dated September 4, 1909, whereby Carman conveyed his interests in said lots to Fairbank. Joint ownership between Carman and Fairbank is based lipón a further series of transfers.
4. On January 14,1914, the Commissioner of the General Land Office directed the Begister and Beceiver of the Land Office at Visalia, California (the land at that time being in the Visalia land district), to institute adverse proceedings against the State of California and its transferees which included the issue of whether Section 36 was known to be mineral on January 26, 1903. The Begister and Beceiver (hereinafter referred to as the Begister) was a regional official of the General Land Office. The Visalia office thereupon requested its field office at San Francisco to supply the names and addresses of all interested parties. However, due to an apparent misplacing of this letter in the field office, no action resulted. A report of the status of the case was made by the Visalia office to the General Land Office on November 26, 1917. Oil and gas commenced being produced from Section 36 in 1919. On March 2,1921, the General Land Office preferred amended charges. Upon being advised of said charges, representatives of claimants to the land appeared before Secretary of the Interior Fall who, after hearing argument, directed the dismissal of the proceedings on June 9, 1921.
5. By Joint Besolution No. 6, 68th Congress, approved February 21, 1924 (43 Stat. 15), the Congress directed that the Secretary of the Interior institute proceedings to estab *19 lish the Government’s title to Section 36. The Resolution read as follows:
Resolved by the Senate and House of Representatives of the United States of America i/n Congress assembled, That the Secretary of the Interior be, and he hereby is, directed forthwith to institute proceedings to assert and establish the title of the United States to sections 16 and 36, township 30 south, range 23 east, Mount Diablo meridian, within the exterior limits of naval reserve numbered 1 in the State of California, and the President of the United States is hereby authorized and directed to employ special counsel to prosecute such proceedings and any suit or suits ancillary thereto or necessary or desirable to arrest the exhaustion of the oil within said sections 16 and 36 pending such proceedings.
6. On May 8, 1925, Secretary Work vacated Secretary Fall’s order of dismissal and directed the Register at Visalia, California, to hold a hearing on charges as to Section 36 that:
(1) The land is mineral in character, containing valuable deposits of petroleum and natural gas, and
(2) The land was known to be mineral in character at and prior to the date of the acceptance of the plat of survey by the General Land Office on January 26, 1903.
On August 17, 1925, the Secretary denied a motion for a rehearing of the decision of May 8,1925.
7. On October 9,1925, the Standard Oil Company of California, the lessee under an oil and gas lease from Fairbank and Carman covering their aforesaid lots in Section 36, filed an action to enjoin the Secretary of the Interior from continuing the adverse proceedings. The company contended that Secretary Fall’s action dismissing the prior proceedings constituted a final determination by the Department of the Interior as to the nonmineral character of the land which served to deprive the Department of jurisdiction over the land. Subsequently, Secretary West, who succeeded Secretary Work, was substituted as defendant. However, on January 2, 1929, the Supreme Court, in West v. Standard Oil Go., 278 U.S. 200, after reviewing the proceedings before Secretary Fall, decided that he had made no determination of the contested issue as to the mineral character of the land, *20 but that he based his order of dismissal on the legal ground that the known mineral character of the land as of January 26,1903, was of no legal consequence and was immaterial because the Government had become estopped, by certain events occurring prior to 1921, from questioning the company’s title. The Court held that such action did not preclude a resumption by the Department of the inquiry looking to a final determination of the factual issue as to the known mineral character of the land.
8. After the decision in the West case, the proceedings ordered by Secretary Work resumed, and hearings were commenced on October 7, 1929, before a Substitute Register, Walter Spencer, at various places in California. The Register at Visalia, because of a former connection with the Standard Oil' Company, was disqualified and the Register of another region served in his stead. Evidence was closed on April 25,1931, after testimony was given by 160 witnesses in 9,570 pages of record and the introduction of 995 exhibits. The Substitute Register personally heard all but four of the witnesses and personally examined Section 36 and the surrounding region. By that time there was no issue as to the mineral character of Section 36, the only issue being whether such character was known as of January 26, 1903. On February 24, 1932, the Substitute Register, by a written opinion, decided that “There appears to be no other conclusion but that Section 36 * * *, by the acceptance of the survey on January 26, 1903, became the property of the State of California, its subsequent mineral character being unknown at that time.”
9. The Substitute Register’s decision against the Government was appealed to the Commissioner of the General Land Office, C. C. Moore, who, by written opinion of February 23,1933, affirmed the Register’s decision. In accordance with the usual practice in such matters, the case had been assigned for review and for the preparation of a proposed decision by the Commissioner. The proceedings were thereafter thoroughly reviewed and a proposed decision drafted which would have reversed the Substitute Regis *21 ter. However, Commissioner Moore rejected said proposed decision, and so noted in bis written opinion, which stated: “A paper with contrary views was prepared in this office, which I have carefully considered, but with which I do not agree.”
10. Commissioner Moore’s decision was appealed by the Government to Secretary of the Interior Ickes who, by a lengthy opinion of January 24, 1935, overruled the Substitute Register and the Commissioner and held “that section 36 * * * was known to be mineral in character at the time of its formal identification by approval of the survey, and that title to this section has never vested in the State of California or its transferees, but remains in the United States.” 55 Interior Dec. 121. A rehearing was denied on May 20,1936. 55 Interior Dec. 532.
11. In 1937, the Government filed an action in equity in the United States District Court for the Southern District of California against the Standard Oil Company of California and the other claimants to interests in Section 36, including the representatives of Fairbank, to quiet title to said section, for an accounting, and for an injunction against trespassing on the lands and drilling any additional wells thereon. After the disposition on August 25, 1937, of preliminary motions 'by the claimants to transfer the case to the law side of the docket and by the Government to strike certain defenses (United States v. Standard Oil Co. of California, et al., 20 F. Supp. 427), including the determination that the claimants were not “entitled to a trial de novo before this court upon the issue of the known mineral character of the land, which carried title with it” (21 E. Supp. 645, 649), the case went to trial upon “the determination of the validity of the Secretary’s decision” which, the court held, “calls for a review of the evidence presented during the contest” (id.) since the claimants contended that “there was no evidence before the Secretary of Interior to sustain his finding of title in the United States” (id). In accordance with the court’s prior ruling, the only evidence before the court was the record of the evidence before the Secretary. The court stated that the problem “is to de *22 termine whether there is any evidence to sustain his [the Secretary’s] finding that the land was known mineral on January 26, 1903” (id.). To determine this issue, the court reviewed “the full record” and concluded that there was evidence, which was reviewed by the court, upon which the Secretary could rely to make his determination. The court concluded that the “facts * * * alluded to are sufficient, under the limited scope of our power of review” to constitute “a factual basis for the decision of the Secretary”, and that this would be so even if “the evidential preponderance is on the part of the defendants” (p. 653). Accordingly, the Secretary’s decision was held to be conclusive, neither fraud, error of law, nor “absence of evidence to support” the decision being shown, these being the only “contingencies which might rob of finality the Secretary’s decision.” As to the last of these contingencies, the court stated that “we have indicated the existence of a solid factual basis for it” and that “It follows that the determination of the Secretary of the Interior was right” (p. 653). As a result, the court issued a decree declaring the Government to be the absolute owner of the lands and quieting its title, and awarded damages against the Standard Oil Company. United States v. Standard Oil Co. of California, et al., 21 F. Supp. 645.
12. On November 16, 1939, the Circuit Court of Appeals, Ninth Circuit, in a 2-1 decision affirmed the decision of the District Court. Standard Oil Co. of California v. United States, 107 F. 2d 402. It stated:
On the trial below the court declined to receive further testimony but admitted in evidence the record and testimony in the land office contest. It held that the Secretary’s decision as to the known mineral character of the land was conclusive if supported by evidence. The land office record was read and considered for the purpose only of determining whether there was evidence in support of the finding mere made. The Standard contends that the court’s examination went no further than to see whether the record contained any evidence to support the Secretary’s conclusion. However, it is clear from the opinion below (D.C. 21 F. Supp. 645, 653), as well as from the findings, that the court was satisfied that *23 the Secretary’s decision was based on substantial evidence. (p. 408)
It held that the District Court was correct in denying “a trial de novo on the question of the known mineral character of the land” and that “the record made before the department was to be examined only for the purpose of determining whether the finding of the Secretary was based on evidence.” (p. 414) Further, it agreed with the District Court’s finding that:
* * * it is not true that there is no evidence in the record in the said land office proceeding to support the decision of the Secretary of the Interior therein; but that, on the contrary, there is sufficient evidence in the said record in said proceeding to sustain the decision, (p. 414)
The dissenting judge felt that the District Court erred in treating the Secretary’s decision as conclusive, that it should have permitted evidence to be introduced “and, on the evidence, made its own determination.” (p. 429)
On January 29,1940, the Supreme Court denied certiorari. 309 U.S. 654.
13. On April 25, 1956, there was introduced in the House of Eepresentatives, 84th Congress, 2d Session, a bill (H.E. 10826), which provides as follows:
A BILE
For the relief of the estate of Charles O. Fairbank
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the estate of Charles O. Fairbank, Morro Bay, California, the sum of $-. The payment of such sum shall be in full settlement of all claims of the said estate of Charles O. Fairbank against the United States arising from its depriving said estate of the use and enjoyment of full rights of ownership of 158.82 acres of land described as lots 5, 6,7, 8,11, and 12 of section 36, township 30 south, range 23 east, Mount Diablo base and meridian, Kern County, California: Provided, That no part of the amount appropriated in this Act in excess of 10 per *24 centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
On May 21,1956, the House of Eepresentatives, 84th Congress, 2d Session, agreed to House Eesolution 488, which provides as follows:
Resolved, That the bill (H.E. 10826) entitled “A bill for the relief of the estate of Charles O. Fairbant”, together with all accompanying papers, be referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House, at the earliest practicable date, giving such findings of fact and conclusions thereon, including de novo the question whether such land was known mineral land on January 26, 1903, as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
On August 24,1956, the petition herein was filed pursuant to said Eesolution. The petition claims $15,000,000 as losses and expenses incurred as a result of Fairbanks being deprived by defendant of the use and enj oyment of the property in Section 36 which was involved in the prior proceedings hereinabove described.
14. On December 10, 1958, the court entered an order directing that a separate trial be had in the first instance on the issue of whether the land claimed by the plaintiff was known to be mineral in character on January 26,1903. The order reads as follows:
Whereas, it appearing that, at a pre-trial conference held on November 13, 1958, plaintiff conceded that his claim set forth in the petition filed herein is dependent upon the Court’s sustaining his contention that, as alleged in paragraph 5 of the petition, the land referred to in said petition and which is the subject matter of *25 this case was, on January 26, 1903, not known to be mineral land and therefore not within the exception as to mineral lands contained in the act of March 3, 1853 (10 Stat. 244), referred to in paragraph 3 of the petition; and
Whereas, plaintiff at said pre-trial conference agreed that, if this issue is decided against him by the Court, he would not further prosecute the claim set forth in the petition; and
Whereas, it therefore appears that the decision on this single issue may be dispositive of this case; and
Whereas, plaintiff desires that said issue be separately tried, and, as a result of the agreement made by plaintiff at the pre-trial conference that, if this issue is decided against him he would not further prosecute the claim set forth in the petition, defendant has no objection to so proceeding.
It is ordered, this, the 10th day of December, 1958, that, in accordance with Eule 38(b), a separate trial be initially had on the issue of the known minerality of the subject land as of January 26, 1903.
Pursuant to the House Eesolution and the court order, a trial de novo was had pertaining to the question whether the land herein involved was known mineral land on January 26, 1903. The entire record of the Section 36 proceeding before the Substitute Eegister has been offered in evidence. In addition, both sides offered further evidence, consisting of both oral testimony and exhibits.[11]

*26
The Southern Pacific Oase

15. On December 12,1904, the Government granted a patent to the Southern Pacific Eailroad Company for parts of Sections 17 and 19, and for all of Sections 15, 21, 23, 25, 27, 29, 33 and 35, comprising approximately 6,100 acres of land, in Township 30 South, Range 23 East, being the same township and range in which Section 36 is located. The lands were located in what are presently known as the Elk Hills, although the hills were not so known at that time. Until approximately 1910, these hills were known by various names, such as the Outer Hills, or the Sand Hills. In December 1910, the Government sued to cancel the patent because of the alleged fraud of the company in representing to the Land Department that the lands were nonmineral when it was known that they were oil or mineral' lands. By decree entered August 9, 1915, the District Court for the Southern District of California, Northern Division, held for the Government, but the Circuit Court of Appeals for the Ninth Circuit, with one judge dissenting, reversed on May 6, 1918 (Southern Pacific Co. v. United States, 249 Fed. 785). On November 17, 1919, the Supreme Court, concluding that the lands were known to be valuable for oil when the patent was first sought on November 14,1903, and granted in 1904, reversed the Circuit Court of Appeals (United States v. Southern Pacific Co., 251 U.S. 1).
Two of the sections involved in that case, being Sections 25 and 35, adjoin Section 36 herein involved on the north and west, respectively, and the other sections are located a relatively short distance to the west and northwest of Section 36. In its opinion, the Supreme Court stated:
“All mineral lands” other than those containing coal or iron were excluded from the grant, and this exclusion embraced oil lands. Burke v. Southern Pacific R. R. Co., 234 U.S. 669, 676-679. * * * there can be no doubt that the patent was procured by representing that the lands were not mineral. Whether this representation was false turns upon the character of the lands as known when the patent was sought and obtained. If they then were known to be valuable for oil, as the Government *27 asserts they were, they were mineral in the sense of the granting act. (p. 7) * * *
The observable geological and other physical conditions at the time of the patent proceedings, as shown by the evidence, were as follows: The area called the Elk Hills was about six miles wide and fifteen long and constituted an anticlinal fold or elongated dome — an occurrence favorable to the accumulation and retention of oil. The lands in suit were about its center. From five to ten miles to the west was the Temblor Eange, the main uplift of that region. Along the east flank of that uplift for a distance of thirty miles was a series of outcrops or exposures of Monterey (diatomaceous) shales, the source of oil in California, and porous sandstone in which oil generally finds its ultimate reservoir. These strata were of exceptional thickness and it was apparent that oil in considerable quantity had been seeping or wasting from the sandstone. The dip of the strata was towards the Elk Hills and there were no indications of any faulting or thinning in that direction. Between the outcrop and the Elk Hills upwards of two hundred wells had found the oil-bearing strata and were being profitably operated, several of the wells being on a direct line towards the lands in suit and within three or four miles of them. In and beyond the Elk Hills were oil seepages and other surface indications of the existence of oil in the underlying strata, one of the seepages being near the lands in suit. Two wells had been sunk in the Elk Hills but obviously had not gone to an adequate depth and were not productive, although some oil was reached by one.
Geologists and men of wide experience and success in oil mining — all of whom had examined that territory and some of whom had been familiar with it for years— were called as witnesses by the Government and gave it as their opinion, having regard to the known conditions in 1903 and 1904, as just outlined, that the lands were valuable for oil, in that an ordinarily prudent man, understanding the hazards and rewards of oil mining and desiring to engage therein for profit, would be justified in purchasing the lands for such mining and making the expenditures incident to their development, and in that a competent geologist or expert in oil mining, if employed to advise in the matter, would have ample warrant for advising the purchase and expenditure.
Other geologists and oil operators, called by the company, gave it as their opinion that the lands were not, *28 under tbe conditions stated, valuable for oil; but as respects the testimony of some it is apparent that they were indisposed to regard any lands as within that category until they were demonstrated to be certainly such by wells actually drilled thereon and producing oil in paying quantities after a considerable period of pumping. This is a mistaken test, in that it takes no account of geological conditions, adjacent discoveries and other external conditions upon which prudent and experienced men in the oil mining regions are shown to be accustomed to act and make large expenditures. And the testimony of some of these witnesses is weakened by the fact that their prior acts in respect of these lands, or others in that vicinity similarly situated, were not in accord with the opinions which they expressed.
After considering all the evidence, we think it is adequately shown that the lands were known to be valuable for oil when the patent was sought and obtained, and by this we mean that the known conditions at that time were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end. See Diamond Coal Co. v. United States, 233 U.S. 236. (pp. 12-14)
Defendant contends, among other things, that under this decision (as well as others) the “observable conditions,” as well as those conditions actually observed, must be considered in determining whether Section 36 was “known” to be oil land on January 26,1903. Plaintiff disputes this contention, but further contends that, in any event, the “observable conditions” pertaining to Section 36 were not such, in the light of the geological knowledge then existing, as to cause the section to be considered “known” oil land as of that date.
16. The Elk Hills, a compact range of hills, are a single geological formation located in the western part of Kern County, California, and in the southwestern part of the San Joaquin Valley. The relatively narrow south end of the valley, in which the hills lie, is surrounded by mountains, the Temblors of the Coast Eange being approximately 5 miles to the west of the hills, the Sierra Nevadas approximately 35 to 40 miles across the valley to the east, and the *29 Tehacbapi Mountains, forming the southern end of the valley, approximately 30 miles on the south. The Sierra Nevadas on the east rise gently from the valley, but the Coast Eange on the west rises more abruptly. The Temblors run in a southeast-northwest direction, and the Elk Hills run substantially parallel to them, but in a slightly more east-west direction. The San Joaquin Valley extends almost 400 miles to the north, also running in a southeast-northwest direction.
The Elk Hills are, from northwest to southeast, about 15 miles long and, at their central part, about 6 miles wide. They rise approximately 700 feet above the floor of the valley on the south side, approximately 1,000 feet above the valley on the north, and about 1,300 feet above the valley at their highest point, which point is approximately 1,550 feet above sea level. The structure is actually more in the nature of a single hill, the name Elk Hills being, in this respect, somewhat misleading. The formation is roughly elliptical and has been variously described as an elongated dome, as mound shaped, and as similar to an upturned canoe. The hills are immediately adjacent to the McKittrick Valley on the west, which separates them from the McKittrick Hills, and the Buena Vista Valley on the south, which separates them from another less extensive formation of hills, called the Buena Vista Hills, and which are cut almost at their central point by a gap, referred to as McNee’s Gap. These hills also lie in a northwest-southeast direction, approximately halfway between the Elk Hills and the Temblors, and generally paralleling them. Between the Buena Vista Hills and the Temblors lies the Midway Valley. At the eastern end of this valley, and extending practically up to the southeastern end of the Elk Hills and down to the northeastern end of the Buena Vista Hills, is Buena Vista Lake. At the northwest end, the Elk Hills are divided from the McKittrick Hills, also sometimes called the McKittrick Front, which parallel the Temblors, by a dry stream bed or gap, through which a railroad line runs, completed by the Southern Pacific Bailroad in 1893. The McKittrick Hills are sometimes referred to as a part of the Temblor foothills, but they lie in a direct line with the geographical axis of the *30 Elk Hills, and are actually a continuation of the Elk Hills structure. The railroad runs northeast from the town of McKittrick, located approximately 1% miles from the western end of the Elk Hills, through the gap, then east approximately 30 miles across the San Joaquin Valley to Bakersfield, on the eastern side of Kern County. Another railroad line, completed around the early part of 1902, runs from Bakersfield southwesterly, around the eastern edge of the lake, and down to the town of Maricopa, known at that time as Sunset, and located at the base of the Temblors approximately 25 miles southeast of McKittrick.
A map, introduced in the proceedings before the Register as “U.S. Ex. 5-W,” and constituting part of plaintiff’s exhibit 2 herein, illustrating the relationship between the Elk Hills, the Buena Vista Hills, the Temblors, the Mc-Kittrick Valley, the Buena Vista Valley and the Midway Valley, is reproduced at the end of these findings.
17^ Section 36 is located in the approximate geographic center of the Elk Hills and near their crest, about 1,225 feet above mean sea level. The highest topographical point of the Elk Hills is approximately 2 miles northwest of Section 86, but the section lies approximately on the summit or crest of the Elk Hills ridge. The surface soil of the township in which it is located, which is typical of the Elk Hills in general, is sandy in nature, containing growths of low sagebrush and seasonal grasses. There is no timber. It is not suitable for agriculture and has only limited uses for grazing. The slopes of the Elk Hills are in many places scored by gulches or washes, from as little as 20 to as much as 200 feet deep.
18. As of January 26, 1903, there were in the foothills of the Temblors, facing and approximately parallel to the Elk Hills, three recognized oil fields or districts, i.e., the Mc-Kittrick, the Midway, and the Sunset. The first wells were drilled in the McKittrick District in the 1890’s, in the Sunset area around 1898, and in the Midway District around 1900. These three fields lay in a northwest-southeast line along the foothills, the McKittrick field lying to the northwest, the Sunset field to the southeast, and the Midway being between *31 them. These three districts represented a strip of approximately 30 miles in the foothills. However, at that time large areas in the strip remained undeveloped between the three districts.
19. As of August 1900, the McKittrick oil field, which was approximately 8-10 miles northwest of Section 36, had 16 producing oil wells as well as several prospect wells. At that time, the Sunset oil field, which was approximately 10 miles south of Section 36, had 17 producing wells and numerous prospect wells. Drilling was just commencing in the Midway field, which was approximately 15 miles southwest of Section 36. The railroad line to McKittrick afforded transportation facilities to the McKittrick area. However, development of the Midway and Sunset fields was at that time adversely affected by lack of water and transportation facilities. As of this period, the production of the Sunset and Midway fields was of little commercial importance. The early development of these fields concerned itself more with the production of asphaltum than with oil.
20. In 1901, there were approximately 160 producing oil wells between Sunset and McKittrick. By January 26,1903, there were approximately 200 producing oil wells in and between the Sunset and McKittrick oil districts. However, there were large areas in the line between McKittrick and Sunset where there were no wells or production. The Midway field was still only slightly developed.
Across the San Joaquin Valley, about 30-35 miles northeast of Section 36, oil in great quantities had been discovered in the eastern part of Kern County in 1899 at Kern River, near Bakersfield, in the foothills of the Sierra Madre. A year later, more than 130 producing wells had been completed and by 1903 there were approximately 500 producing wells in the Kern River field. This field developed quickly, transportation and water being available, and soon became the major oil producing area in the State. It was the development of this great field that stimulated further activity on the east side of the county in the Temblors. Drilling in the Midway field first commenced after the Kern River wells began producing. In 1902, more than half of the oil pro- *32 cLuced in California came from Kern County, with most of it coming from the Kern Eiver field, which was commercially of far greater importance at that time than the fields in the Temblors.
On a clear day, a person standing on Section 36 in 1903 could see the oil derricks in these proved oil fields to the northeast (Kern Eiver), and to the northwest, west, southwest and south, along the McKittrick-Midway-Sunset line of development. The wells in the McKittrick field were approximately 3 miles from the southern and western margins of the Elk Hills.
21. As of January 26, 1903, great importance was placed by oil operators upon petroleum or asphaltum seeps and surface deposits as indicating possible oil territory. The oil wells on the west side of Kern County, i.e., the McKittrick-Midway-Sunset line of development, were in close proximity to, normally on the hillsides just below, and sometimes directly upon, a visible, pronounced, and easily recognizable line of petroleum seepages and asphaltum deposits in the Temblor foothills, sometimes referred to as the “break.” The first wells on the east side of Kern County, i.e., those in the Kern Eiver oil field, were also located in close proximity to pronounced oil seepages there located. Although the presence of such petroleum seeps and asphaltum deposits in the Temblors was known for many years prior to 1900, the actual development of the region as oil-producing territory was commenced in the 1890’s, as set forth above. Near McKittrick, in the Temblor foothills there are very large oil springs and asphaltum exudations which are located approximately 214 miles west of the western end of the Elk Hills and around 9 miles from Section 36. The town of McKittrick itself is approximately 1 y2 miles from the western edge of the hills. The asphaltum seeps and deposits at Sunset were approximately 15 miles southwest of the Elk Hills. There are only slight surface indications of oil on the western side of the McKittrick Valley in the McKittrick Front, and the area there was much less developed than in the Temblor foothills proper near McKittrick or in the Sun *33 set area. At the southern end of the San Joaquin Valley, there are also oil springs at Wheeler Nidge.
22. There were no petroleum seeps on Section 36 itself, and in the Elk Hills as a whole there was only one place which, as of 1903, would have raised the possibility that it was an inactive seep of a petroliferous nature. This consisted of a small exposure of black and dark brown impregnated sands, wholly devoid of vegetation, located in the NW % of Section 32, T. 30 S., R. 24 E., about a mile east of Section 36. It was not a live seep of oil or gas. This exposure was seen in 1899 by one J. I. Wagy, who did farming and was also in the hauling or teaming business. He came upon the location while driving a team across the hills. Wagy thought the occurrence had the appearance of an oil or gas blowout. At that time, the discoloration was about 6 feet long and 4 feet wide, and was located near the bottom of a ravine or gulch. It penetrated the earth to a depth of approximately 10 feet. About 75 feet farther up in the ravine was a second small area of similar material. The lower occurrence, because of the subsequent association with it by one Lamont, as hereinafter set forth, has become known as the “Lamont seep.”
Defendant contends that surface deposits, petroliferous in nature, and stains of petroleum origin, were present in the railroad cut, a dry stream bed, which bordered the northwestern end of the Elk Hills, being located in the NW % SW % °f Section 14, T. 30 S., R. 22 E., about 7 miles west of Section 36, and in the NW % oí Section 23, T. 30 S., R. 22 E., approximately 6 miles west of Section 36, and that these deposits and stains constituted or indicated seepage leakages from below the surface of the Elk Hills. However, the evidence is not sufficient to establish this contention. The record indicates that these deposits were washed down by freshets and floods from seepages or oil production upstream in the Temblor foothills.
23. At the eastern end of the Buena Vista Hills, in Section 11, T. 32 S., E 24 E., at a location approximately 8 miles southeast of Section 36 and about 5 miles from the southeastern border of the Elk Hills, there was a large, approx *34 imately 200,000-square foot exposure of oxidized asphalt deposits, similar in appearance to the aforementioned Lamont seep, but much more extensive. These deposits were the only surface evidence of the existence of petroleum in the neighboring Buena Yista Hills. This area, sometimes referred to as a gas blowout, since gas was escaping therefrom, was seen and known to exist prior to January 26,1903. The Buena Yista Hills, lying between the Temblors and the Elk Hills, were closer to the proved oil fields in the Temblors than were the Elk Hills. Their anticlinal structure was sharper and more clearly visible and observable. However, prior to 1903, only one attempt had been made to drill for oil in these hills. In 1902, the so-called Aroostook well was drilled in Section 2, T. 32 S., B. 24 E., but only water was struck and it was abandoned as a failure, which tended to discourage further attempts during this period. No further drilling was undertaken in these hills until 1908.
24. Following his discovery of the discolored area as set forth in finding 22, Wagy showed a sample of it to one Blodgett of the firm of Jewett and Blodgett, then the principal operator and one of the pioneers on the west side of Kern County- Commencing operations at Sunset in 1889 (by surface workings of the asphaltum seeps), this firm was the only one operating in that field for approximately 10 years. After obtaining the opinion of one W. E. Youle, an employee of the Blodgett firm, who at that time had attained a reputation as a practical oil drilling expert, Wagy, Blodgett, Youle, and others, in 1899 made a large number of mining claim locations for oil and gas covering some 50 sections of land in the Elk Hills, including part of the section in which the discoloration was located. These locations (the “Bajah Co.” claims) consisted of the greater part of the entire Elk Hills. An important factor in the making of such locations was the locators’ belief in the possibility of the discolored area’s being an oil or gas blowout which indicated the presence of oil below the surface. Wagy considered the occurrence to be similar in appearance to other exposures of obvious petroleum origin which he had observed in the Sunset oil field.
Similarly, in 1899, one C. W. Lamont, a prospector and miner, had also come across the same discolored area and, *35 considering it to be a possible asphalt exposure or a gas blowout, had, in association with others, made mineral locations (the “Pelican” claims) in various sections of Elk Hills, including part of the section upon which the discolored area was located.
One C. W. Sylvester, a dentist, also saw the discolored area in 1899 and, also considering that it might be an oil seepage, made, in association with others, locations in Township 30 (the “Bustler” claims).
On March 6,1900, Wagy and Lamont, and their associates, organized the Wagont Development Company, to which were assigned most of the claims they had theretofore made. Their action was based principally upon the belief that the discolored area might be an indication of petroleum. Its appearance indicated that some black or brown substance, apparently deposited originally in some liquid form, had surrounded the sand particles and cemented them together. None of the Wagont locators had any technical knowledge of a scientific, geological nature. Reliance appears to have been based principally upon Youle, whose practical experience and resulting knowledge caused him to be better informed about many phases of the oil industry than the others. In any event he was so regarded by the other locators. Lamont was employed by the company to reside on the claims, and was posted on Section 32, where the alleged seep was located. He lived in a cabin on the section for 3 years.
The above-mentioned locators of Section 32 and the other sections in the Elk Hills had no intention of developing the locations themselves but instead hoped to interest others to develop the locations or to invest in the company. However, they were unsuccessful in doing so, which reflected the general opinion of oil operators and investors at that time of the nonpromising nature of the Elk Hills as prospective oil territory, and of the insignificance of the seep. Although some assessment work was done by the Wagont Company, such as road work, no substantial amount was spent. Reloca-tions were made every 2 years, in 1901,1903, and 1905, to prevent a lapsing of the claims. However, the number of reloca-tions progressively lessened. On December 14,1905, the company’s charter was canceled for failure to pay the State’s *36 license tax. By 1907, tbe company’s remaining eight locations lost legal protection through failure to perform the required assessment work and to file timely the relocation notices. No customary notices of labor and expenditures for assessment work were ever filed in respect of the company’s claims.
After making his locations in 1899, Dr. Sylvester too attempted, throughout 1901 and 1902, to interest others, including the Standard Oil Company and the Southern Pacific Bailroad Company, to invest in the development of his claims, but similarly failed.
25. There is no evidence indicating that Wagy, Lamont, or the other locators associated with the Wagont Development Company ever performed, or had performed, any tests of a scientific or technical nature in an attempt to ascertain the true nature or origin of the discolored material in question. The material did not react to the simple field tests then in common use by prospectors in a way which would indicate that it was of petroliferous origin. It does not give off a petroleum odor when heated. It showed no appreciable solubility when the solvents for petroleum which were commonly carried in the field by prospectors of that day, such as ether, chloroform, or gasoline, were applied. The locators were relying principally upon the similarity in general appearance of the material to that of seeps of unquestioned petroliferous origin which they had seen in the Temblors. However, subsequent laboratory tests, made during the course of the lengthy proceedings hereinabove described, have quite clearly demonstrated the bituminous character and therefore the petroliferous origin of this so-called Lamont seep, although it is not bituminous in its present form. Similar tests could have been made as of January 26, 1903, and similarly interpreted, considering the state of scientific knowledge at that time. However, the record does not indicate that any such tests were made as of such date, or that anyone knew at that time that the discoloration was of petroliferous origin. Had such a determination been made as of January 26, 1903, that factor would have been an important one in the consideration of whether *37 Section 32, as well as the sections nearby, including Section 36, were promising oil territory.
26. There was much activity in posting and recording location notices on Elk Hills, including Section 36, as herein-above described, from 1899 on. Practically the whole of Kern County was thus “located” following the opening of the Kern Kiver field in 1899, when the county became overrun with prospectors. Such activity prior to around 1908 afforded slight evidence of general opinion concerning the petroleum nature of the lands located because such acts generally involved no drilling or other material investment. Prior to 1911, there was, with one exception hereinafter referred to, no drilling in the Elk Hills for oil or gas. For the most part, such locators were not informed or experienced persons who believed that the Elk Hills contained oil of such quality and quantity as would render its extraction profitable and justify expenditures to that end. They were generally speculators, often not even engaged in any aspect of the oil business. Without making any material effort or investment of their own, they hoped that other persons might come along who entertained a favorable belief as to the oil possibility of the land, and to whom they could dispose of their interests at a profit. Many were persons engaged in general types of business in and around Bakersfield. Generally, as was true of the Wagont Company locations, such locations lapsed through failure to perform the required assessment work, and this was also true of the locations which were made at or about 1903 in various parts of the Elk Hills. Under the then applicable law, the posting of notices and.the performance of the necessary assessment work ($100 per location per year), in the absence of “discovery” by actually striking oil, did not give a valid title as against the United States. None of the mineral locations made on Section 36 prior to the sales thereof by the State of California in 1909 to Hay and Buffington, as hereinafter set forth, was ever perfected by discovery, all the subsequent claimants to said section as set forth in the above-described administrative and court proceedings having traced title from patents issued by the State.
*38 Many of the locations of the type hereinabove discussed, which widely covered Kern County during the 1903 period, were colloquially referred to as “court house” locations, meaning locations made of record without posting or staking of any location notices on the ground, or doing any assessment work, or even considering the property was any good as oil land. Names of alleged locators were frequently used without knowledge or permission, or, when with permission, as an accommodation by friends or acquaintances who had no interest in the particular property, but only so that the requisite number of names could appear on the notices. For the above reasons, the making of the above-described locations in the Elk Hills by the Wagont Company had, in and of itself, little significance so far as prevailing general opinions were concerned in appraising the Elk Hills as prospective oil territory.
27. The only drilling accomplished in the Elk Hills prior to 1911 was performed by one Hoy, who organized the Western Union Oil and Development Company and commenced drilling in 1901 in Section 11, T. 31 S-, E. 24 E., which is located approximately 5 miles southeast of Section 36 and approximately 4 miles southeast of the Lamont seep. Said section is on the southwest edge of the Elk Hills, near Buena Vista Lake. Hoy was without experience in or knowledge of the oil business or accepted oil exploration techniques. The location was selected only because there happened to be a natural roadway on it and there was easy access to water, which was hauled from the lake. He raised funds from Illinois investors for this particular enterprise by taking photographs allegedly showing a gas seepage burning in Section 1, T. 31 S., E. 24 E., which adjoins on the northeast the above-mentioned Section 11. There was in fact no such seepage, a blackened discoloration of a small area in such section being located at a then well-known wild bee cave and attributable to torch fires used to gain entrance to the cave to obtain honey. The Hoy well was located near this mythical gas seepage. Hoy was without skill as a driller. He had a portable star rig that could not drill to a depth exceeding 1,300 feet. Drilling ceased upon reaching 560 feet, which was not sufficiently deep even to penetrate *39 the cap rock. No oil was struck, although, a small amount of gas, sufficient to operate a cooking stove, was obtained from the well. Further capital could not be raised to permit deeper drilling and the Hoy interests and equipment were sold out at a sheriff’s sale, the successor purchasers refusing to proceed further with the venture.
No serious importance was attached to this 1901 drilling attempt by the oil operators and investors of that day. The small gas showing was not considered significant. Furthermore, small pockets of gas were often struck in the early stages of drilling, without the production of oil resulting from deeper drilling. Such pockets were sometimes considered as constituting so-called “marsh” gas, and which is unrelated to gas of a petroleum origin. Even if the gas were considered to be of petroleum origin, many operators considered the encountering of a gas zone as a disadvantage rather than an advantage. Although by 1903 satisfactory techniques had been developed to handle gas by permitting it to blow off over a period of days or weeks, and then hoping that the well would be converted from a gas well to an oil well, it was still a very troublesome problem to most operators who preferred avoiding this additional obstacle.
No oil was struck by drilling in the Elk Hills until 1911, and there was no proved commercially successful well until 1919.
28. In 1903, drilling in California was done with cable tool equipment. The use of the present rotary drilling equipment in California commenced only about 1910. It was peculiarly difficult to drill for oil in California in 1903 with cable tools. When water was struck it was necessary to seal it off with pipe, and successive strata required strings of pipe to pass inside the preceding string, until the hole became too small for the insertion of further pipe. The California rock was softer than that of the East, and tended to cave in on the bit. Consequently, in California the wells generally had to be cased to the bottom. As a result, as of January 26, 1903, no California well had been drilled below approximately 2,500 feet, and in the Midway-Sunset area, none below approximately 1,500 feet. Approximately 3,000 feet was at that *40 time regarded as the outside limit on the west side of Kern County with the tools and the techniques then available, despite the fact that in the eastern oil fields, wells had been drilled to greater depths. As early as 1889, a well had been drilled at Erie, Pennsylvania, to a depth of approximately 4,500 feet.
29. The great San Joaquin Valley, in the southern part of which the Elk Hills are located, is a vast structural and geological basin or depression. Its geological history and features were as readily ascertainable by a competent geologist in 1903 as they are today.
There are numerous exposures or outcrops of geological formations and strata along the rim of the mountains and foothills forming the eastern and western sides of the San Joaquin Valley, as well as along its southern rim. The appearance of these formations is virtually the same today as it was prior to 1903.
30. (a) The history of the geological formations in the southern part of the San Joaquin Valley pertaining to the generation and accumulation of oil and gas beneath the surface can be traced through several geologic ages, and was understood by qualified geologists in 1903 and prior thereto. Of particular significance is the Miocene Age when the sea invaded the San Joaquin Valley area and deposited thick sediments of microscopic marine organisms, referred to as diatoms. These marine sediments constitute a series of shaly rock known in oil geology as source or generating rock. It is also referred to as the organic series. The rocks are diatomaceous shales which were called “Monterey” or “Maricopa” rocks by California geologists. Although there is not universal agreement with respect thereto, as is true about almost every aspect of oil geology, nevertheless the theory is quite extensively accepted now, as it was in 1903, and long prior thereto, that these diatomaceous shales are generally the source of the oil in California.
(b) Overlying the thick Monterey source shales is another series of sedimentary material consisting of formations of porous, organic rocks. This series is called the reservoir series because of their suitability for containing subterranean *41 fluids, and to which the oil generated in the source bed could migrate if under pressure. The lower part of the series is in part intrastratified with the upper part of the organic series. The lower part of this reservoir series is sometimes called the Santa Margarita, and the upper part as the Etchegoin, although it does not appear that the latter term was applied to this part of the series in 1903. The reservoir series consists of sandstones or sandy shale, or it may consist of a coarser grit or conglomerate. Geologists recognized long before 1903 that, in order to obtain commercial deposits of petroleum, the existence of diatomaceous shales alone was insufficient, and that it was also essential to have a suitable rock of a porous nature, so situated stratigraphically in relation to the generating rock that it could act as a reservoir for the accumulation of the oil as it moved out of the source series.
(c) Above the reservoir series is another series of sedimentary rocks, referred to as the capping, cap rock, or overlying series. This series was recognized as a fresh water lake or swamp deposit. Geologists referred to it variously as the Tulare (since they are of the Tulare age) or the Paso Eobles formation. It consists of an impervious layer, composed of loosely cemented sandstones, grits and conglomerates, and also contains layers of clay, as well as limey and marly shales. It was known in 1903 that such a seal was necessary to prevent the escape of oil to the surface, the consequent evaporation of its volatile elements, and its general dissipation. It was recognized that sometimes the escaping oil itself could coagulate and act as a seal, but an impervious rock stratum was recognized as being preferable.
Sometimes, the term “McKittrick” is applied to the entire group of strata overlying the Monterey and would thus include both the reservoir and cap rock series. In this terminology, the lower part of the McKittrick would consist of the Etchegoin and the upper part of the Tulare.
Overlying the cap rock series in many places, and sometimes concealing it, is a fourth type of more recent material, referred to as alluvium. This material has been washed down by streams and deposited in the form of flats, fans, and terraces.
*42 The above basic principles relating to oil accumulations were well accepted and known prior to 1903. It was known prior to 1903 that the sandstones and conglomerates of the series overlying the Monterey shales constituted an excellent reservoir for the oil, since oil was being produced from these strata from the McKittrick, Midway and Sunset fields in the Temblors, as well as from the Kern River field. The impermeable nature of the Tulare, which enabled it to act as a satisfactory cap rock, was also known, since wells were being drilled through such series to the underlying oil sands from which the oil was obtained.
31. In many areas on the eastern slope of the Temblor Mountains and in the foothills, from McKittrick to Sunset, the geological formations of source rock (generating series), reservoir series, and cap rock are exposed and can be evaluated by a competent geologist.
There are also outcrops and exposures of these formations, except the Etchegoin, on the southern and eastern edges of the San Joaquin Valley, and at Kern River there are some exposures of the reservoir series.
In the Temblors, the Monterey shales are exposed in several places in great thicknesses, with an indicated thickness of from 3,000 to 5,000 feet, and may be observed dipping under the Midway Valley, the angles of dip varying greatly. They give the appearance of silicious shales, varying in color, hardness, and thickness of beds. The exposures of the reservoir series are not as extensive or plentiful, but the sandstones and conglomerates composing this series are present and were recognized as of 1903 as a suitable reservoir bed for the underlying source rock. The thickness of the series at the few places of exposures in the Temblors ranges from approximately 200 to 1,000 feet. The Tulare series is exposed in the Temblors in vaiious thicknesses of up to approximately 2,000 feet.
In addition to these exposures along the western, southern and eastern edges of the San Joaquin Valley, there are, as hereinabove described, also numerous oil and asphaltum seepages and deposits in the region, such as along the McKit-trick-Midway-Sunset line of development, and in the Kern *43 River area. Some were recognized as early as 1855 in T. 30 S., R. 22 E., where the McKittrick oil field is located, by a United States Deputy Surveyor and were so reported by him in his official survey of the township made in 1855. That township adjoins Township 30 S., R. 23 E., in which the Section 36 herein involved is located.
The Midway and Buena Vista Valleys are covered by a blanket of alluvium, which begins at the base of the Temblors. No rock strata of any of the three series are exposed in these valleys. In the Buena Vista Hills and the Elk Hills, only the Tulare is exposed.
32. (a) The geological formations of source rock, reservoir series and cap rock variously exposed along the eastern and western rim of the San Joaquin Valley, as hereinabove described, continue toward the center of the valley and underlie it in Kern County, including the Elk Hills, although not necessarily in an absolutely uninterrupted and continuous blanket.
The general continuity of these formations underlying the San Joaquin Valley from the Temblors in the west to the Sierra Nevadas in the east was postulated as early as 1894 by one W. L. Watts, then employed by the California State Mining Bureau as an “Assistant in the Field” and reported by him in the Bureau’s official Bulletin No. 3 (1894), entitled “The Gas and Petroleum Yielding Formations of the Central Valley of California,” where he stated:
Petroleum and gas bearing formations are found on both sides of the San Joaquin Valley in Kern County. At the Sunset Oil District and at Asphalto, on the western side of the valley, the petroleum and gas yielding rocks are extensively exposed, and oil and asphaltum industries are carried on. * * * On the eastern side of the valley, oil, bituminous matter, and gas are found * * *. On the eastern side of the valley, however, the showing of hydrocarbons is insignificant compared with that on the western side. This is partly accounted for by the fact that the geological disturbance of the tertiary rocks on the western side is very great, while on the eastern side it is very slight. Moreover, it is not improbable that on the eastern side of the valley the formations contemporaneous with the rocks yielding oil on the west *44 ern side are overlaid by more recent tertiary strata, in which the hydrocarbons are not very abundant. On the eastern side of the valley, the tertiary formation is well represented, as shown by fossils * * *.
As can be seen by examining the record of the strata penetrated by wells which have been sunk for water in the valley lands of Kern and Tulare Counties * * *, the recent filling of the valley appears to contain sufficient clayey strata to serve as a cover under which gas could be stored in underlying porous formations. A review of the situation, therefore, warrants the opinion that deep borings in the valley lands of Kern County would be quite likely to penetrate gas-yielding and possibly oil-yielding strata. * * * (pp. 20-21)
(b) Six years later, Watts, who had been appointed in 1899 as “State Expert in California Mining,” stated in California State Mining Bureau Bulletin No. 19 (1900), entitled “Oil and Gas Yielding Formations of California”:
During the past two years, there has been great development in the oil-yielding formations of Kern Comity, on both the eastern and western sides of the San Joaquin Valley. On the western side numerous productive wells have been drilled in the Sunset oil-district and the McKittrick District. On the eastern side of the valley an extensive and promising oil-field has been developed in the Kern Diver district, (p. 109)
He restated his conclusions of 1894 concerning the continuity of these geologic formations under the San Joaquin Valley and added:
* * *, the geological formations in the foothills of the Sierras at Kern Diver are of similar age to the rocks forming the first bench of foothills of the Coast Danges [Temblors] at Mud Creek, on the western side of San Joaquin Valley.
It is not surprising that evidences of petroleum should be found in the outcropping rocks of both localities, and that discoveries of petroleum at Sunset and McKit-trick were a prelude to the development of the Kern Diver oil-field, (p. 110)
Watts was recognized as one of the outstanding experts of that day in the field of California petroleum geology. He spent considerable time in the San Joaquin Valley area and *45 was widely read by the more informed and experienced California oil men.
While the above writings indicate Watts’ broad consideration of the stretch of San Joaquin Valley lands ranging from the Temblors to the Sierra Nevadas, there is no showing that he, or any other such geological expert, addressed himself, as of January 26, 1903, specifically to the particular area therein now known as the Elk Hills, or to any localized part of such hills, such as Section 36, or to the advisability, from a profitable commercial aspect, of drilling in such specific locations.
33. By letter dated September 11,1902, one E. T. Dumble, Consulting Geologist for the Southern Pacific Railroad Company, gave instructions to the company’s field geologist, Josiah Owen, concerning certain geological work Owen was to do as oil geologist for the company in the southern San Joaquin Valley. Attached to Bumble’s letter was a sheet containing two rough sketches and another sheet containing notes which he had prepared as a result of preliminary investigations he had made. The sketches indicated the horseshoe shape of the southern end of the San Joaquin Valley, and also indicated the McKittrick field on the west side and the Kern River field on the east side. They traced in a general way the presence and continuity of the geological strata and formations of oil-bearing sands and shales beneath the valley from McKittrick in the west to Kern River in the east, a distance set forth as 50 miles. However, in the notes, Dumble stated:
The Kern river and McKittrick oil fields are different in every particular. The oil at Oil City [Kern River] is in a heavy bed of sand containing more or less clay in irregular masses. This bed seems to underlie the entire region, sloping very gently to the northwest, so that wells may be sunk anywhere within an area of several thousand acres with a certainty of striking oil.
The McKittrick field, however, shows a very sharp anticlinal structure and is confined to a comparatively narrow line along its crest. I think there can be little doubt that the oils belong to entirely different series of deposits, that at McKittrick being in older beds than those of Oil City.
*46 34. In 1910, there was issued by the United States Geological Survey its bulletin 406, entitled “Preliminary Report on the McKittrick-Sunset Oil Region, Kern and San Luis Obispo Counties, California.” The report was written by two competent and highly regarded geologists employed by the Survey, Ralph Arnold and Harry R. Johnson, and was based upon geologic field studies made in 1908. This work appears to have been the first detailed geologic survey of the Elk Hills area specifically, as well as the adjoining areas, including the Buena Vista Hills and the Temblor oil fields. In this report, in which the name Elk Hills was first used (a herd of elk being known to live in the hills), the continuation of the organic shales and oil sands out into the valley was also assumed. However, subsequent to the completion of their field studies in 1908, but prior to the final preparation and publication of their report in 1910, the first successful well drilled in the Buena Vista Hills, as will be hereinafter set forth, produced large quantities of gas, and the authors not only included this fact in their report but also drew conclusions therefrom. The part of the report which specifically refers to the Elk Hills states as follows:
The Buena Vista district includes the region of the Elk Hills and Buena Vista Hills, and lies northwest of Buena Vista Lake, northeast of Midway Valley, and east and southeast of McKittrick Valley. The structural conditions in both the Elk and the Buena Vista hills are practically ideal for the accumulation of petroleum. As the shales of the Monterey and the Santa Margarita (?), which are believed to be the source of the oil throughout this region, underlie the McKit-trick beds that form the surface of the hills, the chances for obtaining commercial quantities of petroleum in the district are excellent. Assuming the thickness of the McKittrick formation to be about the same in the hills as it is in the Midway and McKittrick districts — that is, between 1,500 and 2,000 feet — it seems probable that at the axis of the Elk Hills anticline the oil-bearing zone is from 900 to 1,400 feet below the surface. As the edge of the hills is approached the dip of the beds carries the formations down, so that wells drilled near the edge would have to go at least 600 or 800 feet deeper than they would near the summit of the hills. Furthermore, *47 the dip, at least on the southwest flank of the main anticline, steepens perceptibly toward the edge of the hills, and this would still further increase the depth to which the wells would have to be put down to penetrate the oil-bearing zone.
At least two of the test holes that have been drilled in the Buena Yista Hills have struck large quantities of gas in sands below thick clay deposits. As these wells are both near anticlinal axes the gas strikes indicate one of two things to the writers. Either the gas is the accumulation above oil that lies lower down the dip in the same stratum, or else the gas has been able to penetrate higher beds than could be penetrated by the oil from which it is believed to be derived, and the oil lies in the same formation as that containing the gas but in lower beds. In either case the occurrence of the gas is believed to be indicative of the presence of oil in the hills under discussion.
The arguments favoring the occurrence of petroleum in the Elk Hills are also applicable to the formations in the Buena Yista Hills, the anticlines apparently offering the strongest inducements because of the less depths at which the supposed oil-bearing formations would be encountered, and also because as a general rule the greatest accumulations of petroleum occur near the axes of anticlines.
A particularly advantageous locality for exploitation is that southeast of the region of the Belgian (now Temblor-McKittrick) wells in sec. 34, T. 30 S., R. 22 E. Not only are there indications of petroleum along the southeastward continuation of the Dabney anticline, but the dips on the flanks of this anticline support the theory that it is fractured little, if any, and therefore is more likely to retain its petroleum than it would be were it crushed and fractured. The flat country between the Buena Yista Hills and the hills southwest of the Mc-Kittrick Yalley is covered by recent deposits which mask the underlying structure. It appears quite likely, however, that the anticlines which plunge southeastward under this masked area are continued in the anticlines found in the Buena Yista Hills, and in some instances this supposed relation has been shown on the map (PI. I). Assuming therefore that the conditions are continuous across these flats, it is almost certain that if petroleum is encountered on the flanks of these anticlines it will also be found beneath the flats along the continuation of the same anticline.
*48 The only surface evidence of the occurrence of petroleum in Buena Yista Hills is the oxidized asphalt deposits in sec. 11, T. 32 S., R. 24 E. These occurrences strengthen the belief that commercial deposits of petroleum underlie the hills. In selecting points for development work the localities where the beds dip steeply should be avoided and those chosen where the dips are moderate and the conditions less favorable for faults and sharp flexures, (pp. 209-211)
35. Another factor supporting the geological inference or conclusion that the source, reservoir and cap rock series continued under the Elk Hills was the presence of the above-mentioned seep in the Buena Yista Hills in Section 11, T. 32 S., R. 24 E., referred to by Arnold and Johnson, as herein-above set forth, as “oxidized asphalt deposits.” This would indicate the existence of the organic series beneath the surface of Buena Yista Hills, despite the fact that there are no exposures of the organic and reservoir beds in the Buena Yista Hills, as there are in the foothills of the Temblors. At this occurrence, similar in appearance to the Lamont seep, but more extensive, sulphurous fumes are given off and gas is escaping. This exposure is frequently referred to as a gas blowout.
36. A technical article entitled “The Oil Fields of Kern Co. California,” by Marius Duvall, a geologist, was published in the National Oil Reporter, a trade magazine, on December 26,1901, in which the author discussed the marine history of the San Joaquin Yalley. He concluded that oil mining operations to that date had merely touched the rim of the vast oil basin in the southern end of the San Joaquin Yalley and that it was certain that oil would be produced from the foothills and well in toward the center of the valley. He too stated as a “fact” that the “oil-bearing strata * * * underlie the entire San Joaquin Yalley from the Sierra Nevada mountains on the east to the Coast Range mountains on the west” and that “there can be no question but the oil-bearing strata underlie the entire San Joaquin Yalley * * *.” Pertinent portions of the article relating to the basic oil geology of the San Joaquin Yalley are as follows:
* * * the Sierra Nevada Mountains to the east, and the Coast Range Mountains to the west, come together *49 about 30 miles south of the town of Bakersfield, thus forming a horse-shoe shaped basin, which is now the southern end of this valley.
geology. — At the close of the Jurassic Period, what are now the Sierra Nevada Mountains were uplifted and formed the eastern shore of the Pacific Ocean. At this time the layers of sediment that are now the oil-bearing strata of this valley began to be deposited. During the first part of the Tertiary Period what are now the Coast Range Mountains appeared above the ocean, thus making the present San Joaquin Valley a vast inland sea, which then received the sediment from both shores. About the middle of the Tertiary Period this inland sea, together with both shores, underwent a further uplift, and its water sought the ocean through the Golden Gate, thus forming what is now called the San Joaquin Valley. This is the history, briefly told, of movements of the earth’s crust, that required, no doubt, hundreds of centuries to accomplish. The main fact to which I wish to call attention is that the oil-bearing strata are not rocks, but sand, and that they were laid down and distributed by water at a geological period after the uplifting of the Sierra Nevada Mountains, and before the elevation of the Coast Range Mountains and hence underlie the entire San Joaquin Valley from the Sierra Nevada Mountains on the east to the Coast Range Mountains on the west.
^ ‡ ^ $
the on. districts. — The Kern River district lies a little northeast of Bakersfield, and at present is being developed in a westerly and northwesterly direction. It is spoken of as an oil belt. In my opinion it is the eastern marginal rim of the main oil basin of this valley. The drill has shown an almost horizontal stratum of oil sand, dipping at a slight angle to the west and northwest. The dip, I believe, is approximately 100 feet to the mile. If this angle of dip continued across the valley, the stratum of McKittrick, Midway and Sunset districts would be approximately 3,500 feet beneath the surface of the land. The drill in these districts, however, reach the oil sand at different depths, approximately at an average depth of 600 feet. Tins and the oil seepages and asphaltum beds show that the oil sands have been brought to the surface by the elevation of the Coast Range Mountains, and I therefore consider the so-called West Side Oil Belt nothing more than the western marginal rim of the main oil basin of this valley.
On account of the great geological disturbance shown by the rocks of the Coast Range Mountains, the oil *50 sands here have in many places been detached from the main strata and uplifted and tilted at different angles, which will make drilling uncertain if operations are carried on to the west of the fault line that runs irregularly along the axis of this range of mountains. Detached and tilted oil sands may produce good wells, but there will be many failures if a careful selection of the ground is not made before operations are begun. In other words, the oil-bearing strata of Kern County are similar to blanket veins in metal mining, and the elevation of the Coast Range Mountains, occurring as they did after the formation of these strata, have broken them, thus tilting at high and irregular angles and in many places bringing to the surface these strata; the lines of fracture collectively being the fault line referred to, and hence operations carried on to the east of this line will prove to be the safest. From the fact that the oil sands of the Kern Fiver district dip toward the Sunset, Midway and McKittrick districts, and that the oil sands of the Sunset, Midway and McKittrick districts dip toward the Kern River district, and that in the oil districts to the north the sands dip toward the four districts named, it seems reasonable to consider the southern end of the San Joaquin Valley in Kern County a vast reservoir of oil and that development so far is only upon the outer edge or rim.
value of LANDS. — The value of land depends upon the thickness of the oil sands. In the Kern River district, the sands grow thicker toward the west. In the Sunset, Midway and McKittrick districts the sands grow thicker toward the northeast and east respectively. A thickness of over 500 feet has already been obtained in the first-named district, and over 200 feet in the other three. On the basis of a flat stratum of oil sand 100 feet thick * * * a conservative estimate * * * and estimating that one-fifth of [the oil] can be recovered * * * at 50 cents per barrel [the value of the land] amounts to $14,500 per acre. With thicker oil sands or other oil strata when deeper wells are drilled, you may draw your own conclusions as to the value of those lands.
conclusion. — There can be no question that the oil-bearing strata underlie the entire San Joaquin Valley, and that development so far is only upon the outer edge or rim. The question, therefore, is how far in toward the centre of the valley will it be possible to drill without encountering insurmountable difficulties. The larg *51 est artesian well in the State is in the centre of this valley near the north line of Kem County. This artesian area, no doubt, extends north and south through the county. This might make drilling in this part of the valley an impossibility. Therefore, I think that the sure oil territory will be found in a belt extending around the margin of this valley, embracing in its path part of the foothills and part of the flat land, and that the wells on the flat portion of this belt will produce a larger quantity and better quality of oil than has yet been obtained, and that the deepest wells in this territory should reach the sands at a depth not to exceed 2,000 feet.
The Elk Hills as such, or the question of whether any oil thereunder (or any particular part thereof) could be reached by the drill and obtained in commercial quantities, were not specifically mentioned or discussed in this article.
37. (a) In the Temblors, the exposures of the reservoir and organic series indicate that the former rests in angular unconformity on the latter, although the cap or Tulare series is generally conformable with the reservoir series. That the reservoir series rests unconformably on the organic Monterey series was observable and known as of 1903. This means that the dips in the two strata are not parallel. An uncon-formity indicates that the strata were deposited in different geologic time sequences. If the lower bed was folded upward, or partly eroded, before the upper bed was deposited, the lower bed would not be parallel to the upper. This results in so-called angular deformity, i.e., the rocks below may rest at an angle different from the angle of the overlying bed. An accepted geologic theory accounting for the uncon-formity is that while the valley was part of the ocean, earth pressures caused the uplift resulting in the Temblor Eange, with its folds and faults, after which the waters withdrew, exposing the shales to erosion. Subsequently, the ocean re-advanced, and the deposition of the reservoir series sandstones and conglomerates followed upon the partly eroded shales, resulting in the unconformity. The conformity of the cap series and the reservoir series is accounted for by the further theory that there then followed a general uplifting *52 of the floor of the valley, with such localized more extensive uplifts as resulted in the Elk Hills. The ocean water in the valley then gradually changed from salt to brackish water, and formed lakes, on the floors of which was deposited the Tulare, with no long period of geologic time intervening between the deposition of the reservoir series and these events resulting in the deposition of the Tulare, so that no substantial erosion in the reservoir series resulted.
As Watts noted in his 1900 bulletin, and as is more fully hereinafter set forth in finding 44, the question of conform-ability is “very important,” because if the reservoir series rests conformably on the organic series, “the oil prospector would know that there might be a good chance of finding oil in the formations immediately underlying” the reservoir series, even though the organic series “did not crop out at the surface.”
Thus, since these two series varied in thickness in different places, where they were not visible, or where the organic series alone was not visible, the presence or thickness of the organic series could not be foretold accurately. As of 1903 the Monterey shale did not outcrop nearer Section 36 than approximately 10 miles, and no drilling any nearer by had reached it.
(b) The unconformability of the source rock with the reservoir series would prevent accurate calculation of the dip and strike of the reservoir series under Section 36 (assuming such series extended under the hills) either from distant exposures, since there were no exposures of such strata in the Elk Hills, or from exposures of the younger strata of the cap rock series in the Elk Hills, which was the only series exposed thereon. The dip or strike of an unexposed bed could not be calculated when unconformability was known to exist, since the attitude of the bed would be unknown.
In his aforesaid 1900 bulletin, under the heading “Geological Structure Pertaining to the Occurrence of Petroleum in California,” Watts also emphasized the importance of ascertaining whether the reservoir series was conformable to the cap rock series, i.e., “whether or not the oil-sand is folded in the same way as the rocks which are exposed at *53 the surface.” As shown, in the Temblors, these two series are conformable. W atts’ statement isas follows:
In prospecting for petroleum * * * the outcrop is a most important guide. * * * an examination of the outcropping stratum would show the direction in which the oil-sand extends, and the angle at which it dips or is inclined. Consequently, the depth at which the oil-sand could be struck by drilling at any distance from the outcrop might be calculated. * * * In locating an oil-well, the character of the fold affecting the rocks about to be prospected should be taken into account * * *.
In most instances, however, only glimpses of the outcrop can be obtained. * * * the oil-sand may be covered by a great thickness of overlying rock, and the existence of oil-yielding formations may be indicated only by an oil-spring, or they may have been accidentally discovered by drilling. When such buried oil-yielding formations have been discovered on any particular fold, and the position of the oil-sand with regard to the inclosing rocks has been determined, the probable course of the oil-lines may be ascertained by tracing the course of the fold. It is quite important to ascertain whether or not the oil-sand lies conformably beneath the rocks which cover it; or, in other words, whether or not the oil-sand is folded in the same way as the rocks which are exposed at the surface. In hills and mountains, however, it is more than likely that the prospector will be assisted by glimpses of the oil-sand in ravines and canons, where the overlying rocks have been cut through by erosion. * * * (p. 189)
In elaborating about prospecting in new territory, and the importance of ascertaining the dip and strike of the oil sands, Watts emphasized the considerable risks involved in prospecting for oil in an area “where no outcrop of oil-sand has been discovered,” although the risk would be minimized somewhat if “the strike and dip of a remunerative body of oil-sand in an adjacent oil-field are known, and the rocks overlying the oil-sand can be traced to the territory about to be prospected.” Watts’ full statement in these respects is as follows:
The financial risks of prospecting for oil vary greatly. Oil-prospecting propositions may be divided into two orders:
First — The “orthodox” proposition. In this case the prospectors have in view a definite oil-yielding stratum, *54 which has proved remunerative in adjacent territory, and from which stratum they expect to obtain their oil. Moreover, they have satisfactory geological evidence in sight that the oil-stratum they have in view forms an oil-line through the territory they are about to prospect.
Second — The “wild-cat” proposition. In this instance the prospectors have no definite oil-stratum in view which has proved remunerative in adjacent territory, or they have not satisfactory geological evidence in sight that an oil-yielding stratum, which is known to be productive in adjacent territory, forms an oil-line through the land they are about to prospect.
In prospect wells of the first order the least risk is taken where the outcrop of an oil-sand, which has proved remunerative in a certain oil-field, can be actually traced through the territory to be prospected, and the geological structure of the locality is known.
More risk, however, is undertaken where there is no outcrop of the oil-sand, although the strike and dip of a remunerative body of oil-sand in an adjacent oil-field are known, and the rocks overlying the oil-sand can be traced to the territory about to be prospected. * * *
Most oil-mining enterprises which have for their object the development of new territory, especially when operations are conducted at a distance irom any known oil-field, are “wild-cat” propositions. Some idea of the conditions regulating the amount of risk involved in such enterprises may be gathered from the following statements:
The least risky “wild-cat” proposition is the case in which the strike and dip of a remunerative stratum of oil-sand in adjacent territory have been ascertained, and, although there is no conclusive geological evidence in sight, it is found after carefully platting a map of the territory that, if the stratum of oil-sand were extended in the direction of its strike, without any material alteration of the angle of the dip, it would form an oil-line across the territory to be prospected. * * *
It is a still more risky “wild-cat” proposition when a stratum of oil-sand has been discovered, concerning which nothing is known except that the sand gives evidence of containing oil, and a well is sunk for the first time to determine whether or not the oil-sand contains oil in remunerative quantities.
It is a much more risky “wild-cat” proposition where no outcrop of oil-sand has been discovered, but where a well has been sunk in a certain formation because it *55 shows some irregular seepages of petroleum, or because the formation appears to be similar to that containing a remunerative body of oil-sand in other places..
It is well for oil-prospectors to study the risk they are about to take before expending money, and care should be taken to control sufficient territory that they may have sufficient room to develop their oil-field, in case their venture proves successful. No one should undertake the more risky forms of prospecting unless he can well afford to lose the money to be put into the enterprise.
In California petroleum is found in shales, lime-stones, sandstones, and conglomerates, and in a few instances crystalline rocks are found impregnated with it; but in nearly all of the productive wells the oil is found saturating sandy strata. In this State the folding of the rocks has brought these oil-soaked strata near the surface, and the oil-lines, or lines along which remunerative wells can be obtained, are parallel to the axes of folds, or to the lines of faulting. The oil-lines extend in breadth only a certain distance down the limbs of the folds or down the block of tilted strata, which has been isolated by faulting. The lateral extent of the oil-line is limited at its upper margin by the outcrop of the oil-sand, or'by a line of geological disturbance such as a fault, or by the oil-sand being brought too close to the surface at the axis of the fold on which the oil-line is situated. On its lower margin it is limited by the dip of the formation, which carries the oil-yielding stratmn to too great a depth for it to be profitably reached by the drill; or, where the oil-sand is struck below a certain depth, it may be found that water has displaced the oil.
As geologists and oil-men know, the dip and the strike of the oil-sand are of the greatest importance in locating the site of an oil-well, and in the case of prospect wells the dip and the strike have to be ascertained irom the exposed rocks.
$ $ $ $ $
The dip of a stratum of rock is the angle which its surface, when inclined, makes with the horizon. The strike is the horizontal direction in which a stratum of rocks extends, and is always at right angles to the dip. Therefore, if the direction of the dip is known, the strike can be readily determined.
The direction of the dip of an inclined stratum corresponds to a line drawn along the inclined surface in *56 the direction of its greatest inclination, and is always at right angles to the strike. * * * (pp. 192-194)
38. After the thick deposits of marine sediments or diato-maceous shales were laid down during the Eocene, Miocene and Pliocene ages of the Tertiary period of geologic time in the region now comprising the Temblor Mountains, the San Joaquin Valley and the Sierra Nevadas, a folding and uplifting of these sedimentary layers occurred as a result of tremendous horizontal pressures, causing the formation of the mountains on either side of the valley, and later the Elk Hills and Buena Vista Hills near the foothills of the Temblor Eange.
Geologists term the structural, arch-like, condition resulting from the folding and uplifting of the strata an “anticline,” which has long been considered to be favorable for the accumulation and retention of oil where the stratigraphy of the area indicates the presence of the source, reservoir and cap rock series.
The form and directions of the exposures of the Tulare formation (cap rock series) in the Elk Hills show that the Elk Hills is an anticlinal structure. It could have been determined to be such a structure in 1903 by competent geologists.
The Elk Hills anticline is referred to as a “doubly plunging” anticline, because the exposed layers of the cap or covering series dip in different directions. On the northeast slope of the hills, they dip downward toward the northeast, while on the southwest slope, the same formations dip downward toward the southwest.
39. (a) Prior to January 26, 1903, no known careful geological work was accomplished by any competent geologist which led to the informed conclusion that the Elk Hills was an anticlinal structure. However, the anticlinal nature of the Elk Hills had been observed and, as it turned out, correctly understood by at least two oil operators prior to that date. One of them was Colon F. Whittier, who in 1901 had passed around the hills, although he did not enter them prior to 1903. Whittier was not a geologist but knew that geologists considered anticlinal structures favorably. His recognition *57 of this possible anticlinal structure led him to attempt to persuade others to interest themselves in the area, but he was not able to do so. It was not his intention to cause drilling to be commenced immediately in the Elk Hills at that time, since he felt that if oil did exist there, it would be so deep that it would result in an extremely expensive undertaking. However, although he knew a large number of other operators in the Temblor fields, he was unable to interest any of them in the Elk Hills. His brother, Max Whittier, who was at that time a well-known operator there, was also uninterested. These operators refused to invest in an area which lacked seepages of the type visible in the Temblors and at Kern River. Whittier made no locations in the Elk Hills.
One B. K. Lee, who was also operating in the McKittrick area prior to 1908, became generally familiar with the Elk Hills area at that time and also concluded prior to 1903 that it was an anticline. He saw indications of the formation at the railroad cut separating the western end of the hills from the McKittrick Hills, and, followed it up in a northwest-southeast direction into the hills, approximately 3 miles. However, he did not explore the matter further until around 1909, when he went deeper into the hills up to Section 36 and somewhat beyond, correctly concluding that the anticline extended to such section and as far as he went beyond.
(b) The first known conclusion based on detailed geological work by a competent geologist that the Elk Hills constituted an anticlinal structure was made by Josiah Owen. A map showing the Elk Hills anticline, as well as other data, was made by Owen in connection with the geological work in the McKittrick district which he did for the Southern Pacific Company pursuant to the instructions contained in the letter of September 11, 1902, from E. T. Humble, hereinabove referred to (finding 33). Owen’s work was commenced on February 3,1903, and completed sometime prior to February 28, 1903, since his original handwritten field notes bear that date. The map of the Elk Hills anticline was forwarded to Humble with a typewritten copy of the field notes on March 25, 1903. In these notes, Owen also *58 confirmed Dumble’s conclusion as to the continuity of the oil sands from the oil fields on the eastern side of the valley to the Kern Diver fields on the west side, stating:
There is but one oil horizon in this field [McKit-trick] and below this horizon there are 1500 feet of white slate strata below which the slates are noncon-formable and probably belong to another series of rock.
There are several thousand feet of these slates or shales; they compose the main Diablo range and are tilted up almost vertical and these in turn rest upon sandstone of great thickness which are exposed * * *. * * * Northeast of Temblor the oil horizon rests directly upon these massive sands. In the direction of Midway, I find that the McKittrick fold flattens out in the valley, 'but other hills further on in the same direction would indicate that it may extend to near the Kern Lake. * * * I have traced the outcrop of the oil horizon all the way to Sunset Oil field and find that there is but the one oil sand and I believe it will be possible to trace the same horizon to the Kern Eiver fields. There are several reasons for believing that they all belong to the same zone.
v The ultimate technical conclusion that the Elk Hills structure is anticlinal in nature could have been made with certainty by a competent geologist as of January 26, 1903, only after a period of careful study and after making numerous measurements. The dip of the strata is gentle and averages approximately 5 degrees. It was not immediately or readily ascertainable simply by untrained or casual observation, although some indications of the anticlinal structure of the Elk Hills were readily observable, as they were observed by Whittier and Lee, the visible dipping of the rock strata generally toward the north on the north flank of the hills (although not wholly uniformly), and toward the south on the south side, being the basis for a reasonable early postulation of an anticlinal arch. However, exposures of recognizable strata, or layers of rock, the accurate inclinations of which can be observed, are not common in the Elk Hills. Most of the surface is covered by alluvial deposits and only the top strata of the rock are exposed in a few places. For this reason, careful topographic mapping would be neces *59 sary to demonstrate a consistent anticlinal pattern rather than a heterogeneous hodge-podge of inconsistent formations. Nevertheless, such careful geological investigation could have been made as of January 26,1903, given sufficient time, as it was made by Owen just subsequent thereto, and would have inevitably led a competent geologist as of January 26, 1903, to conclude that the Elk Hills was an anticline.
It was on the basis of Dumble’s and Owen’s work that their employer, the Southern Pacific Company, applied for a patent on the lands described in finding 15, claiming them to be agricultural, and which claim the Supreme Court held to be fraudulent. The land involved was “lieu” land, and not land which the company had to purchase. There was no recommendation by Owen for immediate exploration of such lands, nor was there any such immediate exploration, although his report did lead to their immediate acquisition by Southern Pacific. In 1907, Owen himself participated with others in making locations in the Elk Hills.
(c) As shown in finding 34, in their 1910 publication, geologists Arnold and Johnson also referred to the Elk Hills anticline. Elsewhere in their report, they stated:
The Elk and Buena Vista hills are of very recent origin. The broadly arching anticlines to which they owe their existence have been traced as carefully as time would permit. The low angles of 5° to 10° at which the incoherent sandy and clayey beds dip makes the exact drawing of the axes with reference to the topography difficult, (p. 99)
40. Section 36 lies on the crest or apex of the Elk Hills anticline, a particularly favorable location for oil accumulation and exploration. It is approximately midway between the northwest-southeast extremities of the anticline. Owen’s February 1903 map traces the apex of the anticline through the north part of Section 36. The accuracy of Owen’s map is corroborated by the subsequent tracing of the axis or apex of the Elk Hills anticline by R. W. Pack, a geologist employed by the United States Geological Survey, as shown by Plate II of a report he wrote and which was published in *60 1920 as United States Geological Survey Professional Paper 116, entitled “The Sunset-Midway Oil Field, California.”[12]
However, Section 36 is not in the vicinity of any exposure disclosing to the observer only of surface phenomena on such section that it is at the crest of an anticline. Such a conclusion could have been arrived at with certainty only as a result of careful geologic work tracing the anticline axis, such as was done by Owen and Pack.
41. The anticlinal theory of the accumulation of oil rests upon the hypothesis that, due to the pressure of deep ground water, which is heavier than oil, the oil generated in the source rocks is forced to migrate upward into the reservoir series until it meets an impervious barrier. In addition, the weight of the thick cover of the impervious cap rock series also serves to force the oil, gas, and water out of the capillary spaces in the organic rocks, with the oil then being forced upward by the water into the pores of the more porous sandstones of the reservoir series. When the strata are tilted or inclined, as in an anticline or arch, the oil will then move laterally up into the incline, migrating to as near the top of the structure as it can, considering the effect of the inclined impermeable cap rock series in stopping the upward migration. Thus, the oil becomes trapped, forming a large pool. A doubly plunging anticline like the Elk Hills, the strata sloping downward from the apex in all directions, is considered an exceptionally favorable structure in which oil may be trapped beneath the crest. Sometimes, if gas is *61 present, the gas rises to the very summit of the doubly plunging anticline, witF the oil being just below the gas, and the water being below the oil on the outer flanks of the fold.
The anticlinal theory was well-known and generally accepted by oil geologists long prior to 1903. It had been advanced as early as 1860. Although there had been early doubts and differences of opinion among geologists about the validity of the anticlinal theory of oil accumulation, nevertheless by 1903 it was generally accepted by leading geologists. It was even understood as of January 26, 1903, by many of the better informed oil operators. Many articles on the subject had been published in scientific and trade journals prior to 1903, and California geologists as well as other geologists throughout the United States considered it to be a fundamental principle of oil geology that oil and gas accumulate and are trapped in anticlines. For example, in Volume 27 of the American Geologist published in 1901, Edward W. Claypole, who was then Professor of Geology and Biology at the Polytechnic Institute, Pasadena, California, in an article entitled “Notes on Petroleum in California,” stated that “The accuracy of the anticlinal theory of the accumulation of oil and gas * * * has received abundant confirmation from California. In many of the fields the line of development on the surface clearly coincides with the anticlinal line underground * * *. Where the anticlinal ridges can be traced they are in most cases relied upon as safe guides for extending the investigation.” Similarly, Watts’ aforesaid 1900 publication, entitled “Oil and Gas Yielding Formations of California,” devoted considerable attention to the subject of anticlines and folds and the occurrence of petroleum therein. G. H. Eldridge, a geologist employed by the United States Geological Survey, made an investigation of the California oil fields in 1901 and 1902, the results of which were published in 1903 by the Survey as its Bulletin 213, entitled “The Petroleum Fields of California.” In this bulletin, Eldridge concluded: “From the facts established in the preliminary examination of the oil fields of California it appears — That the productive areas *62 have been in every instance developed in connection with, anticlines, either in proximity to their axes, along their flanks, or about their terminals.”
However, the mere existence of an anticlinal structure does not insure the existence of an oil pool. Such a structure is only one factor, although an important one, which must be considered along with others, such as the existence of the oil shales and the reservoir sands. However, as shown, the existence of these strata throughout the valley had been postulated prior to January 26, 1908, by Watts, Duvall and Dumble. Further, basic to the anticlinal theory is the presence of sufficient water to exert the upward pressure. Barren anticlines may be due to this factor. However, while such a condition is always possible, it would not have been considered as a serious probability in this particular area. Many of the wells drilled prior to 1903 in the San Joaquin Valley fields had struck large quantities of water and the problems caused by the striking of such water was one of the more troublesome ones encountered by the driller of that day. Indeed, it was such striking of large quantities of water in these areas which frequently caused the abandonment of wells.
42. It is not only the existence of the reservoir series that is essential to the creation of an oil pool, but it is also essential that such series be composed of the proper grain of sands so as to give it adequate porosity to act as a suitable reservoir. As Pack pointed out in his above-mentioned 1920 Professional Paper 116:
The lithology of the beds which overlie the diatoma-ceous shales and which now contain the oil in the Sunset-Midway field is, for several reasons, important in a consideration of the occurrence of oil. The porosity of the beds must be great enough to permit them to absorb a very considerable quantity of fluid; the open spaces in the rock — -that is. the “voids” — must be of sufficient size to permit these fluids to move fairly freely through the rock; and finally the porosity of the different beds must be different, for otherwise there would be no particular tendency for the oil to concentrate in certain beds, but rather would it tend to disseminate through all the beds. (P- 78)
*63 He then points out that in the Sunset-Midway field the lithology of the bed is “diverse to the extreme,” ranging from very coarse to very fine, in which there are “many admirable reservoirs in which the oil may collect,” and many places containing impervious clay, so that the productive oil sands are not continuous, “and the field is in consequence somewhat ‘spotted’.” He stated:
The practically barren belt along the northeastern slope of Twenty-five Hill is an example of the control that the lithology exercises over the concentration of petroleum, for * * * the lack of oil here is due to the fact that there are in this area no suitable porous sands in which the oil might collect, and the oil has therefore collected in the immediately adjacent areas, where such sands are plentiful, (p. 79)
He explained that porosity is not dependent upon the size of the grains “but rather upon the shape of the individual grains, the arrangement of the grains, and their regularity in size”; that, while “other things being equal, the coarser-grained beds are the ones that offer the more attractive reservoirs in which the oil, particularly viscous oil, may collect,” nevertheless, “many very fine grained sands are much more porous than coarse-grained sands near by, and these fine sands offer by far the more attractive reservoir for light oils”; and that “the coarse fragments were deposited near the edge of the basin of deposition while the smaller and lighter ones were carried farther out toward the center of the basin.” Specifically with respect to the Elk Hills, he stated:
In considering the possibilities of undeveloped portions of the field a great deal of attention has frequently been given to the size of the grains making up the bed, and certain areas, as, for example, the Elk Hills, have been condemned, for it was believed by many geologists that the sands were too fine grained to permit them to act as reservoirs. It is remarkable, however, just how fine grained some of the producing oil sands really are, and the writer believes that no portion of the whole Sunset-Midway field lacks beds porous enough to make satisfactory reservoirs for the oil. Small areas * * * lack porous beds * * * but no large area seems to be without adequately porous beds. (p. 81)
*64 He then cautioned that “those who have condemned parts of the field because of the lack of coarse-grained sands forget” that “fine-grained beds may be very porous” and that it is more important “to have beds of different porosity than to have coarse-grained beds.”
43. As shown, outcrops of the geological formations comprising the source and reservoir series were exposed in numerous places in the eastern slope of the Temblors opposite the Elk Hills. The angles of the dips of these strata toward the valley ranged from less than 20 degrees, and in some places as little as approximately 10 degrees, in the lower foothills, to 45 degrees or more on the higher slope of the mountains, where the folds had been uplifted sharply. The angles of the dips could have been measured by a geologist as of January 26,1903, and the formations projected into the valley and under the Elk Hills. Of course, such a projection based upon exposures miles away from the Elk Hills would have been hypothetical, based upon assumptions, and therefore speculative. It would have assumed that the exposed series would continue conformably out to the Elk Hills, with sufficient continued thicknesses in the organic and reservoir series to generate and collect oil in sufficient quantities so as to make drilling commercially feasible, and that the formations would continue without interruption by reason of hidden faults or the interposition of unknown strata either above the reservoir series, which could cause such series to be below reachable depths, or below such series, which would interfere with the passage of oil from the source rock to such reservoir series.
On the eastern side of the San Joaquin Valley at the Kern Eiver oil field there were only a few exposures of these strata, but the logs and borings of the many producing wells which had been drilled prior to 1903 would have shown the source and reservoir series to be dipping gently toward the Elk Hills. As shown in finding 36, Duvall noted this in his 1901 article.
Also, from the visible flattening out of the angle of dip of the strata in many places along the Temblor foothills as they entered the valley, a 1903 geologist could reasonably postulate that the strata dipping toward the valley gradually *65 flattened out so that they lay horizontally nnder the valley floor. For instance, as set forth in finding 39 (b), Owen, the field geologist for the Southern Pacific Eailroad Company, reported in February 1903: “In the direction of Midway, I find that the McKittrick fold flattens out in the valley * * The varied and sharper tilts in the Temblors were attributable to the localized geological disturbances which resulted in the formation of these mountains. It would thus be reasonably concluded that in the valley the strata flattened out, as they were seen to flatten out in many places in the Temblors as they entered the valley. Duvall, in his 1901 article, did not take the steep angles of dip in the Temblors as the basis of projecting the depth of the oil sands out into and across the valley, recognizing that the steep angles of the strata in these hills resulted from the localized geological disturbances which caused the uplifting and formation of the mountains. Instead, he made his projections on the basis of the gentle angle of dip (100 feet to the mile) of the oil sands at the Kern Eiver field. Furthermore, as noted, such a geologist coidd reasonably postulate that the underlying reservoir and organic series folded upward in the Elk Hills anticline and that the altitude of the reservoir series would be higher near the center and crest of the anticline, where Section 36 is located. Duvall’s 1901 article also shows that the oil sands in the Temblor fields are at a considerably higher elevation than a projection of their angle of dip at Kern Eiver would put them, if such projection were made at the same angle across the valley westward to the Temblors.
44. (a) Not all proved oil fields bear such favorable visible or surface evidence of underground pool accumulations as obvious anticlinal structures or exposures of such geological formations as organic diatomaceous shales, reservoir shales, and cap series rocks, such as exist in the Temblor foothills. Naturally, the absence of such indicia makes diagnosis of the area as possible oil territory by a competent geologist more difficult. For instance, as Watts noted in his aforesaid 1900 publication, “Oil and Gas Yielding Formations of California”: “There are very few rock-exposures in the Kern Eiver oil-field.” However, he did note significant rock exposures in this field at certain locations on the bank *66 of the Kern Eiver where “strata of sandstone, somewhat impregnated with petroleum, dip to the west of south at an angle of less than 10°.” (p. 113) These were the reservoir rock series. There were no exposures of the organic series diatomaceous shales in this field as there were in the Temblors. Watts also noted the difficulty of estimating “the precise direction of the dip of the oil-sand, even when the depth at which the oil-sand was struck has been given.” One reason for the difficulty was that “the angle of the dip is so slight that it is necessary to use the records of wells which are far apart for the purposes of calculation.” (p. 113)
However, despite this rich oil field’s lack of an obvious anticlinal structure, Watts was able, by collating “the well records kindly furnished * * * by the well owners in this oilfield”, to calculate the strikes and dips of the oil sands.
The history of this field shows its development resulted from successful initial explorations in 1899 made near the surface outcrop of oil sand at a certain location and the consequent gradual extension of drilling from such outcrop.
Actually, the Kern River field is not anticlinal in structure. Instead, it is referred to as a gentle monocline, the inclination of the rocks being in one direction only. The record does not indicate that it was definitely regarded as an anticline by any competent geologist as of January 26,1903, although there was some speculation at the time that the field might be anticlinal in nature.
(b) In his aforesaid 1900 publication, under the heading “The San Joaquin Yalley — Geological Sketch,” Watts made certain, comparisons between the eastern and western sides of the valley, pointing out, as did Duvall in his 1901 article, the more violent disturbances of the formations, and their consequent steep angles, on the west side. From the fact that a inch oil field was found in an area of such slight disturbance, as at Kern River, he assumed that similar good fields would be found in other areas of moderate inclination, thus in effect rejecting the popular theory subscribed to by many of the laymen operators that preferably oil was to be looked for in steep folds, such as in the Temblors. He noted that as between the west side and the east side of the *67 valley, “the place to look for such conditions [of little disturbance to the oil-yielding rocks] is on the east side of the San Joaquin Valley.” (pp. 108-109) As noted, although the Elk Hills area is on the west side of the valley, it too is only gently inclined. Watts’ discussion with respect thereto, which also included references to the importance of con-formability between the reservoir and source rock series, referred to in finding 37(a), is as follows:
* * * The productive oil-fields that have been developed in this region are in the foothills of the Coast Eanges and the lowermost foothills of the Sierras at the southern extremity of the San Joaquin Valley.
The formations to which the oil-yielding rocks of the San Joaquin Valley belong are the Eocene * * * and the Neocene; the latter formation having been deposited during an era which embraced the Miocene and Pliocene periods. Of recent years, geologists have decided that it is best to include the Miocene and Pliocene formations of California under the head of Neocene, and to divide the Neocene formations into the Upper, Middle, and Lower Neocene. The Eocene rocks are for the most part rather hard sandstones and dark-colored shales, with some strata of hard limestone. The sandstone is characterized by numerous concretions. * * * The only place in the Central Valley where valuable oil-measures have been developed in this formation is at Oil City, near Coalinga, on the western side of the San Joaquin Valley in Fresno County. * * *
The Lower Neocene formations consist of a series of sandstones and shales * * *. The exposed rocks are usually bleached, and they are sometimes found to be either white or whitish for a considerable depth below the surface. * * * These shales are interbedded with numerous strata of chert and cherty limestone. They also contain a few strata of sandstone and diatomaceous earth. The sandstones are usually more or less impregnated with petroleum. In many places springs of heavy, tar-like bitumen issue from these shales, forming beds of impure asphaltum. Wells sunk in this formation in most instances yield a heavy, tar-like oil * * *. There is little doubt that the Lower Neocene rocks rest non-conformably on the Eocene formations, for we find them resting on different material in different portions of the Coast Ranges. In most cases, however, they rest on the Eocene rocks, and very frequently it is difficult to detect any absolute non-oonformability between the *68 Lower Neocene and the Eocene rocks at their points of contact. In some places, as at the Sunset oil-wells in Kern County, the whitish shales show a thickness of several thousand feet. In the San Joaquin Valley these shales form a conspicuous feature in the scenery throughout a large portion of the foothills of the Coast Eanges. * * ❖
Nesting with apparent nonconformability on the colored shales are the Middle Neocene formations, in which are the most important oil-measures yet developed in the San Joaquin Valley. These are composed of a series of comparatively soft sandstones, bluish shales, and clay strata. * * *
On the eastern side of the San Joaquin Valley, the Neocene rocks differ somewhat in character from those forming the foothills of the Coast Eanges. The sandstones are interbedded with clay, and are made up largely of granitic material; volcanic ejectamenta appear also to have contributed to their composition.
* * * Throughout the greater portion of the San Joaquin Valley, the Neocene formations are covered with alluvium. These formations are evidently many thousands of feet thick, but the rocks are so covered with alluvium that it is difficult to determine the extent to which faults may have increased the apparent thickness.
* * * The question of conformability and noncon-formability between the Eocene and Neocene formations is very important. If the Neocene formations rested conformably on the Eocene, the oil-prospector would know that there might be a good chance of finding oil in the formations immediately underlying the Lower Neocene rocks, even though the Eocene rocks did not crop out at the surface.
The Neocene formations on the eastern side of the valley are much less disturbed than those on the western side. On the eastern side they are usually inclined at a very slight angle, generally less than 15°, while on the western side the inclination is seldom less than 20°, and sometimes as high as 10°. The reason of this is that the earth-movement which so greatly disturbed the rocks of the Coast Eanges at the close of the Neocene period, affected but slightly the Neocene formations in the foothills of the Sierras. The development of the remunerative oil-field at Kern Eiver, on the eastern side of the San Joaquin Valley, where the formations are so slightly disturbed, warrants the assumption that other localities may be found where oil-yielding rocks which *69 have been subjected to but very little disturbance form a wide and extensive oil-line. The place to look for such conditions is on the east side of the San Joaquin Valley. As previously stated, a great drawback to prospecting in the lowermost foothills of the San Joaquin Valley is alluvium, which to a great extent covers the Neocene formations.* * * (pp. 106-109)
In his next chapter, Watts noted that “During the past two years there has been great development in the oil-yielding formations of Kern County, on both the eastern and western sides of the San Joaquin Valley,” and that “On the western side numerous productive wells have been drilled in the Sunset oil-district and the McKittrick district,” that “On the eastern side of the valley an extensive and promising oilfield has been developed in the Kern Kiver district” (p. 109), that “the geological formations in the foothills of the Sierras at Kern River are of similar age to the rocks forming the first bench of foothills of the Coast Ranges at Mud Creek, on the western side of the San Joaquin Valley,” and finally, that “it is not surprising that evidences of petroleum should be found in the outcropping rocks of both localities, and that th8 discoveries of petroleum at Sunset and McKittrick were a prelude to the development of the Kern River oil-field.” (p.110)
45. As of 1903, the fields in the Temblors were generally in areas characterized by seeps, outcrops of oil sands, faulting and sharp anticlines. At Sunset, as noted by Watts in his 1900 publication, “Numerous seepages of heavy petroleum exude from these [Lower Neocene (Miocene) ] shales, forming beds of asphaltum, which, in some places, before these deposits were mined * * * extended over an area of several acres.” (p. 121) At McKittrick, as noted by Watts in the same publication:
The formation penetrated by the productive wells in the McKittrick district is that portion of the Middle Neocene formation which immediately overlies the light-colored silicious shales. The oil-yielding strata are inclined at a very great angle, which makes the oil-line a narrow one. * * *
Following the strike of the formation in a northwest direction * * * the character of the debris cover *70 ing the hills and occasional outcropping ledges of rock, evidence the proximity of the sandstone and diatoma-ceous rocks. The sandstones are frequently oil-soaked, and seepages of maltha may be seen in nearly every cañón. These features warrant the conclusion that the source of the oil and maltha is at or near the contact of the sandstone [the reservoir series] and the diatoma-ceous rocks [the organic series], (p. 127)
At Midway, between these two older fields, the shales also outcropped.
As distinguished from these fields, the Elk Hills are a moderate anticline with dips under 10 degrees. As noted by Pack in his aforesaid Professional Paper, the Elk Hills anticline is “broad and low, the beds rarely being tilted more than 5° or 6° on either flank,” with no large faults apparent. Exclusive of the “Lamont seep,” it is without seeps and there is no outcropping of oil sands. Thus, the Elk Hills did not in a great many respects resemble, in outward physical appearance, the Temblor oil fields which were proved in 1903. Other areas in the mountain foothills in the eastern parts of Kern County resembled, in their outward appearance, the proved fields as of that date more than did the Elk Hills.
Watts, in his said 1900 publication, pointed out the desirability of having petroleum seepages “at or near the locality in which prospect wells are to be drilled,” stating:
A review of. the oil-fields in the Coast Eanges leads to the conclusion that the most favorable locality in which to drill “prospect wells” is one wherein a definite stratum of oil-sand has been discovered in a formation belonging to a geological horizon known to include productive oil-measures in other places; preferably there should be seepages of liquid petroleum at or near the locality in which prospect wells are to be drilled, and the angle at which the oil-sand dips should not be more than 50° nor less than 10°. * * * in a general way, the oil-lines, or lines along which remunerative wells may be found, follow the strike of the axes of folds in the rocks, or the course of faults which have isolated blocks of strata inclosing the oil-yielding rocks. It is evident that the oil-yielding formations * * * show great geological disturbance, and the complex structure resulting therefrom gives rise to somewhat difficult geological *71 problems. It follows that the tracing of oil-lines in this State, and the development of oil-fields, necessitate a competent knowledge of structural geology, without which the risks of oil-mining are greatly increased. (pp. 200-201)
46. (a) From a study of the exposures and dips of the cap, reservoir, and source series along the Temblors opposite Elk Hills, a competent 1903 geologist could, on the assumption of the continuation of these series to and under the Elk Hills, reasonably conclude, on the basis of various theories, that the oil-bearing reservoir series could be reached at depths of somewhere between 2,000 and 4,000 feet beneath the surface.
Oil wells had been drilled in California prior to January 26,1903, to depths of more than 2,500 feet and approximately 3,000 feet was then considered a possible depth. Thus, the estimated depth of the oil-bearing series was within the capabilities of the cable tool method of drilling used in California in 1903 at least to the extent of approximately 3,000 feet.
As shown by Watts (finding 45), experience prior to 1903 in the San Joaquin Valley oil fields indicated that the oil was found “at or near the contact of” the source and reservoir beds. Arnold and Johnson also so stated in their above-mentioned 1910 “Preliminary Report”:
The McKittrick formation is the principal oil reservoir of the developed fields of the McKittrick-Sunset region, its basal conglomerates and sand yielding practically all of the product of the McKittrick, Midway, and Sunset fields. The oil is believed to originate in the Monterey and Santa Margarita (?) formations, and at least part of it to migrate across the line of un-conformity between these and the overlying porous beds of the McKittrick. In these fields the zone of impregnation varies in thickness from 200 to 1,000 feet or more above the base, most of the commercially productive sands lying within the lower 200 feet. Besides the evidences of petroleum found in the McKittrick in the developed fields, the group offers indications of oil in the * * * Buena Vista Hills, and the region east of the developed Sunset fields. It is upon such evidence that the conclusions are based that productive wells will *72 be obtained in the McKittrick formation in areas other than those already developed.
A study of the thickness and structure of the Mc-Kittrick is necessary before proper predictions can be made concerning the probabilities of the occurrence of and depth to oil-bearing beds at the base of this group of rocks, (pp. 89-90)
Cracks or faults in the reservoir series would enable the oil to move up to higher levels in the series. However, ordinarily the driller in the Temblor region expected to find the oil at approximately 200-300 feet above the contact between the reservoir series and the Monterey shales, although, as Watts points out, the oil in some places was known to rise 1,000 feet or more in the reservoir series. However, if the relatively conservative 300-foot figure were taken as the basis for calculation, the depth of the top of the source rock where it contacted the reservoir rock would normally control the ability to reach the oil in the 300-foot zone above the top of the source rock.
Watts further noted:
The formations most extensively exposed in the Mc-Kittrick district are light-colored silicious shales [i.e., the organic series] similar to those in the Sunset district. * * * The dip of the exposed rocks at McKit-trick is about N. 30° E., and in many places the rocks stand at a very high angle, 60° or more. The strike of the formation corresponds to that of the oil-line, which is about N. 60° W. (pp. 126-127)
If the 60-degree angle of dip in the Monterey shales exposed in the Temblors at certain places continued without change until it came to the Elk Hills, it would be approximately 5-6 miles deep under the Elk Hills. If it continued at a 40-degree rate, it would be 3.3 miles below the surface at a distance of 4 miles to the east of McKittrick, which would be at the extreme western end of the Elk Hills. Such depths would put the oil zone far out of reach of the drill.
However, competent geologists could, on the basis of the considerations and theories set forth below, reasonably put the reachable depths of the oil under Section 36 within the 2,000-4,000-foot area above-mentioned.
*73 (b) At Section 22, T. 32 S., R. 23 E., which is at the foot of the Temblor Range as it flattens out into the Midway Valley, there are good exposures of the reservoir and source series. The exposed portions of the formations overlying the diatomaceous shales at this point, i.e., the reservoir and cap series, collectively referred to as the McKittrick, would be the basis for a calculation that, without the complete erosion that occurred at such point and which exposed the source series, the overlying McKittrick would be approximately 1,400-1,600 feet thick. This calculation would be derived from (1) a cross section of the last exposed strata before reaching the valley alluvium, and (2) a projection to the surface exposures across Section 22. The assumption would be made that all the formations flatten out in the valley, the dip gradually lessening until they become horizontal in the heart of the valley. (The area between the Temblors and the Buena Vista Hills is referred to as a “syncline,” which is a structure between the crests of two folds, the flanks of the anticlines also constituting the flanks of the adjoining syncline.) Thus, the formations would not continue to plunge down into the valley at the same angle as they dip into the valley at Section 22. (The 30-degree dip at this point, if so projected, would carry the shales to a depth of approximately 24,000 feet under the Elk Hills.) The formations would then rise again in the Buena Vista anticline, partaking in the same earth movement as the cap rock, then flatten out again in the Buena Vista Valley, and then rise again in the Elk Hills anticline. The center of Section 36 in the Elk Hills is approximately 10% miles from the center of said Section 22. However, it would also be assumed that the various strata would progressively thicken in the valley, where the former sea basin was deepest, and the period of deposition was the longest. A reasonable assumption would be that the overlying beds thickened to the extent of approximately 3,000 feet, which, added to the 1,400 feet at the last exposure in the aforementioned Section 22 point in the Temblors, would give a thickness of approximately 4,400 feet of strata overlying the source series at Section 36 in the Elk Hills. However, an anticline like the Elk Hills would, especially at its crest *74 where Section 36 is located, be subject to erosion throughout the ages, occurring after its original uplift. A reasonable estimate of the extent of such erosion as of 1903 would be approximately 800-1,000 feet. Subtracting this amount from the total 4,400 figure, results in a depth to the source series at Section 36 of approximately 3,400 feet. The oil would be expected to be reached at approximately 300 feet above in the reservoir series, or at approximately 3,000 feet from the surface of Section 36, or even higher if cracks or faults would cause the oil to become more greatly elevated in the reservoir series, or if the pressures or the porosity of the sands were such as to cause it to rise higher in such series. As shown, in some cases oil had been found in the reservoir series in California as high as 1,000 feet or more above the contact between the origin and reservoir series.
A variation of this theory, which would reduce or even eliminate the bed thickening factor, would place the top of the source series at an even higher level. There was evidence that the waters of the former marine basin were not of great depth. A shallow sea would thus not produce greatly thickened beds. Arnold and Johnson, as shown in finding 34, postulated “the thickness of the McXittrick formation to be about the same in the hills as it is in the Midway and McXittrick districts — that is, between 1,500 and 2,000 feet,” and then further postulated that “it seems probable that at the axis of the Elk Hills anticline the oil-bearing zone is from 900 to 1,400 feet below the surface.” This calculation would thus assume a 600-foot rise of the oil in the reservoir bed. While this statement was made in a 1910 publication and with the benefit of the exploratory work accomplished subsequent to 1903, including a gas strike in the Buena Yista Hills, insofar as it was based upon the thickness of the McXittrick formation and the anticline theory, it could also have been postulated in 1903.
(c) At points in Sections 27 and 28 of T. 30 S., X. 22 E., in the McXittrick field, which are approximately 8 miles west of Section 36, there are outcroppings of the reservoir series. A computation of the dip of this series at these places, and the projection of such dip to Section 36, considering the attitude of the exposures in the entire inter- *75 yening area, would result in the conclusion that the series would be struck at from 2,000-4,000 feet under the Elk Hills. The considerable leeway in this estimate is due to possible variations in the thickness of the cap series and the alluvium covering such series. It also makes allowances for the attitudes or positions of the reservoir series under Section 36, since the anticline of the underlying strata is not necessarily conformable to the anticline of the cap rock, it being possible for the apex of the reservoir series to be a short distance off in one direction or another from the apex of the cap series. Generally, however, the theory is based upon the cap series and the alluvium being approximately 2,000 feet thick at Section 36, and then encountering the reservoir series. This calculation does not consider the exact thickness of the reservoir series under the hills or where the oil would be found in it, although it generally presupposes a thickening of the reservoir series to 2,000-3,000 feet in the heart of the basin from the above-mentioned places at McKittrick where it is approximately 200 feet thick, and then finding the oil in such series after penetrating it approximately 1,000-2,000 feet. Here again the theory presupposes that the source rock generally follows the contour of the topography, as do the other series. Furthermore, since the cap and reservoir series are generally conformable, it could be reasonably concluded that the reservoir series followed the folding of the cap series across the valley.
(d) Distinctive reef beds of marly cemented limestone in the cap rock series visibly outcrop at McKittrick, at Midway in the Temblors, in Elk Hills, and in the Buena Vista Hills. At some places they are extensive. For instance, they visibly extend for miles along the north side of the Elk Hills. A lithological study of these beds and the adjacent strata would reasonably lead to the conclusion that the beds, referred to as “key” beds or horizons, constitute one geological horizon. They bear a great similarity in appearance and composition. Calculating the thickness of strata by measuring from horizons that can be correlated is a standard geological technique. At Midway, the highest key beds are approximately 2,000 feet above the base of the cap series, or the top of the reservoir series. At the Elk Hills, there is such a *76 bed at their crest which corresponds with the highest at Midway. Thus, a projection and correlation of this Elk Hills bed to its corresponding Midway bed would put the bed approximately 2,000 feet above the top of the reservoir series. Since Section 36 is approximately at the crest of the Elk Hills, the same conclusion would be reached that the distance from the surface of Section 36 to the bottom of the cap rock (or the top of the reservoir series) would be approximately 2,000 feet. The theory would then presuppose the finding of oil somewhere in such series at reachable depth.
(e) Other observable and actually observed factors as of January 26,1903, would tend to buttress the conclusion from these theoretical calculations that the oil in the Elk Hills was present at reachable depths. The surface manifestations of the gas blowout in the adjacent Buena Yista Hills and the so-called Lamont seep in the Elk Hills themselves would be considered as some evidence that, if caused by the presence of oil underneath the area, the oil could not be too deep. Excessively deep oil pools would naturally be less likely to give surface indications of their presence. As Arnold and Johnson stated, “These occurrences [oxidized asphalt deposits in the Buena Yista Hills] strengthen the belief that commercial deposits of petroleum underlie the [Buena Yista] hills” (finding 34.) Even the small indications of gas encountered in the shallow Hoy well would be some additional favorable evidence. Furthermore, seeps were present and oil was found in the McKittrick Hills or Front, which is separated from the Elk Hills only by the railroad cut. These hills were considered as a continuation of the Elk Hills anti-clinal structure. Owen’s 1903 sketch tracing the anticline so indicated. The seeps and reachable oil in such nearby structure would lend support to the view that the oil was similarly reachable in the continuing Elk Hills anticlinal structure.
47. (a) The mere presence of the source and reservoir series in an area is not sufficient to cause an oil pool. These series must be in contact so that the oil can flow from the one into the other. Thus, the conclusions set forth in finding 46 as to the possible depths at which the oil pool could be *77 reacted in Section 36 presuppose that these series are in contact in Section 36, as they are from the projecting points in the Temblors. Formations intervening between them might interfere with the migration of the oil from the source series and upset the conditions prerequisite to satisfactory oil accumulation, as well as interfere with the anticlinal nature of the underlying strata, despite the appearance of an anticline in the cap rock series. Similarly, a formation intervening between the cap and reservoir series would affect the calculations set forth in finding 46 as to the prospective depth of the oil pool.
While a competent geologist would recognize the possibility of such intervening formations, nevertheless he could reasonably proceed on the assumption that there would be none of such extent under the Elk Hills as would seriously interfere with the migration of the oil or the aforesaid depth calculations. The exposures visible in the Temblors show the various series in contact, and even though such exposures are miles away, they are still sufficiently close from a geological point of view that the inference could reasonably be made that they continue in contact into the valley and under the hills. As shown, the entire area at one time formed a common sea basin and generally the same conditions of strata deposition could be reasonably assumed to exist throughout the basin. Furthermore, the transitions between the source and reservoir beds are not sharp or distinct. The reservoir beds are generally intrastratified with the upper layers of the source beds, showing a gradual change in the character of the sediments, due either to the water gradually becoming shallower or the land gradually becoming uplifted. The acceptance of the gradual change theory would make the possibility of a massive intervening formation remote. In addition, it would not be expected that any such intervening formation would be of such spread over such a large area as to act as an effective seal between the source and reservoir series throughout the entire anticlinal structure. Lateral and vertical migration under pressure would still cause the oil to circumvent localized barriers, or to penetrate such barrier through cracks or faults.
*78 (b) As subsequent drilling in the Elk Hills showed, the fears of those geologists who would postulate the possibility of intervening formations would have turned out to be justified. A well drilled by Standard Oil in 1928 in Section 31, T. 30 S., E. 25 E., which is near the eastern end of the Elk Hills, in which oil was struck at a depth of 3,300 feet, went down 8,300 feet before it struck the Monterey shale, and in so doing, passed through a stratum of nonorganic, impervious, hard blue shale approximately 2,600 feet thick intervening between the Monterey shale and the Etchegoin (reservoir series). Overlying this dense mass is approximately 3,000 feet of a less compact and less impervious blue shale interspersed with sand lenses and which is part of the Etchegoin. A well drilled in Section 14, T. 30 S., E. 22 E., on the western end of the hills also showed blue shale at approximately 4,200 feet. Similarly, when Standard Oil drilled successful wells in Section 36 in 1919 and thereafter, it struck oil at a point approximately 2,600 feet above the Monterey shales, which are separated from the oil pool by approximately 2,600 feet of this same dense blue clay shale. Thus, it was discovered that the oil that was found there at about 2,000-2,500 feet from the surface did not lie in juxtaposition to the same dia-tomaceous shale Monterey series as was present in the Temblors. Since the oil was found in the part of the reservoir series sometimes called the Etchegoin, and the Monterey ¿hales are so far below, the situation has given rise to speculation as to the source of the oil in the Elk Hills, inasmuch as the blue shale is barren of oil. It has consequently been theorized that in these parts of the Elk Hills, the reservoir series itself acts as a source rock and is the source of the oil, which is a distinct possibility, since diatoms are also found in its various layers, especially the Etchegoin. However, geologists in 1903 did not generally consider that the reservoir series, or any part of it, was a source rock, although the Etchegoin part of such series is now believed to be capable of constituting such a rock.
The Monterey shales under Section 36 lie at about 5,000 feet from the surface, a much greater depth than the 2,000-2,500 feet at which the oil was obtained. Thus, these shales *79 actually turned out to be at a depth under Section 36 which was not possible to reach with the cable tool methods employed in California as of January 26,1903.
It has also been speculated that the source of the oil under Section 36 is actually the deep Monterey shales, as it was in 1903 and still is generally considered to be such source throughout California, and that in some way the oil from the Monterey shales under Section 36 migrates through or around the blue shale and into the Etchegoin. Faults do exist in the Elk Hills. The extent or continuity of these strata of blue shale in the Elk Hills is unknown. These shales have not been shown to exist in every well that has been drilled in the Elk Hills. They have not been found in the Buena Vista Hills. It could well be that they do not exist in continuous blanket form under the Elk Hills and that, in the places where they do exist, the oil is forced around them and up into the Etchegoin.
(c) The existence of the particular blue shales which were ultimately discovered in certain parts of the Elk Hills could not reasonably have been postulated in 1903. There was nothing in the Temblor or Kern Fiver oil districts to indicate such an intervening formation. The closest area in which a possibly similar shale formation was then known was in the Kettleman Hills, where there were some outcrops. These were approximately 50 miles away to the north, a distance too great for a reasonable geological projection of this particular character to be made, considering the different nature of the areas involved. However, the general possibility of intervening formations was one that competent geologists of 1903 would have been obliged to take into consideration, since such a possibility is a recognized hazard in this industry. Nevertheless, the lack of any indication of this particular type of formation in any area of reasonable proximity to the Elk Hills and forming part of the valley basin, would justifiably have led a competent geologist to conclude that the possibility of its existence was remote. Neither Durable, Owen, Watts, nor Arnold and Johnson, indicated the possibility of such a massive intervening formation in this part of the San Joaquin Valley.
*80 48. In addition to Duvall’s technical article entitled “The Oil Fields of Kern Co.” published in the National Oil Reporter on December 6, 1901, pertinent portions of which are hereinabove set forth (finding 36), there were other reports, technical articles and news items in oil trade journals, newspapers, and other publications published in and prior to 1903 generally pointing to the San Joaquin Valley area in which the Elk Hills are located as being potential oil land. However, these publications painted with a broad brush. None of them reported upon or mentioned the Elk Hills locality specifically. Nevertheless, these publications, which were of general circulation, do indicate knowledge by at least some part of the public interested in such matters in 1901-1903 of certain basic facts, such as that diatomaceous shales were considered to be the source of oil in southern California and that anticlines were an important factor in locating oil fields. They also indicate that some persons believed in 1903 and prior thereto that the oil-bearing strata which were evident in the outcrops on the eastern and western rims of the San Joaquin Valley flatten out toward the valley and continue under it from McKittrick to Kern River. For instance, the February 7, 1903, issue of the Pacific Oil Reporter, a trade journal, published a map showing all of T. 30 S., R. 23 E. as being included in “a great oil belt” running from the Coalinga District to the Sunset District. A note under the map stated:
The above map shows the great oil belt running from Sunset District in the southeast to the Coalinga field on the northwest. This belt extends through the counties of Kern, Kings and Fresno, and includes the oil fields of Sunset, Midway, McKittrick, Temblor, Devil’s Den, Kregenhagen and Coalinga. The oil belt is included in the two lines running through the map. The limits of the oil belt, as designated in the above, were located by one of the most conservative and capable oil experts in the United States, and the developments in the belt thus far have proved the general correctness of his judgment. At no far distant day this entire region will be producing oil, the most of which will be a light oil of superior quality.
There was no indication of who the maker of the map was or who was the expert referred to in the note.
*81 In the February 16,1902, issue of the Los Angeles Sunday Times, there was also published an article entitled “Geology and Geography of Kern County and Adjacent Oil Fields,” written by one F. C. Grimes, a geologist, together with a “sketch map,” in which Grimes, after delineating the developed oil fields, included the Elk Hills area within a large territory designated as “Probable Oil Fields,” without, however, specifically labeling or particularizing such hills by any name. The article set forth the San Joaquin Valley marine basin theory, including the forming of the oil shales and reservoir sands, and refers to oil formations in earth folds. It stated the possibility of “an immense belt of more or less regularity” extending from Sunset and “possibly following near the ancient shore line clear to Coalinga.” The author stated that there is “not one solid prolific field,” and that “even where oil exists it may be beyond the practical reach of the drill, or the stratum of oil bearing sand may be too thin, or the sands, though thick and of great depth, may not be rich enough to make the exploiting of oil profitable.” Nevertheless he went on to say, “But I am persuaded, however, that oil in profitable quantities exists quite within reach of the drill under a vast acreage of this land, where most people today consider the chances of success not worthy of the effort. However, in some localities the dip of the oil-bearing stratum is such as to preclude reaching it with a drill.” He stated that seepages on large folds are sometimes underlain by barren “intrusions” shoved up by the earth pressures, that sometimes drilling through the seepage resulted in striking the intrusion and obtaining no oil, and that the operators then “immediately condemned the territory, or said that the oil belt was exceedingly narrow.” In such instances, he stated, good results might well have been obtained if drilling was accomplished “farther from the fracture.”
However, none of these publications influenced any of the then responsible, practical oil men to drill in the Elk Hills, the great majority of such oil men at that time not considering such area to be likely oil territory insofar as profitable investment under the then existing conditions was concerned.
*82 49. (a) In 1899 a petition to the Secretary of the Interior and the Commissioner of the General Land Office was signed by a number of residents of the lower San Joaquin Valley, including corporations and persons of various occupations, requesting the withdrawal of large areas of land in southern California, including T. 30 S., R. 23 E., from agricultural entry. The petition, known as the Miners’ Petition of 1899, states that the persons executing it were greatly interested in the development of the petroleum industry in Kern County and other counties in southern California, refers to “tar springs” and “asphaltum beds” in the region, and states that the “greater portions of said lands are essentially mineral in character” and were considered to be more valuable for minerals than for agriculture. The petition complained that the surveys that had been made of the lands falsely returned them as agricultural lands despite the “indications of petroleum” existing “in very many places throughout the territory described” and the actual drilling of wells in certain places “which are now producing petroleum in paying quantities.” The petition further stated that the “petitioners have not yet had an opportunity to develop and demonstrate the value of much of their lands for petroleum purposes, as the development of such lands and the drilling of wells from which petroleum can be obtained in paying quantities, in many places, involves the expenditure of large sums of money and requires many months of labor, the cost of the successful wells in some instances amounting to as high as $25,000, and some of the wells being drilled to a depth of 1500 to 2500 feet.” The petition concluded with the request that the lands described “be withdrawn from entry as agricultural lands, and that a re-survey or reexamination of said lands be had, and that the lands essentially mineral in character be segregated from the agricultural lands, if any, within said territory, and returned to the Department and classed as mineral lands * * *.”
(b) As a result of this petition, the Commissioner of the General Land Office, by telegram, directed the Register and Receiver at Visalia, California, on February 28, 1900, to “suspend from disposition until further orders” many of the townships named in the petition, including T. 30 S., R. *83 23 E. At this time, Section 36 had not as yet been officially surveyed.
50. On December 2,1901, the official survey of the southern half of T. 30 S., R. 23 E., in which Section 36 is located, was begun by one James M. Duee (later known as “Dewey”) pursuant to contract dated September 30,1901, between bim and the Surveyor General. Generally, the surveyor was required to ran the four enclosing lines of each square mile section, thus in effect creating the section. He was also required to report the character of the land, as to whether it was mineral or nonmineral. The survey was completed December 20,1901, Surveyor Duee returning as mineral all the lands in the township covered by his survey. In his “Field Notes” Duee stated, under the heading “General Description”:
All that portion of township 30 South, Range 23 East, Mount Diablo Meridian, included in this contract, is mountainous and the soil is similar throughout, being of a sandy nature, with occasionally some fine gravel, and in my judgment should be termed second-class land.
There is no timber, and the underbrush consists of low sage-brush.
There are no springs or running water in the township.
There are no settlers on any of this land, but it has been used for many years as sheep pasture.
This township is situated within what is known as the Midway Mineral District, which is the name given to a district within which many successful oil wells have been developed. To the north-west is what is known as the McKittrick District, the center of which is about Sec. 18, T. 30 S., R. 22 E. To the south-east is what is known as the Sunset District, the center of which is about sec. 7, T. 11 N., R. 23 W., and the Midway District, is on the line of oil developments between the two.
The surface of the ground in T. 30 S., R. 23 E., from the south-east comer running northwesterly shows a geological formation, with asphaltum exudations, that is regarded by experts as an almost sure indication of the presence of valuable petroleum deposits.
The land I have surveyed being more valuable for mineral than for agricultural purposes, I return the following sections as mineral land: S.E. % and W. % of Sec. 14, all of secs. 15 and 16; E. y2 and S.W. % of sec. *84 17; S.W. % and E. % of sec. 19, all of secs. 20-21-22-23-24r-25-26-27, 28 & 29; E. y2 and N.W. % of Sec. 30; N.W. % and E. y2 of sec. 32 and all of secs. 33-34r-35 and 36.
* * * * *
Dnee’s reference to asphaltum exudations existing in the township was erroneous. He saw none, and none existed. Attached to the report of survey was a list of nine mining claims located on Section 36, consisting of four claims of the Wagont Company, four claims by the Rajah Company, and one claim by the Rustler Company, all hereinabove referred to (finding 24). The survey was examined for accuracy in September 1902 and in his report of November 8, 1902, the Examiner of Surveys recommended that it be accepted. The official plat of survey was approved and accepted by the Commissioner of the General Land Office on January 26,1903. At this time, the suspension resulting from the Miners’ Petition was still in effect. Under the administrative practice and procedure of the Department of the Interior in mineral cases, the official acceptance of the survey, which returned Section 36 as mineral, was considered as a caveat or notice to prospective purchasers from the State that the State did not acquire title to the land under the 1853 School Land Grant Act, unless the presumption created by the mineral return was overthrown by evidence submitted in an appropriate proceeding. Although treated as a prima facie classification, it was recognized that the mineral returns were not always accurate. Consequently, the return itself would not prohibit title passing to the State. If the return was subsequently shown to be inaccurate, it would, in this respect, be disregarded.
51. Because of the reported mineral character of Section 36, as indicated by Duee’s mineral return, the State of California, acting through its Surveyor General, signed an application on January 3, 1903, offering “Mineral Sec. 36, T. 30 S., R. 23 E.” as base land for the selection of an equivalent number of acres of public land in lieu thereof, as permitted by section 7 of the Act of March 3, 1853 *85 (10 Stat. 247) .[18] The application was filed with, the Register at the local land office at Redding, California, on January 4,1903, and accepted by the Register March 7,1903. The State attempted to amend this application on August 15, 1905, by substituting other school land as base land for the same indemnity or lieu selection. On August 24, 1908, one Hay applied to the State for a certificate of purchase for the west half and the west half of the east half of Section 36 at $1.25 per acre and Buffington made application for such a certificate for the remainder of the section at the same price. On January 5, 1909, the State issued a certificate of purchase to Hay for the land covered by his application at said price, and, as set forth in finding 3, on February 8,1909, the State issued such a certificate to Buffington for the land covered by his application, also at said price. In the meantime, the State’s application of January 3, 1903, submitting Section 36, T. 30 S., R. 23 E., as base land for a lieu land selection remained on file in the local land office until December 18, 1909, despite the State’s amendatory application of 1905 substituting other base lands for Section 36. On December 18, 1909, said original 1903 application was formally canceled because of the conflicting applications by the State involving the same lieu selections.
On November 29, 1909, Hay assigned his certificate of purchase to one Oscar Sutro, an attorney for the Standard Oil Company, and also gave Sutro a quitclaim deed of his interests in Section 36. On January 31, 1910, the State issued a patent to Sutro covering said lands and on March 21, 1910, Sutro deeded the land to the company. Thus, the company became the claimant to said portion of the section.
As set forth in finding 3, on January 25, 1910, Buffington conveyed certain of his interests to Carman, after which Car-man and Fairbank, as purported owners in fee, leased the lands to Standard Oil on May 5, 1919. Thus, Carman, Fairbank, and the company became the claimants to such *86 portion of the section in the above-mentioned proceedings in the Department of the Interior.[14]
52. In December 1903, the Commissioner of the General Land Office directed one of his special agents, E. C. Eyan, to examine the lands covered by the withdrawals ordered on February 28, 1900, including T. 30 S., E. 23 E., and to report whether their suspension from disposition should be continued. Eyan, who had no geological or oil-mining experience, submitted reports on January 22 and March 22, 1904, recommending the restoration of some of the lands to entry, including T. 30 S., E. 23 E., principally upon the ground that no oil wells had been drilled on such lands. Eyan examined the lands in question, obtained opinions of oil operators, and investigated the extent of any oil-drilling operations. Some lands in which wells were actually drilled but abandoned or only a small amount of oil produced were also recommended by him to be lifted from the suspension, since the lands did not appear to him to be productive territory. Parts of the township, not including Section 36, were relieved from suspension “from disposition under the agricultural land laws” on February 11 and February 20, 1904, and the remainder of the township, including Section 36, was relieved from suspension on April 5,1904. The Acting Commissioner stated that the special agent reported “that certain of the lands so suspended are being developed for their deposits of mineral and that numerous oil wells have been sunk which have proved to be good producers of mineral. Other townships and portions of townships have not been developed at all or wells that have been sunk have proved to be barren. The lands upon which he states active mineral development is in progress will be allowed to continue suspended but as to the following tracts where no mineral has been discovered it is believed that no good reason exists for further suspension.” All of Township 30 South, *87 Eange 23 East, was included in the list which, was lifted from suspension.
53. Ealph Arnold, the U.S. Geological Survey geologist hereinabove mentioned, by letter dated June 30, 1907, to the Director of the Survey, reported that the area he was mapping that summer, which included the McKittrick-Midway-Sunset districts, contained “the only vacant land, giving promise of being oil productive, that I know of in this part of the state. This land which, with few exceptions, is absolutely worthless except for oil land, is being taken up by homesteaders, by scrip and in various other ways. The legitimate oil promoters are anxious that something be done to safeguard the interests of those who are trying to gain title to the land by legitimate development, such as drilling. * * *”
54. By letter dated February 24, 1908, the Director of the Geological Survey reported to the Secretary of the Interior that liquid fuels were then being recognized as superior for use on ships, including battleships, and therefore for the use of the Navy, and that he was consequently recommending that “the filing of claims to oil lands in the State of California be suspended in order that the Government may continue ownership of valuable supplies of liquid fuel in this region where all fuel is expensive.” He noted that:
The present rate at wdiich the oil lands in California are being patented by private parties will make it impossible for the people of the United States to continue ownership of oil lands there more than a few months. After that, the Government will be obliged to repurchase the very oil that it has practically given away.
He stated that the year before production of petroleum did not meet the demand, that demand was increasing moré rapidly than production, that the older fields were being depleted, and that it was important to conserve the remaining supply. He closed by saying:
Those areas in which the probabilities are greatest for striking commercial deposits of oil have nearly all been prospected with a drill and either proven or condemned. There are only a few areas of probable oil territory now remaining under Governmental control, and these are rapidly being filed on and patented, either through legit *88 imate oil development or by subterfuge, over claims for gypsum, etc. If anything is to be done regarding the matter, there is no question but that it should be done at once, for prospecting is now going on at an unprecedented rate throughout the West. All of the larger oil companies realize not only that the supply in the proven fields is limited, but that the area over which prospecting is liable to result favorably, is also restricted.
55. By letter of August 25, 1908, to the Commissioner of the General Land Office, the Acting Director of the Geological Survey requested the “temporary withdrawal from homestead entry” of 68 townships in “the McKittrick-Sunset Oil District, California,” including Township 30 S., R. 23 E. The Acting Director stated that the lands involved “are believed to be those which future development will prove to be more or less oil bearing * * *.” By letter of September 8, 1908, from the Commissioner to the Secretary of the Interior, the Commissioner recommended the temporary withdrawal of such lands “from agricultural entry pending their examination and classification by the U.S. Geological Survey.” On September 14, 1908, all the lands in said 68 townships were so withdrawn.
56. By letter of September 24, 1908, to the Director of the Geological Survey, Arnold reported the progress he was making on his geological work in the Sunset-McKittrick and other areas, referred to “the same old problems of mineral rights vs. agricultural (mostly fake propositions to get the land for oil),” made inquiry about the status of the request concerning the withdrawal of the McKittrick-Sunset oil district lands, and stated “We will not be able to cover entirely the area mapped in the McKittrick-Sunset sheet, but we will finish the most important parts.”
57. (a) Kern County, California, experienced a drastic and major decline in oil prices from 1901 to 1907. Prices dropped from an average of $1 a barrel in 1898-1900 to less than 30 cents a barrel during this period. Some of the oil produced in Kern County sold for as little as 10 cents a barrel during this depression, and some for even less. The drop in oil prices was caused primarily by the overproduction of the Kern River oil field in 1901, the production from which *89 exceeded the entire oil production of the State of California for any previous year. This economic condition depressed drilling and exploration activities in the county during this period. For example, in 1902, 245 oil wells at Kern River, 40 oil wells at McKittrick, 55 oil wells at Sunset, and 16 oil wells at Midway were capped and production shut off because of a lack of market for the oil. The number of new oil wells which were drilled at proved fields in the entire State decreased significantly during this depressed period. In addition, of the 331 “wildcat” oil wells drilled in California from 1895 to 1910, 254 were drilled prior to 1903 and only 77 were drilled between 1903 and 1907.
(b) Lack of transportation and oil storage facilities retarded the development of the oil fields in western Kern County prior to 1903. The extremely high cost of hauling drilling equipment resulted from a lack of adequate railroad facilities in the area. As noted in finding 16, railroad facilities to McKittrick were completed as early as 1893, affording access there, but it was not until 1902 that such facilities were completed to Sunset. The Midway field was still without such facilities, and materials and water had to be hauled in from either McKittrick or Sunset. The serious handicaps and difficulties experienced by the oil operators in western Kern County were reported in the Pacific Oil Reporter on September 5,1902, as follows:
*****
When one realizes that all material utilized in the construction of derricks, all machinery, and in fact supplies of every nature had to be hauled for a distance of forty-five miles over what is practically a desert, and that the first operators in this district were compelled to carry the drinking water a distance of fifteen miles, one begins to comprehend the magnitude of the work begun and accomplished, and one marvels that not more has not been accomplished, but that as much has been accomplished as has been done by these pioneers of the West Side.
The early development of the Kern River field on the eastern side of Kern County was also hampered by lack of transportation facilities. However, that situation was al *90 leviated when, in August 1900, a spur was constructed from the main line of the Southern Pacific Railroad to the Kern River oil field.
These transportation difficulties of these early operators, as well as the problems raised by the oil price decline in 1903, is also described in Pack’s aforesaid Geological Survey Professional Paper 116, as follows:
* * * In the later part of 1899 the Kern River field was discovered, and the success attained in the relatively shallow wells there gave a great impulse to the search for oil in the surrounding regions. Most of the land in the Sunset-Midway field was at this time located under the provisions of the placer-mining law, but owing to the distance from the railroad drilling was actually started on but few of the claims. In August, 1900, there were between Old Sunset and the site of the present town of Maricopa 16 wells, which ranged in depth between 250 and 400 feet and yielded between 10 and 25 barrels of oil of 11° Baume. Another well 875 feet deep had been drilled in sec. 18, T. 11 N., R. 23 W., east of the main group. Besides the wells of Jewett & Blodgett the only other productive well in the Sunset field at this date was one belonging to the Monarch Oil Co., in the NW % sec. 2, T. 11 N., R. 24 W., which flowed and was said to yield about 75 barrels of oil a day.
About this time an agreement was reached with the Santa Fe Railway to build a line from Bakersfield to Sunset, but before construction had been started an arrangement had been made between the Santa Fe and the Southern Pacific concerning joint ownership of feeder lines from points common to the two roads. The Sunset Railroad was to have been completed in 1901 but was not actually finished until 1902. This delay in the completion of the road had a serious effect on the field, for upon the announcement that a railroad was to be built to Sunset that field became the scene of great activity, all vacant land about Sunset and in what is now the Midway field was located, and drilling was started on many of the sections. Most of the wells about Sunset got small quantities of petroleum, but by the time the railroad was completed and adequate means for shipping the oil were provided the price for oil had dropped so low that few of the companies could live.
The drop in the price of oil affected the Midway field even more seriously, for it was at that time without *91 proper transportation facilities, and all lumber, machinery, and fuel had to be hauled by team either from Sunset or from McKittrick. At first drinking and even drilling water had to be hauled from the Miller & Lux well far out in San Joaquin Valley. The difficulties under which the first operations were conducted here are described as follows in an article published in the Maricopa Oil News in July, 1914:
The first drilling in the [Midway] field was by the Oregon Midway, on sec. 4, 32-23, with a patent rig. Three wells were drilled, but with the rig 600 feet was the greatest depth to be reached. A standard rig was secured and a hole drilled to 1,000 feet. The drilling water had to be hauled by team from the Miller & Lux hog ranch. In 1901 the Producers’ Guaranty Co., which guaranteed to strike oil in two years or refund the amount paid for stock, began drilling. On its first well the drillers were paid $5 per foot, the company furnishing all machinery, supplies, water, and fuel. On February 26, 1901, the machinery was hauled across the bed of Buena Vista Lake, which was then dry, no water having been in it for three years. On May 1,1901, the first oil was struck, at 1,407 feet, the casing being 7% inches. For this work the water cost $1.25 per barrel delivered at the well. After the water was delivered the company had to permit the 10-mule teams used to haul it to drink from it. They used about half the water hauled. Fuel oil was secured from Sunset, it requiring four days to bring a tank of oil. It cost $2.90 per barrel, and hauling cost $15 per day for the team.
* * * In 1903 the oil industry in the Midway “blew up”, as there was no way to ship it, and Kern Liver oil was selling at 10 cents per barrel. This continued until 1907. * * *
In 1907, with the return of adequate prices for oil, the Sunset-Midwav field started its tremendous growth that has continued up to the present time. * * * Prospecting gradually left the foothills along which it had hugged, spread boldly out over Midway Valley and the Buena Vista Plills, and in 1910 entered the Elk Hills. During this time the field passed through the period of speculation common to most new mining camps. Titles to mining claims changed hands many times in a few weeks, each time at an increase in price. The price for *92 claims covering tracts several miles from any producing well increased from a few dollars to $1,000 or more an acre, and those holding a clear title to the land were able to command even higher prices. * * * (pp. 64 — 65)
(c) Watts, in his aforesaid 1900 publication, reported that “the cost of drilling wells varies according to the accessibility of the locality where the well is situated” as well as “the character of the formation penetrated.” He stated that a consensus of opinion of well-known oil producers showed that in the Temblors, the cost of drilling a 1,000-foot well was, exclusive of the cost of casing, $2,000-$7,000. With casing, the drilling cost averaged approximately $10 a foot.
58. (a) For sometime prior to the purchase in 1909 of parts of Section 86 for $1.25 per acre by Hay and Buffington, as hereinabove set forth, the school land was probably available for purchase from the State at this low price. The lack of buyers at this price is indicative of the general low opinion the oil operators of that period had for the section in particular and the Elk Hills in general as oil land, but it may also be indicative to some extent of the fact that it was then uncertain whether the State had the right to sell the land. See findings 50-51.
As of 1903, land considered as good prospective oil land in or closely adjacent to proved oil fields was selling for approximately $500 and more per acre. While the depression in oil prices on the western side of Kern County, and the lack of adequate transportation facilities to the Midway area in general and to such places as the Elk Hills in particular, stifled oil development and contributed greatly to the general lack of interest in purchasing prospective oil lands, some additional exploration work did continue on the west side all during the depression period, as well as in the Kern Kiver field on the east side of the county. In 1909, with the return of activity in the west side fields, good prospective oil land in or closely adjacent to proved oil fields was selling from approximately $700 to $1,500 per acre. In 1901, the Dabney Oil Company, operating on the west side of Kern County, purchased three sections in the Midway flat. A dry hole was drilled on one section. No operations were conducted on the other two. The land thereafter had only nominal *93 value. In 1910', after the Santa Fe Railway had brought in a successful well in the flat in an adjoining section, the Honolulu well in the Buena Vista Hills proved such a success, and other wells began to come in on the flat, the Dabney Oil Company sold 90 acres of one of their three sections for $1,200 an acre.
(b) The Kern River field was somewhat less affected by the depression in oil prices than were the west side fields, where the abnormally low prices were at least in part due to the low gravity of their oil, which ranged from 14 to 22 degrees. In 1904, lighter oils of better gravity, such as came from the Kern River field, sold as high as 80 cents per barrel. The heavier oils of the west side at this time sold for as little as 10 cents per barrel, where it could be sold at all. As noted, these fields were also badly hampered by lack of transportation facilities, which also contributed to the lack of demand in this area. A calculation that Elk Hills contained oil would have also been accompanied by the reasonable conclusion that the oil would be of better quality than the oil from the Temblor fields, because the poor quality of such oil was at least in part due to the escape of volatile elements through the numerous seeps and blowouts. There were no such seeps and blowouts on Section 36.
59- (a) As shown by California State Mining Bureau Bulletin No. 32 of June 30, 1904, entitled “Production and Use of Petroleum in California,” prepared by “Engineering Chemist” Paul W. Prutzman, and the maps therein included, the Sunset field was, as of June 30,1904, concentrated along a narrow line running northwest, from the northwest corner of Section 20, T. 11 N., R. 23 W., to the southwest corner of Section 28, T. 12 N., R. 24 W. There was a scattering of unsuccessful abandoned wells off the line in adjacent sections. The bulletin stated that:
The producing strip is a very narrow one and appears to have been determined on all sides, with the possible exception of the southeast corner.
The Elk Hills were to the northward.
(b) The bulletin also showed that the Midway field was then similarly concentrated along a narrow line, from a *94 point about half a mile north, of the northernmost Sunset well, extending northwest about 6 miles, all in T. 32 S., R. 23 E., from Sections 25 through. 6. Off the line, there was the usual scattering of unsuccessful abandoned wells. The producing strip was not over a mile in width. The bulletin noted that the wells to the west of the strip “found the oil sand in place but unproductive, while on the extreme east the oil sand has given place to a water sand. The boundaries of the producing ground seem to be fairly well marked out, but much of the intervening territory is undeveloped, though the work thus far done would give the impression that it is spotty.” The bulletin further noted that the district “is without transportation facilities of any kind”, and that “for this reason, practically no oil has been actually produced, most of the wells capable of producing having been capped.”
(c) At that time, the McKittrick field was also concentrated along a narrow line running northwest from Section 34, T. 30 S., R. 22 E. to Section 11, T. 30 S., R. 21 E., with an offshoot in 18-30-22. The bulletin stated that: “the field has been thoroughly tested, and proven to be very ‘spotty’, a condition readily explained by the highly broken condition of the surface, and the numerous seepages and evidences of chemical reaction.” The field was surrounded by the usual sprinkling of failures or abandoned wells. It was considered that the presence or absence of oil was largely determined by the presence or absence of breaks or faults in the anticlines.
60. As Pack described (finding 57), the return of prices to adequate levels occurred in 1907. In that year also, construction of the extension of the railroad to the town of Fellows in the middle of the Midway oil district commenced, and the Standard Oil Company also built a pipeline to the district. Thereafter, the Temblor oil fields resumed activity and growth, and prospecting gradually left the narrow lines to which they had been confined in the foothills and extended out into the valley. The first activity in the flat lands of the valley lying between the foothills of the Sunset and Midway fields and the Buena Vista Hills, commonly referred to as the Midway “flat,” took place in the summer of 1908. The railroad extension to Fellows was completed’ in 1909.
*95 61. As of late 1908, there was still no activity in the Buena Vista Hills though oil had been struck in the Midway Valley floor (the Knob Hill well) between these hills and the Temblor foothills, resulting in great excitement in that part of the valley area. The oil was lighter and of better quality than, the heavy oil in the Temblor foothills. In early 1908, Standard Oil had commenced purchasing property in the Midway area, including valley lands, and also commenced operations in the flat. Up to then, Standard had not been a producer in this area. Instead, it purchased its oil from the other producers. At this time, however, it decided to become a producer. The Buena Vista Hills were, in certain respects, a more likely and attractive place in which to drill than the Elk Hills. Lying between the Temblors and the Elk Hills, they were closer to the established Midway and Sunset fields, and the asphalt deposit or blowout in the Buena Vista Hills was an extensive one more readily identifiable as being of petroliferous origin. These hills too constituted an excellent anticlinal structure and one that was more readily identifiable as such than the Elk Hills. In 1908, one Harold W. Fairbanks, a geologist of recognized competence whose work was referred to and included by Prutzman in the California State Mining Bureau Bulletin referred to in finding 59, took an option on a section adjoining the aforementioned blowout in the Buena Vista Hills. In 1907, Fairbanks had acquired interests in the Midway field in the Temblors. Fairbanks acquired the Buena Vista option after seeing the blowout in these hills. He concluded the Buena Vista Hills presented ideal conditions for an oil field. However, he was obliged to drop the option owing to inability to obtain financing, investors remaining unconvinced that the area would be a profitable one. Then, on December 28,1908, he made an agreement with one Crandall for the drilling of certain claims on Section 10, T. 32 S., B>. 24 E., in the Buena Vista Hills, and Crandall and one Mat-son began drilling a well there, referred to as the “Honolulu,” early in 1909. This section was adjacent to Section II in the Hills on which the blowout was located. By this time, the excitement and rush of speculators to the area extended out to the Buena Vista country, despite the fact *96 that the Honolulu operation was considered as an extremely risky wildcat operation by the great majority of the operators. Nevertheless, at this time Standard purchased lands in the Buena Vista Hills. In February 1909, Fairbanks entered the Elk Hills to investigate their geology. He found nothing but apparently vacant land, unappropriated except for location notices which had been posted several years before and had manifestly expired for lack of assessment work. He concluded that the structural conditions there were similar to the Buena Vista Hills and just as favorable for oil. Thereupon, he (together with others) made 12 locations in the Elk Hills on land he found to be vacant. In late February 1909, some gas showings appeared at the Honolulu well, and on June 30,1909, the well obtained a very strong flow of gas at 1,600 feet, running wild for 2 months as the operators were wholly unprepared for the great pressure encountered. This well was approximately 9 miles from Section 36, T. 30 S., R. 23 E., in the Elk Hills.
62. (a) On June 25,1909, Carman, a practical oil man of many years’ experience, and who, as set forth in finding 3, obtained his interests in Section 36 from Buffington (and who is sometimes referred to by the parties herein as the “partner” of Charles O. Fairbank, whose estate is the plaintiff in this case), wrote to the Attorney General of the United States requesting that an action be filed to cancel patents granted to the Southern Pacific Railroad Company in 1904 for lands in lieu of land grants made to the company by an act of Congress. These patents covered several sections of land in the Elk Hills in T. 30 S., R. 23 E. (where Section 36 is located), and in T. 30 S., R. 24 E. Carman had engaged in the oil business in Canada in partnership with Fair-bank but had come to California in 1899. In April 1909, after the commencement of developments in the Midway flat and the first gas showings in the Honolulu well, Carman, together with others, made locations in the Elk Hills on lands that had been patented to Southern Pacific. However, he had not as yet acquired any interests in Section 36.
In March 1909, a suit had been filed by one Burke, a lawyer, against Southern Pacific attacking the Railroad’s title to *97 certain lands in another part of California, to which the. Bailroad had a patent under land-grants. The suit contended that the lands were mineral, not agricultural, of which Southern Pacific had knowledge at the time it applied for the patent. Burke therefore contended his mineral locations on the land were valid as against Southern Pacific’s patent. This suit received wide publicity in California, and there was much speculation about the validity of the Bailroad’s titles to its vast acreage throughout the State.[15]
Carman’s letter to the Attorney General stated in part as follows:
An association of gentlemen, ten in number, have appointed me their attorney and agent to investigate the validity of the title of certain lands in the western part of Kern County, California. These parties located this land for various minerals, including petroleum. The lands are situated on the axis of a well marked anti-clinal fold, which has attracted the attention of petroleum prospectors for the past ten years. It is m the vicinity of an oil field that has been producing for more than that period, and has always been considered well within the oil belt. In 1901 and 1902 two wells were drilled on the axis of this fold at points about five miles apart. Each of them struck some petroleum. In 1901 the lands in question were located for petroleum by parties who spent $8,000.00 in surveying (the land was unsurveyed by the U.S.) in properly monumenting, building a road and camp. The amount of this expenditure is merely cited, to show that these were not merely random locations made by parties who attached no particular value to their claims. These claims expired in two years, and the territory was again.located in 1903. During the life of this latter set of claims, the Southern Pacific By. obtained a patent to the territory in question. At that time and for some years previous, it was generally known by oil men to be highly desirable territory, and by oil men operating in adjacent fields this anti-clinal fold was well known and considered to be valuable oil territory. * * *
Acting for my friends, who have located the territory hereinafter described, and who have found that the railroad holds a patent to the same, I make the *98 claim that the land was well known to be of mineral character at and before the time the patents were granted, and that circumstances were such that the railroad presumably knew of this fact. I wish to emphasize the fact, that no oil development whatever has taken place along this anti-clinal fold, or in the vicinity, since the date of patent that would cause the land in question to be considered of any more value now than at that time. In other words, the value of the territory for oil is based solely upon considerations which were known at the date mentioned, and nothing has occurred since to enhance the value.
The land above cited consists of the following sections *
Sections 19, 21, 25, 27, 29, 83 and 35 in Township 30 South, R. 23 East.
Sections 31 and 33 in Township 30 South, 24 East.
All of the sections of land in T. 30 S., R. 23 E., referred to by Carman as being on the “axis of a well marked anti-clinal fold,” two of which adjoin Section 36, were subsequently found by the Supreme Court to have been of known mineral character on and prior to December 12, 1904, the date of the patent to the railroad, and the patent was set aside and canceled in United States v. Southern Pacific Co., 251 U.S. 1 (1919), as set forth in finding 15.
(b) In writing this letter, Carman, who was not an attorney, was motivated by the belief, as attorney Burke was contending in his suit against Southern Pacific, that, should the Southern Pacific’s patent be canceled, his locations on such lands would give him superior rights to the land. His own personal interests caused the statements he made in the letter to be considerably colored. The reference to the “association of gentlemen, ten in number,” were the 10 locators of the Elk Hills properties, including Carman himself. His statement that the lands involved “has attracted the attention of petroleum prospectors for the past ten years” is erroneous if it meant anything more than that locations had been made in the hills approximately 10 years ago and some assessment work of a relatively negligible character accomplished during such 10-year period. The statement that in 1901 and 1902 two wells were drilled on the axis of the fold is erroneous, unless it referred to drillings in the *99 McKittrick Front which., as shown, was an extension of the Elk Hills anticlinal structure. The only drilling that had occurred in the Elk Hills themselves prior to the writing of the letter was the unsuccessful Hoy venture, and this well was not on the axis. The further statement that “Each of them struck some petroleum” was also untrue, unless the reference is to the gas showing in the Hoy well.[16] The reference to certain parties spending $8,000 in 1901 in connection with their locations in the Elk Hills is not clear, unless it referred to the expenditures made by the Wagont Company. The amount of such expenditures is unknown, but it was insubstantial. It may also have referred to money spent in making the locations themselves. The statement that oil men generally considered the area to be “valuable oil territory” when Southern Pacific obtained its patent was inaccurate, unless it refers to the conclusions of Southern Pacific itself, and its geologists Dumble and Owen, and it is not shown that Carman was familiar with Humble’s and Owen’s work or conclusions. The great majority of the practical oil men in the area, who did not have the benefit of the geological work accomplished by the Southern Pacific geologists, and their conclusions, did not so consider the land at that time. As shown by finding 61, the letter was written after the great rush to the Midway Valley developed. It also came after geologist Fairbanks made arrangements with Crandall for drilling the Honolulu well in the Buena Vista Hills and after the first showings of gas developed in the Honolulu well. Subsequently, on August 21,1909, Carman obtained an option on the approximately 159 acres in Section 86 (approximately a quarter of a section) from Buffington which are involved herein at $20 an acre, and thereafter exercised the option, Buffington conveying title to Carman on January 25,1910.
At that time, the Hay part of Section 36 was offered for sale at $30 per acre, but Carman rejected it at that price. Similarly, a few months after Carman purchased the 159 acres, Buffington offered him the balance of his holdings *100 in Section 36, consisting of 53 acres, for $30 an acre, but Carman rejected this tender also. Carman and Fairbank thereafter held the 159 acres. In 1917, Carman returned to Canada.
63. Following the temporary withdrawal, on September 14, 1908, of the 68 townships hereinabove mentioned, the classification of the lands therein by the Geological Survey proceeded. On June 4, 1909, the Director of the Geological Survey advised the Commissioner of the General Land Office of the Survey’s classification of part (around two-thirds) of said lands. 430,340 acres were “Lands Classified As Oil Lands,” including all of Township 30 S., E. 23 E., and 544,480 acres as “Lands Found Not to be Oil Lands and Eeleased From Withdrawal.” On the same date, the Director similarly advised the Secretary of the Interior. On June 7, 1909, the Secretary restored to disposition the lands classified as nonmineral. As to the other lands, he stated: “The withdrawal of lands classified as containing deposits of oil will be continued temporarily pending consideration of the question of legislation upon the subject, unless it be shown by reclassification or sufficient evidence that any particular tract or tracts thereof do not in fact contain oil.”
64. On September 17, 1909, the Secretary of the Interior wrote a letter to the President concerning “the conservation of the petroleum resources of the public domain, with special reference to the present and future requirements of the American Navy.” He advised that the latest battleships and destroyers were equipped to use oil, that the Geological Survey reported that “the present rate of production of petroleum can not be maintained beyond a very few years, after which a marked decrease will result in an insufficient supply and increased prices,” that “at present * * * the disposal of the public petroleum lands at nominal prices simply encourages overproduction,” and that “the logical method of checking this unnecessary waste would be to secure the enactment of legislation that would provide for the sane development of this important resource.” The letter further informed the President of the Geological Survey’s report of *101 June 4, 1909, classifying approximately 430,000 acres in. California as oil lands and the direction of the Commissioner of the General Land Office that these lands be temporarily withheld from agricultural entry, the Secretary stating that the Government still retained title at “at least 40 per cent” of such lands. The letter closed with the following recommendation:
The time appears opportune for legislative action that will assure the conservation of an adequate supply of petroleum for the Government’s own needs. This legislation should give authority to fix the terms of disposition of public oil lands so as to provide for the future demands of the Navy and should also authorize the permanent reservation of such areas as the Executive, after full investigation, may find necessary for this Federal purpose. It is believed that such legislation would not interfere with the profitable development and utilization of the California oil pools.
In aid of such legislation and indeed as essential to the accomplishment of its purpose, all the lands herein-before mentioned should be temporarily withdrawn from all forms of filing, entry and disposal, including mineral entry.
By letter of - September 27, 1909, to the Secretary of the Interior, the Acting Director of the General Land Office submitted a recommendation which stated that “in aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain,” all public lands on an accompanying list, which included all of Township 30 S., K. 23 E. “are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or non-mineral public land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination.” On the same day, the Acting Secretary of the Interior approved the recommendation, thus effecting such withdrawal. President Taft approved this withdrawal on July 2, 1910, and thereby placed the township, together with other withdrawn lands in California, in Petroleum Keserve No. 2, and, by Executive Order of September 2,1912, the township was, “subject to valid existing rights,” placed in *102 Naval Petroleum Reserve No. 1 and to be held “for the exclusive use or benefit of the United States Navy.” The Order of Withdrawal which placed the lands involved therein in Naval Petroleum Reserve No. 1 followed a recommendation by the Director of .the Geological Survey for the inclusion in. a special reserve of approximately 38,069 acres in the Elk Hills as “a compact body of public lands containing an ample supply of fuel oil for the use of the United States Navy.” All of the 38,069 acres in the Elk Hills constituting this Naval Reserve No. 1 had theretofore been withdrawn on July 2, 1910, and had constituted a part of Petroleum Reserve No. 2.
,65. The renewed activity induced by the return of adequate oil prices in 1907 continued for approximately 2 years before it had any material effect on the demand for Elk Hills property. There was no such marked demand until the flow of gas in the Honolulu well. The southeast end of the Elk Hills was just north of the Honolulu well. As hereinabove set forth, on August 21, 1909, Carman obtained his option to purchase part of the Buffington tract of Section 36, T. 30 S., B. 23 E., at $20 an acre. On November 29, 1909, the Standard Oil Company obtained the 480 acres in the Hay tract of Section 36, T. 30 S., R. 23 E., for $11,000, or approximately $23 per acre. Standard also obtained the Elk Hills Section 36, T. 30 S., R. 24 E., in November 1909 (referred to as the Tupman Section), located at the eastern part of the hills, for $12,500, or approximately $19.50 per acre. At the same time it paid $64,000 for the Buena Vista Hills Section 36, T. 31 S., R. 23 E., or $100 per acre. All this occurred before either the Buena Vista Hills or the Elk Hills was proved by the actual striking of oil. Land in proved fields brought in the depressed period of 1904, $3,500 to $5,000 per acre in the better parts of Kern River where the oil was lighter and of better quality and therefore bringing higher prices; $500 to $1,000 an acre at Sunset where the oil was heavy and almost tar-like in places, and similarly up to $1,000 an acre at Midway. Besides the brightened prospects for 'the Elk Hills resulting from the strong gas showing in the Honolulu well, Standard’s interests in these three Section 36’s was stimulated by the withdrawal order of Septem *103 ber 27, 1909, whitíh cast a cloud upon titles to Government lands upon which, many producers were working. The result of the order was to stop activity on such lands. Thereafter, Standard attempted to obtain title to the Section 36 and Section 16 State School Lands. Drilling of the Honolulu well resumed in the fall of 1909. In November 1909, the Chanslor-Canfield Oil Company brought in a very successful well, termed a “gusher,” in the Midway Valley. The Honolulu well in the Buena Vista Hills began to produce oil at 2,500 feet in February 1910. There then followed an extraordinary rush of prospectors into the Elk Hills, who felt that if oil were found on an isolated structure such as the Buena Vista Hills, which were halfway over to the Elk Hills from the Temblors, there might well be oil in the parallel Elk Hills isolated structure too. Also, it tended to show that the oil might well be within reach on the Elk Hills, as it was in the Buena Vista Hills. It also gave assurance that the diatomaceous shales and reservoir sands did not disappear in the valley. While the Elk Hills were still considered as wildcat territory even after the Honolulu well produced oil, it was more promising wildcat country than it had previously been. At about this time, in March 1910, a great gusher, the Lakeview well, was brought in by Standard Oil in the Midway Valley. The previous month, another great gusher, the Hawaiian well, had come in in the north Midway District part of the valley. These 1909 and 1910 successful wells in the flat showed that there existed in the valley a second series of rich oil sands below the first series and the water to which it was thought the sands had changed. As shown, the first wells drilled in the flat had encountered only water and had been abandoned.
One W. L. Leland, an oil operator, was present at the Honolulu well the first morning in February 1910 after the oil had come in, and immediately headed for the Elk Hills. He found nobody there and no sign of any activity. However, he did observe location notices. Thereupon, he contacted some of the prior locators and formed a syndicate for the immediate drilling of Elk Hills, ignoring the September 27, 1909 withdrawal order. The commencement of this activity in the Elk Hills, including the establish *104 ment of a camp and. the movement of drilling materials to the hills, heightened the rush to Elk Hills even further. Tents and wagons were everywhere in the hills, and the entire area became somewhat of an armed camp, with locators attempting, often by armed watchmen, to protect their locations against invaders or claim jumpers. On February 11, 1910, those in the syndicate for the first time recorded their claims.
By June 1910 there were three wells being drilled on Elk Hills by the Associated Oil Company. However, the results were disappointing. Some oil was found in each of them, the first oil showing being made in 1911, but none of the three ever achieved any commercial success. All three wells were in the center of the anticline, and on different sections. A well on the east end of the hills went down approximately a mile deep without success.[17] Another deep well on the west end was commercially unproductive.
Fairbanks was unable to raise sufficient capital to develop the locations he had made in the Elk Hills in early 1909.
66. The discouraging results obtained from the first drill-ings in the Elk Hills which were commenced in 1910 dampened further drilling enthusiasm and investment there. The lack of roads and the difficulty of hauling in materials, water, fuel, and provisions, added to the problem of developing the hills. Furthermore, the withdrawal of 1909 and the subsequent inclusion of the hills in the Petroleum Reserves in 1910 and 1912 caused conflict and confusion over titles to lands located there, delaying further their development. The question arose whether the withdrawals served to defeat claims theretofore initiated in good faith where the locators had not at the time of the withdrawal actually discovered oil or gas in valuable quantities but had nevertheless indulged in a great deal of preliminary work.
However, in 1918, spurred on by war shortages, Standard Oil commenced drilling on Section 36 herein involved, first on the property it had purchased from Hay and then under a lease from Carman and Fairbank on the property Carman had purchased from Buffington. This was the first drilling *105 that ever took place on Section 36. Up to then, the wells drilled in the Elk Hills had all been failures, so far as commercial production was concerned. By 1916, they had all been shut down. The renewed activity in 1918 was part of a broad exploration program then commenced by Standard in the southern part of the San Joaquin Valley, as well as in other parts of California and the States of Washington and Oregon.
On January 5,1919, the first well on Section 36 began producing at a depth of approximately 2,500 feet. This was the first commercial production from the Elk Hills. In 1920, Standard commenced drilling wells in its Tupman Section in the eastern part of the hills, the first well coming in there on February 11, 1920. Over 400 wells had been drilled in the Elk Hills by the end of 1928. As of the beginning of 1935, there were about 35 productive oil wells on Section 36 alone, proving the section to be extremely rich in oil at reachable depths. Despite a number of dry holes, the Elk Hills has turned out to be one of the greatest oil fields in the United States. As of 1959, there were 983 producing wells in the hills, constituting it the second largest oil field in the country, with an estimated potential production of 200,000 barrels a day.
67. (a) As of January 26, 1903, the great majority of investors interested in the oil business, practical oil operators, and others associated with oil operations in various ways, such as drillers, who actually were acquainted in any way with the Elk Hills, did not regard such hills favorably as possible or potential commercially profitable, oil territory, and this opinion prevailed through 1907. The oil operators at that time placed primary importance upon the existence of seepages, such as those in the Temblor foothills and in the Kern River field. As shown, almost all the drilling operations in 1900-1903 were undertaken near or directly upon easily identifiable and recognizable oil or asphaltum seepages. The McKittrick-Midway-Sunset fields had reached their 1903 stage of development almost entirely by drilling along the line of seeps and outcrops, frequently referred to as the “break.” These wells were for the most part *106 confined to a comparatively narrow strip approximately one-half mile wide along the line of the seepages. There were no seepages of such a nature in the Elk Hills. As of 1903, the so-called Lamont seep had not been recognized, identified, or generally accepted as a seep of petroliferous origin. Many operators did not know of its existence, and of those who did only a few, based simply upon general appearance, considered it to be of a genuine petroleum character. The small showing of gas in the Hoy well was disregarded as of little or no significance. In any event, the encountering of a gas zone at that time was, as stated, considered as a disadvantage and a troublesome problem. The small gas showing in that well caused no excitement or any exploratory rush to the Elk Hills. Many of the operators were also familiar with the so-called blowout in the Buena Yista Hills, but considered it to be only a sulphur blowout. As was true of the small gas pockets, there were many sulphur blowouts and deposits throughout that country and the operators generally did not consider them to be an indication of oil. What the operators of that period were seeking were recognizable oil seepages. Many persons working or residing in the area were quite familiar with the Elk Hills, one of the roads to the Midway oil district from Bakersfield skirting the hills on their southeast edge. Sometimes people would drive their teams directly across the hills to Midway. Many people entered the hills to hunt for quail or ducks, or to see the elk herd. For such purposes, as well as for general prospecting, the area was not inaccessible.
(b) Those operators and investors who had some knowledge of the basic geological principles concerning the source, reservoir and cap series in juxtaposition, or concerning anticlines, and who considered that the favorable strata formation in the Temblors might continue for several miles through the valley and under the Elk Hills, probably also felt, from the angles of dip of the source and reservoir series from the Temblors into the valley, that by the time these series reached the Elk Hills they would be too deep for the drill to reach, especially considering the drilling equipment and methods then available and known.
*107 (c) Most of the operators had no knowledge of such scientific principles, and little confidence in them in any event. They hugged close to the seeps in the Temblors, located for the most part in steep anticlines, and thus viewed with suspicion a relatively gently inclined area such as the Elk Hills, despite the fact that the great Kem River field developed in a relatively flat area. It took them years to move •from the hills and into the so-called “flat” of the valley, and this probing out away from the seeps in the hills was done only in gradual steps, especially after initial probings in the flat met with failure. Rather than theorizing about the shales and oil sands thickening out in the valley basin, many thought that the oil sands “pinched out” in the valley, or turned to water, since early attempts by wildcatters to drill farther down the slope of the hills away from the “break,” and even into the flat, encountered only water, causing the wells to be abandoned. Such early attempts to probe away from the foothills and out into the valley were met with misgivings and even ridicule, as was, as late as 1909, Crandall’s venture of going clear across the valley and into the Buena Vista Hills. Similarly, despite the fact that some successful wells in the State had actually been drilled in the ocean, as in the Summerland Field, many of the operators on the west side of Kem County feared drilling below sea level, which would have been the situation out. on the flat, since whenever they encountered salt water in this area, they concluded that the oil had turned to water and abandoned the well. Water encountered in wells drilled for oil was a particularly difficult problem to handle in these early days.
(d) The oil industry on the west side of Kern County was at that time in its infancy. There was still plenty of comparatively good unexplored territory along the line of the McKittrick-Midway-Sunset seepages, upon which many successful wells had already been drilled and oil had been profitably produced at quite shallow depths. There were also seepages in unexplored territory in other parts of the San Joaquin Valley. Faced with such problems as depressed oil prices, transportation difficulties, and lack of tank car facilities even where the railroad had been built, there was at that *108 time little urgency to explore such unproved and relatively distant, wildcat, territory showing, on the basis of the above-mentioned generally unscientific knowledge, such little promise. As a practical matter, a dry well was a calamity often resulting in financial ruin. Every risk was to be reduced as much as possible and it was considered that adhering to a surface evidence of oil was the safest procedure.
(e) Generally, the basic and technical principles of geology, insofar as they related to the formation of oil pools or the constitution of promising oil territory were, as of January 26, 1908, little understood by most of the practical oil operators and investors operating on the west side of Kern County. Many of them had little experience or education. Consequently, they did not possess the qualifications required to form a reasoned judgment of the oil value of the Elk Hills. Many of them were novices in the oil business.
Furthermore, in these early days, most of the oil operators, prospectors, and drillers had little regard for the geologists and their theoretical approaches. During this period, the record does not indicate the retention, as a professional consultant, of any competent geologist to make a detailed, careful, study of any part of this area looking to possible exploration until Owen performed his survey of the McKittrick area in February 1903. Actually, as of January 26, 1903, geologists had played little, if any, part in the development of the oil fields on the west side of Kern County. The large companies with their geologists, more interested in procuring potential oil-bearing lands as reserves for future development, had not as yet entered the area as producers. Most of the original work was undertaken by individuals and speculators of diverse backgrounds and degrees of financial stability, experience, competence and intelligence, and who were essentially interested in drilling immediately in the most readily accessible places. At that time, the geology of the Coast Range, from a petroleum exploration point of view, had only been superficially studied. However, the theories and the practice of petroleum geology had, by January 26, 1903, developed to such an extent as to have warranted the employment of a geologist to advise an operator before the *109 ma.king of large exploratory or development expenses. As of that date, the leading and pioneer operator in the Sunset District, Jewett & Blodgett, had not employed any professional geologist. Yet, they made their camp available to Watts, the State geologist, and did attempt to obtain from him the benefit of his geological knowledge.
(f) There were some practical oil operators, such as Colon Whittier (finding 39 (a)), who, for one reason or another, did have some faith, in various degrees, that the Elk Hills might well at some time in the future turn out to be valuable oil territory. For instance, one E. W. McCutchen, an operator with interests in the Sunset District, made locations in the Elk Hills on January 1,1903, concluding from the general surface appearance of the land that it was of the same shaley character as the surface of the lands at the oil fields at Sunset. However, he was a relative newcomer to the oil business and had no technical competence in judging promising oil lands. The locations were all ultimately abandoned and were not made with any intent to make any expenditures thereon. Nevertheless, his faith in the Elk Hills persisted to the extent that in 1907, with the revival of activity in the Kern County west side fields, he reentered the hills to make new locations. This time his conviction was buttressed by Josiah Owen’s association with him as one of the locators. Owen advised this group of locators in 1907 to locate any land they could obtain on the north slope of the Elk Hills. Owen died in 1909, and there is no record of any expenditures having been made by this group to develop their claims.
However, like Whittier, whose faith was based upon a well-founded suspicion of an anticlinal structure, or some of the Wagont Development Company’s organizers, whose faith was based upon the Lamont seep, or McCutchen, whose judgment was based only on surface appearances, their opinions were not based upon any well-reasoned scientific conclusions. They were in the distinct minority, and their own faith, dampened by the oil depression, transportation difficulties, and inability to raise capital, was not backed up by any substantial investment or activity on their own part.
*110 €8. (a) Piad competent geologists as of January 26, 1908, considered the question of whether they would recommend to a client-operator the purchase of Section 86 and the making of expenditures to drill for oil thereon with the prospect of a profitable, commercial venture, they would not have been in agreement. Some would have recommended such purchase and expenditures, and some would not. It could not fairly be concluded that the recommendation of either group would have been unreasonable.
(b) Those geologists who would have recommended the purchase and development of Section 36 as of January 26, 1903, would have done so principally on the basis of the following factors and considerations:
(1) The generally accepted theory of Kern County’s having been part of a marine basin in early geologic time, with deposits resulting in the formation of diatomaceous shales, the oil-producing series, could reasonably result in the conclusion that these shales, and the resulting oil generated therefrom, generally underlay this part of the San Joaquin Valley. They were actually visible in large layers in the Temblors, outcropping in various places over a stretch of approximately 30 miles, together with the reservoir and cap rock series. Successful wells had there been drilled in three producing Temblor fields, at Sunset, Midway and McKittrick. It could be reasonably concluded that the shales would extend eastward out into the valley at right angles to the line of outcropping in the Temblors for at least a similar distance. A line drawn at a right angle from the northwest-southeast strike of the oil line at a point near the center of the Midway field where there are exposures of organic shales (Sec. 7, T. 32 S., F. 23 E.) would extend directly through Section 36 in the Elk Hills.
Furthermore, these same series were actually traceable all the way to the Sierra Nevadas and the successful Kern Fiver field in the foothills thereof on the east side of Kern County. The reservoir and cap rock series, although not extensively exposed, were visible in certain locations in the extremely successful Kern Fiver field. The absence of visible generating series shales in the Kern Fiver field *111 would not have been considered significant, since its existence could be inferred from (a) the geologic marine basin theory, (b) the existence of oil seeps, and (c) the actual discovery of oil in great quantities at the field. By 1903, log borings from the wells at the field gave direct evidence of the existence of these shales. Furthermore, these logs showed the strata dipping toward the Elk Hills. While the proper interpretation of these borings indicated that such shales may well have been deposited at a different period of time from those on the western side of the valley, this difference would not have been considered significant. Though they were not identical, they were similar, and also deposited in the Miocene period. It could be reasonably concluded, as Owen did conclude almost contemporaneously, that they were part of the same oil horizon, and not two separate geologic incidents, with no relationship between them or the area joining them. Similarly, the logs of wells drilled at Midway also showed the strata dipping toward the Elk Hills. Since the shale was deposited on both sides of the San Joaquin Valley, the conclusion was reasonable that the entire valley was at one time the floor of a great bay or extension of the ocean and that .the organic shales had been deposited in a generally continuous sheet under the valley. As shown in finding 21, petroleum seeps were visible around the eastern, western, and southern rim of the basin. Duvall pointed out in 1901 that the oil sands at Kern Eiver dip toward the east, those in the three Temblor fields dip toward the west, and the sands in the successful oil districts on the north at Coalinga in Fresno County dip toward all four districts, thus concluding that the southern end of the valley is “a vast reservoir of oil” (finding 36). All of this commercial production as of 1903 around the rim of the basin demonstrated the existence of the requisite rock strata and structural conditions in the region.
As shown above, the general continuous existence of the oil-producing shales and the other strata from the western through the eastern side of the valley, including the Elk Hills area, had been postulated prior to 1903 by Watts, Dumble, Duvall and Grimes, as well as by Owen (finding .39) and others (finding 48) in February 1903. . .
*112 (2) It could also reasonably be postulated that the organic diatomaceous shales thickened in the central part of the valley, where the Elk Hills are generally located, because of the theory that the diatoms accumulated heaviest in the deeper parts of the ocean. Although the conditions for deposit of the marine shale, i.e., whether in deep or shoal water, or on the shoreline, were not fully understood in 1903, it was nevertheless widely believed that the greater accumulations were in the deeper parts of the ocean. Scientific expeditionary work theretofore performed gave substantial basis for this conclusion. Under this theory, there would be even thicker layers of the organic series under the Elk Hills than the great exposed strata in the Temblors and which strata visibly dipped toward the Elk Hills. Thus, the Elk Hills area, lying toward the central part of a former sea basin, would have appeared to be the area containing the maximum thickness of the shales and consequently, so far as this specific factor is concerned, a particularly attractive area for oil exploration.
(3) While local outcrops of the oil sands in Section 36 or the Elk Hills were not present as a guide in determining the important matter of the dip and strike of the oil belt, as they were in the Temblors, this factor would not have been too discouraging to these geologists in light of the conformability of the cap rock series with the reservoir series in the Temblor area. As a result of such conformability, the oil sands could be expected to follow the lines of the cover series as such series projected from the Temblors, across the valley, and into the Elk Hills. Since the cover series folded up in the Elk Hills anticline, the oil sands, conformable with such cover series, would also be expected to fold up conformably (finding 37(a)). There were exposures of the cover series in the Elk Hills, and from the dips and strikes of such series, a prognostication of the dip and strike of the underlying conformable reservoir series could be attempted. The Elk Hills fold is not a superficial one. Such a great fold in the surface rocks would reasonably be expected to be reflected in, and to affect, the deeper rocks.
Considering the geology of this entire basin area, the ability to calculate the dips and strikes of the oil sands in *113 the relatively adjacent Temblor area, and the reasonableness of the theory that such sands projected out to the Elk Hills in conformity with the cover series, the lack of oil-sand exposures in the Elk Hills as a dip and strike guide would not have been considered as a factor calling for the abandonment of the area as a prospective place for the drilling of successful wells.
(4) It could be reasonably postulated that the oil under Section 36, assumed to be present as a result of the considerations set forth in (1), (2), and (3), could very probably be within reach of the drill in accordance with then known methods and techniques. In line with the considerations set forth in (3), and as noted in finding 46, the steep angles of dip of the organic series exposed at McKittrick in particular, or the Temblors in general, would not be presumed to continue at the same rate under the valley and the Elk Hills. They were seen to flatten out to as little as 6-10 degrees as they entered the valley at some places. As shown, projections premised upon the visible flattening out of the cap rock series, with which the reservoir series was conformable, and for the other reasons set forth in finding 46, it could reasonably be postulated that the oil in Section 36 could be reached 2,000-4,000 feet below the surface, or even somewhat higher. In 1903, wells in California could be drilled by known methods to about 3,000 feet. At the least, it could reasonably be expected that improvements in equipment and techniques would permit drilling to 4,000 feet or more in the foreseeable future so that the more cautious geologists in this group would advise the operator to wait a reasonable period of time before attempting actual drilling operations,, but would still advise the immediate acquisition of the property as good prospective oil land from which commercial quantities of oil could be obtained in the not too distant future.
As shown, the conclusion that oil under Section 36 would be struck at depths of 2,000-4,000 feet would have turned out to be justified, since oil was ultimately obtained from Section 36 in 1919 at about 2,500 feet. The calculations of the depth of the reservoir series would have been generally accurate. The calculations of the depth of the Monterey shales, however, would have been inaccurate, as would the *114 supposition that the two series, in contact in the Temblors, would also be in uninterrupted contact under Section 36. These errors would have been attributable to the un-forseeable intervention of the massive blue shale formation under at least certain parts of Section 36. However, as shown, these geologists would have properly taken into account the possibility of intervening strata (finding 47 (a)) but, even conceding the possibility thereof, would still have made their favorable recommendation. They would not have considered that such a formation could have the effect of being so extensive and impervious, without cracks or faults therein, as to seal off effectively the two series and prevent the migration of the oil from the Monterey shales either around or through the intervening strata, and into the reservoir shales. In this respect, assuming the source of the oil under Section 36 to be the Monterey shales, as it appears to be generally throughout California, they would have been correct.
(5) These geologists would not have been unduly discouraged by the theory that coarse grained sands are preferable for an oil reservoir and that the Elk Hills, being near the center of the former marine basin, and therefore presumably containing deposits of the finer sands, were to be condemned as constituting an unsatisfactory oil reservoir. (Finding 42.) As Pack points out (finding 42), many excellent reservoirs were found in the Temblors where there were very fine grained sands. It is true that even in proved fields, dry wells may sometimes be encountered because nonporous or tight sands are struck in isolated areas immediately adjacent to areas containing porous sands, or because a thin spot in the oil sands is unexpectedly encountered. The nature of the ocean currents which deposited the various strata might cause the sandy reservoir series to be thick in some places, thin in others, and even entirely absent in others. However, it is unlikely, as Pack points out, that, in a large stretch of deposition of the reservoir series, such as in this valley basin, there would not be found sands of good porosity despite some pockets or spots of nonporous sands. In recommending the acquisition of Section 36 as good prospective oil *115 land, these geologists would not be guaranteeing that a productive oil well would be drilled at each and every place therein. They would recognize the possibility of dry wells, but they would also feel reasonably certain that-good productive wells would ultimately be drilled into satisfactory porous oil sands of sufficient thickness. A recommendation for the acquisition and development of Section 36 would assume sufficient financial ability on the part of the oil operator to drill more than one well, if necessary. Even in the proved McKittrick, Midway and Sunset oil districts, the results were spotty. Some wells produced large quantitiés of oil, some only small quantities, and some nothing. For this reason, if the operator were interested in only a small acreage, such as 40 acres, upon which it would be feasible to drill only one well, it would then be reasonable merely to acquire such acreage and permit its development to await development by others in the surrounding territory. The ownership of 80 acres might, however, well warrant a recommendation for active development.
(6) The anticlinal structure of the Elk Hills would have been an extremely important and favorable factor. The ■ doubly plunging nature of this particular anticline would have been considered as making it a most promising place for oil accumulation (finding 41), and Section 36, being on the crest of such an anticline, would be considered as being located at the most favorable place for the drilling of a successful well. The encountering of oil and gas in the McKittrick Front, an extension of the Elk Hills anticline, and recognized to be such by Owen (finding 46 (e)) would have been a further favorable factor, despite the fact that the production there was not, as of January 26, 1903, sufficient for commercial purposes. Pack too described the extension of the Elk Hills anticline northwestward as “a structural saddle between the Elk Hills and the main range about McKittrick” (p. 58.)[18] The wells on the McKittrick Front were approximately I14 miles from the edge of the Elk Hills.
The possibility of lack of ground water to provide the necessary hydrostatic pressures to force the oil upward in *116 the anticline would reasonably have been considered to be remote. (Finding 41.)
(7) The unconformity between the reservoir and organic series would not have been a factor which would cause these geologists to rule out the area. The unconformity might present an irregular surface between the two series, resulting from erosion to the underlying series during the geologic period of time prior to the deposition thereon of the overlying strata. However, it would not invalidate the assumption that the two series generally lie parallel to each other and in contact. As such, it would not vitiate the theory of geological projection, i.e., assuming the situation under the Elk Hills to be generally similar to the exposed conditions in the Temblors. The unconformity would not prevent the oil from rising into the reservoir series and up into the anti-clinal structure.
(8) The determination that the so-called Lamont seep was of petroliferous origin would have been an important, favorable factor. It would have afforded weighty evidence that the Monterey shales and the reservoir series did in fact extend out from the Temblors into the valley, and under the Elk Hills, as the marine basin theory would reasonably postulate. The more extensive, and the even more easily determinable, petroliferous seep in the Buena Vista Hills, which was on the axis of the Buena Vista anticline, lent further corroboration of such extension.
While the small Lamont seep area of discoloration might well have been missed even by a careful geologist investigating the Elk Hills region, nevertheless, as of January 26, 1903, the particular area had already been discovered, was the subject of local inquiry and curiosity, the area adjacent to the seep, including Section 36, had been located, in part at least, because of it, and Lamont was openly residing in the hills to protect and guard the locations. A careful, competent, oil geologist would, therefore, have learned about it, and would have had the opportunity of examining and testing it by technical, chemical, laboratory methods, rather than by the common field methods of the layman prospector then in vogue. These laboratory tests, together with other *117 factors, such as the obviously liquid nature of the substance that surrounded and cemented the sands, its color, its general resemblance to the more easily identifiable petroliferous seep in the Buena Vista Hills, and its location in the heart of this former marine basin, would have reasonably convinced such geologist that the discoloration was of petroliferous origin.
(9) No weight would have been given in and of itself to the sole attempt made prior to 1903 to drill in the Elk Hills, i.e., the unsuccessful, uncompleted Hoy operation referred to in finding 27. Hoy and his backers were not informed operators acting, insofar as was known, upon any sound geological or scientific advice. However, some weight of favorable significance would have been given to the small gas showing obtained by Hoy, since, as pointed out by Arnold and Johnson, gas is often indicative of the presence of oil (finding 34). Although, as stated, small gas showings of the kind there involved are far from conclusive, and standing alone would not have warranted undertaking the considerable financial risks involved in exploring unknown territory, nevertheless they could well be considered as some evidence of the existence of petroleum, and in conjunction with the Lamont seep and all the other considerations, could reasonably have been considered as an additional encouraging factor.
(c) One part of Section 36 would have appeared to these geologists to be as good as any other part. The entire Section 36 lies on the crest of the very broad and comparatively flat dome of the Elk Hills anticline.
(d) As stated, either opinion of competent geologists both recommending and not recommending the acquisition and development of Section 36 would have been reasonable, the considerations involved being so complex and there being considerable room for competent geologists to differ with respect to technical aspects. (The factors and considerations supporting a negative recommendation are set forth in finding 69.) However, the fact that the only competent geologist who, after careful survey and investigation, actually made a conclusion at or about the time herein involved concerning lands in the immediate vicinity of Section 36, i.e., Owen’s *118 work for Southern Pacific, which was to the effect that such lands were prospective oil lands, indicates that a similar recommendation concerning the purchase of Section 36 would have constituted a valid opinion. The lands involved in Owen’s work included two sections immediately adjacent to Section 36. There is nothing to indicate that such sections were any better than Section 36. Owen was widely regarded and recognized at that time as a highly competent oil geologist. While the record does not indicate all the factors which may have entered into his conclusion, and while other competent geologists, on the basis of the factors and considerations set forth herein, may well, upon reasonable grounds, have differed with him concerning the various elements leading up to his ultimate conclusion, the fact remains that, after a careful analysis of the Elk Hills area and the specific parts thereof adjoining Section 36, he did in effect recommend to his employer in February 1903 that such lands be acquired as desirable prospective oil territory. Although this recommendation came shortly after January 26, 1903, there is nothing to indicate that it would-have been any different had it been made prior thereto.
However, Owen’s work was in the nature of a rather broad survey of a wide area, and was addressed to the question of acquiring an expanse of territory as indemnity selections for land grants made to the company. Thus, the basic nature of his problem was somewhat different. His work was accomplished in approximately 3 weeks (finding 39 (b)), which would be an insufficient period of time to spend upon a specific assignment consisting of the- making of a detailed investigation and recommendation concerning the purchase and development by an operator of a single section or a part thereof for profitable exploration. As of January 26, 1903, it would have taken a competent geologist 2-3 months to make a truly informed investigation and recommendation concerning the profitable exploration of Section 36.
(e) The considerations involved in the making of a geologist’s recommendation, based essentially upon technical, scientific factors, and an operator’s determination of a future course of action after receiving such a recommendation, are not necessarily the same in all respects. It would *119 have to be the client’s ultimate responsibility to determine when, after the acquisition of the property, the considerable investment involved in drilling should actually be undertaken. This involves practical, economic considerations not primarily within the domain of the geologist, such as current oil prices, the financial ability to drill to the probable depths involved or to drill more than one well, and the increased costs due to inaccessibility, such as the transportation of materials and water over the desert to the drilling site, as well as the transporting of the crude oil from the well. Despite the low price of oil at the time, competent geologists as of January 26, 1903, would still have recommended acquisition of Section 36 as promising oil land, even though not for immediate drilling, leaving such economic factors to the operator’s judgment. All the geologist can do is to advise the operator that the lands in question are, in the geologist’s opinion, good potential oil lands containing such a sufficiently large oil pool as would warrant, at the proper time, commercial development. If the operator is not financially or mechanically equipped to proceed with immediate development, or if the times are not propitious therefor, the geologist would then be obliged to advise the acquisition of the property and then holding it for future development.
(f) Recommendations of geologists to their clients, as well as decisions of the operators based upon such recommendations, are, in this industry, commonly made with considerable degrees of optimism, especially when there are so many favorable factors and circumstances, as hereinabove set forth. Excessive caution or pessimism in this exploratory field of endeavor would stifle all advancement into unknown territory, since, obviously, it is only actual drilling that can ever prove a particular location. Such excess caution and pessimism has not been a notable aspect of this industry. It has, on the other hand, been associated with considerable boldness and imagination, spurred on, naturally, by the great financial rewards of success. Striking out into unproved territory is necessarily accompanied by hazards, but the assumption of such hazards is of the very essence of this dynamic industry. Without the drilling of so-called wild *120 cat wells, and by only hugging to proved oil districts, the development of new fields would never have taken place.
,69. (a) Those geologists who would not have recommended such purchase and expenditures as of January 26, 1903, would have done so principally on the basis of the following factors and considerations.
(1) It could be logically concluded that the same investment in areas of the proved fields in the foothills in the eastern and western parts of Kern County would afford more promise of a successful strike. It would be considered safer to adhere generally to the then established and proved areas in which the stratigraphic and structural conditions under which the oil occurred were better known, rather than to attempt to strike out into unproved, wildcat territory many miles away. Geologists prior to 1903 had predicted that additional fields would be discovered in the territory contiguous to the proved fields of the Coast Range. Similarly, Watts in 1900 particularly recommended the east side of the valley where “the remunerative oil-field at Kern River” had already been discovered, “where the formations are so slightly disturbed,” and where he assumed there was, therefore, “a wide and extensive oil-line” (finding 44(b)). For the present, at least, there was no immediate need of striking out into relatively distant and unproved areas. In 1903, the Elk Hills was wildcat territory, a wildcat well being one drilled beyond the limits of known production.
(2) The differences between the Kern River field, and the fields in the Temblors, as set forth in finding 44, were sufficient to have caused doubt as to whether they belonged to a single oil horizon and, therefore, whether the diato-maceous shales extended continuously across the valley. Dumble expressed such doubts (finding 33). As shown, such shales did not outcrop in the Kern River area, although they were visible, often in huge cross section form, in the Temblors. However, these doubts did not appear to prevent Dumble’s belief that the shales and oil sands did extend across the valley from the east to the west side, as shown by his sketch. Furthermore, upon the basis of a more detailed investigation, Owen felt that it would be possible to trace “the same horizon” of the Sunset field oil sands “to *121 the Kern River fields” and that “there are several reasons for believing that they all belong to the same zone” (finding 39 (b)). However, in this respect his conclusions appeared to be only tentative and based on incomplete data.
(3) As shown, for favorable oil accumulation, the three series of organic, reservoir, and cap rock, lying in juxtaposition, were considered to be necessary, the prevailing opinion at that time being that the only series from which the oil was generated was the organic or Monterey series containing the diatomaceous shales. These three series were exposed and visible in the Temblors, and were seen sloping down to and under the valley lands. The organic and reservoir series were not visible and did not outcrop in the Elk Hills. Their continuance in such juxtaposition and in sufficient thicknesses for miles under tire valley and under the Elk Hills and Section 36 so as to warrant commercial drilling would, as heretofore noted, necessarily be based on speculation, hypothesis, and geological inference from evidence found elsewhere, and which would be complicated by the differences between the east and west sides of the valley, as well as the physical differences between the Temblor foothills and the Elk Hills, described by Pack as an “isolated-dome.” The Temblor foothills are a broken, complicated area, full of faults, and as such would make difficult the correlation of conditions there, by projection, with other areas miles away. Except by drilling, there was no certain way to establish whether or not the Monterey shale or the reservoir sands extended from one side of the valley to the other. As of January 26, 1903, no deep well had been drilled in the flatlands of the valley to reveal the existence there of the source or reservoir rocks and from which a better judgment could be made as to the extension of such rocks eastward and under the Elk Hills. Even under the generally accepted marine basin theory, there was no complete agreement upon the conditions for deposit of the Mon-terey shale. Pack, in his aforesaid 1920 Professional Paper 116, wrote:
The conditions under which the Maricopa shale was deposited are not thoroughly understood. * * *
*122 From the fine-grained character of the shale it was evidently deposited in qniet water, not necessarily in deep water, nor even at any considerable distance from shore, * * *.
Because of the fact that the diatomaceous deposits which are forming in the present oceans are found at . great depths, it has been supposed by many that these deposits of diatomaceous shale were also laid down in very deep water * * *. It should be noted, however, that the Maricopa shale and indeed all the thick formations of diatomaceous shale in California contain a large amount of detrital matter, * * *. The facts that they contain so much detrital material and that coarse beds Avhich clearly were deposited in the littoral zone appear at so many horizons show that these deposits of diatomaceous material can not be considered deep-sea deposits, (p. 36)
Thus, it could be that there would not be any diatoms or organic shales out in the valley and under the Elk Hills because of the possibility that there was principally a shoreline deposition, or deposits only in shoal, rather than in deep areas. Under this theory, the accumulation of diatoms would be thickest at the shorelines, i.e., in the foothills and at the edges of the valley, making the heart of the valley area, where the Elk Hills are located, an unattractive place to explore.
(4) Even assuming a broad deposit of the shales, in sufficient thickness, from one side of the valley to the other, hidden underlying faults or structures might intervene and disturb the situation, as well as unknown layers of other strata. There are real risks in encountering unfavorable localized conditions even in proved oil fields, in the midst of which dry wells sometimes result, with resulting large financial losses. This occurred in the proved oil fields in the Temblors. There, as well as in the Kern Fiver field, the reservoir sands were lenticular in nature. Its sandy characteristics would sometimes terminate and be replaced by clay, shale, or rock, or the sands would diminish in thickness to a feather edge at the edge of the lens. The risks as to such unknown underground conditions would be greatly increased in unproved wildcat territory miles away.
*123 Actually, as shown in finding 47(b), the fears of these hypothetical 1903 geologists about conditions under Section 36 and other places in the Elk Hills being different from those visible and encountered in the Temblors would have turned out to have been justified, at least insofar as intervening structures are concerned, as well as the reservoir series and Monterey shales, visibly in juxtaposition in the Temblors, not being in such continuous juxtaposition under Section 36.
(5) The known angular unconformity between the reservoir and organic beds added considerably to the difficulty of postulating the continued presence or thickness of the Monterey shales from the Temblors approximately 10 miles out of Section 36. As shown, Watts stressed this factor and the great risks involved in such a situation (finding 37(a)). Such presence, in sufficient volume to generate oil in profitable, commercial quantities, was considered as an essential prerequisite.
Unconformity, based upon depositions in different geologic periods, increases the possibility of intervening formations and makes geologic projection more hazardous.
(6) The calculation of the dip and strike of the oil sands at a particular location is important to the location of a well. As hereinabove set forth, Watts emphasized this factor in his 1900 writings (finding 37(b)). Outcrops of oil sands in nearby or adjacent areas are helpful in determining such dip and strike in a particular locality. Since there are no such guiding outcrops on Section 36 itself, or indeed, in the entire Elk Hills, it would be a risky undertaking to locate a well properly in this new area. The unusual risks involved in exploring a location of this ldnd were emphasized by Watts who listed as an exceedingly risky undertaking the exploration in a location where there are no outcrops of oil sands or seepages, and simply on the basis that “the formation appears to be similar to that containing a remunerative body of oil-sand in other places” (finding 37(b)). The risks involved in basing a conclusion with respect to the stratigraphy of the hills only upon a projection of the dip of strata exposed miles away on the slopes *124 of the Temblors are obvious. To geologists of that day, as well as to the operators, the surface outcrop, indicating the presence of the diatomaceous shales and the reservoir sands in the vicinity, was considered as a very important guide in prospecting for oil.
(7) A projection of the angles of dip exposed at McKit-trick at the same various continued rates under the valley and the Elk Hills would put the reservoir and organic series under the Elk Hills too far for the drill to reach them by any then known drilling method or improvements in such methods likely to be made within the near future.
Furthermore, even accepting the “flattening out” theories of the other group of geologists, with the various series rising in the anticline, there would still be considerable doubt whether the oil could be reached at the 3,000-foot depth then considered the outside limit for cased wells to be sunk in California. Under the theory set forth in finding 46(b) that the organic series would be found around 3,400 feet beneath the surface of Section 36, the oil would then have to rise in the overlying reservoir series to above 3,000 feet below the surface of the ground to be reachable. Since at that time conservative opinion held the rise in the reservoir series to approximately 300 feet above the contact between the reservoir and organic series (finding 46(a)), the oil would, at the worst, still be outside the reach of the drill, and at the best, just barely within the limits. Of course, a more optimistic approach to the question of the height that the oil might rise in the reservoir series would put the oil within reachable limits. As shown, in some wells the oil was known to have risen as high as 1,000 feet or more in such series. However, considering the very large investment required, a conservative approach would not have been unreasonable.
Under the theory set forth in finding 46 (c), based on gauging the dip of the reservoir strata at McKittrick and projecting it out to the Elk Hills, no more accurate result could be arrived at than that the reservoir series could be reached at from 2,000-4,000 feet. However, this would be the top of the series, and it would be necessary to penetrate such series until the oil was reached at some distance above the *125 contact between it and the underlying unconformable Monterey shales. It is not only the top of the reservoir series but the bottom of it too that is important in calculating how deep it may be necessary to drill, and calculating the bottom of such series with any certainty would be quite difficult in this instance considering its unconformability with the Monterey series. Thus, this theory would also lead to reasonable uncertainties. Here again, however, a less conservative approach would consider the possibility that the unconformity might also result in a more favorable situation, and put the bottom of the reservoir series in a higher position. Nevertheless, again a conservative approach could not be considered unreasonable.
The same difficulty is encountered with the marly limestone key bed theory set forth in finding 46(d), which would place the top of the reservoir series approximately 2,000 feet below the top of the cap rock series. Again a further calculation would have to be made as to the thickness of the reservoir series and the height therein to which the oil might reasonably be expected to rise. Furthermore, it is difficult to conclude with any high degree of certainty that the so-called key beds so widely separated belong to the same horizon.
As shown in finding 47, the fears of these geologists as to the projected depths of the various series based upon the several theories employed would have turned out to be partly justified and partly unjustified, as indicated by the subsequent actual drillings in the Elk Hills. Generally, the depth of the location of the reservoir series under Section 36 would have been quite accurately forecast. However, at least partly because of the unexpected discovery of the intervening blue shale strata in certain areas of the hills, the projected depth of the Monterey shales would have been quite inaccurate in such places, since such shales were found at about 5,000 feet, and even deeper. Insofar as these theories based the ability to strike oil at reachable depths upon the depth at which the Monterey shales lay in contact with the reservoir series, a depth of 5,000 feet was beyond the capability of 1903 drilling methods.
*126 (8) As pointed out by Pack (finding 42), some geologists feared that, even if the reservoir series extended into the Elk Hills area, such area, being near the center of the former sea basin, would contain sands so fine as not to constitute a good reservoir for the oil. They would seek coarser grained sands which, as Pack says, “other things being equal,” would be the beds “that offer the more attractive reservoirs.” It would be reasonably expected that the finer grains were deposited in the deeper part of this former marine basin.
(9) While these geologists would have recognized the favorable anticlinal structure of the Elk Hills, they would also have known of situations where the anticlinal theory failed. Furthermore, some geologists of that period felt that petroleum was normally found in steep anticlines, rather than gentle ones such as the Elk Hills. For instance, geologist F. H. Oliphant, writing for the United States Geological Survey, in its publication “Mineral Resources for 1900,” published in 1901, stated:
* * * The principal producing counties [in California] are Los Angeles, Kern, Fresno, Orange, and Santa Barbara. The petroleum is usually found in the sharp folds and anticlinals of the strata, although that of the Kern River district is comparatively level. ■ In the producing regions the strata are generally much distorted, although there are many instances where several miles of a continuous anticlinal or a synclinal can be followed * * *.
An anticlinal structure alone is not determinative. There are many other conditions and factors to be considered along with the anticline to determine whether there is likely to be an oil pool under the dome. As of 1903, none of the oil fields in the San Joaquin Yalley was located on top of an isolated ridge or anticline such as the Elk Hills. Instead, all were located in the foothills of high ranges.
(10) Geologists generally agree that the Elk Hills constituted the last of the major uplifts in this particular area, the three approximately parallel uplifts being first the Temblors, then the Buena Vista Hills, and then the Elk Hills, extending in that order out into the valley. This would mean that the Elk Hills area, being under water the *127 longest period, was in turn subject to a longer period of deposition, resulting in a greater thickness in the Tulare or cover rock series. This thickening of the Tulare would affect the depth to which the drill would have to go to reach the oil, and might put it at an impossible depth. Of course, subsequent erosion of the Elk Hills after the uplift would in turn reduce the thickness of the Tulare, but there would necessarily be considerable uncertainty as to the amount of erosion that had taken place in the Elk Hills.
(b) The record does not indicate that, as of January 26, 1903, any competent geologist in fact made a careful, detailed, investigation and survey of Section 36 or the Elk Hills of the type that would warrant giving an informed and qualified opinion to a client-operator. Accordingly, the recommendations set forth herein and in finding 68 would be those of hypothetical geologists acting as consultants to hypothetical operators or investors. As stated, such a careful, detailed survey and investigation, including the working out of the anticlinal structure without the aid of accurate topographic maps, which were then not available, would have taken approximately 2-3 months. No such project was undertaken as of said date, nor was it usual or customary at that time for the general type of oil operator then operating in Kern County to invest the considerable sum that would have been required to obtain a geological investigation of that kind. Owen, who came closest in time to making a detailed geological survey of the west side of Kern County, did not spend any such period of time, and his assignment appears to have been principally concerned with the McKit-trick area, although, as shown, he did extend his investigation somewhat, tracing the various anticlines down to Sunset and out into the Elk Hills area. The first published report specifically concerned with the geological conditions in either the Buena Yista Hills or the Elk Hills, and considering them by name, as oil lands, was the Arnold and Johnson report of 1910.
About 1900, one Frederick McMillan, a geologist and metallurgist who was engaged in the investigation of mining and oil properties, did, at the request of an operator, make *128 a general surface survey, lasting approximately 2 days, of the Elk Hills but rejected the area as prospective oil territory. He was not able to detect the type of structure which he considered essential for the accumulation of oil in commercial quantities.
In August 1903, another geologist, one E. Call Brown, also spent approximately 2 days surveying the Elk Hills area and similarly rejected it. He too could find no favorable structural indications, nor was he able to locate any seepages.
George Gester, a Standard Oil Company geologist, investigated the Elk Hills area in 1909 as a possible favorable place for drilling wildcat wells, but rejected it. He was discouraged because of the lack of seepages in the area. In common with the oil operators, he placed great emphasis upon the existence of seepages and was unwilling to recommend a blind fold., i.e., an anticline displaying no surface evidence, by way of seeps or blowouts, of containing oil. As noted, Watts too emphasized the real aid to the geologist afforded by seeps (finding 45). In addition, despite the favorable results in the Kern River field, he subscribed to the school of thought that in California oil was generally found in steep, sharp, anticlinal structures, as distinguished from the eastern United States, where it was found in relatively flat anticlinal structures. The Elk Hills was a gentle structure. As was true of the great majority of the oil operators, he considered the hills too far out in the valley and away from the successful fields near the seepages on the sharp folds of the Temblors. The record does not indicate how intensive or thorough a study Gester made of the Elk Hills and the surrounding area at that túne.
Another geologist, one Oschner, similarly recommended against the Elk Hills in early 1909, prior to the Honolulu well’s successful showing of oil. He based his conclusions principally upon the negative results he obtained from the Lamont seep material, which did not react favorably to the ordinary field tests. It gave off no oil odor, it would not bum, and did not react to the chloroform test. Oschner concluded the material was of vegetable, not bituminous origin. Further, he felt that if there was an oil-bearing stratum under the Elk Hills, it would be too deep to reach. *129 Oschner did not make a thorough, intensive, geological study of the Elk Hills or the surrounding area at that time. He spent only approximately a day or so in the Elk Hills.
,70. (a) Neither group of geologists referred to in findings 68 and 69 would, justifiably, have given any consideration to the findings contained in either the Duee survey returning Section 36 as mineral, or the 1900 action of the Department of Interior officials in suspending the area from further entry because of its alleged mineral character. The Duee survey referred to the existence of “asphaltum exudations” on the township he surveyed. The survey was manifestly erroneous in this respect and Duee in fact saw no such exudations. Duee had no technical geological competence. Also, the suspension action followed the Miners’ Petition of 1899, which broadly included large areas in the request for suspension, recognizing that some of the land included therein might well, upon investigation, not be classified as mineral.
(b) The April 5, 1904, action of the Department of Interior officials in lifting the suspension, based upon the Kyan findings and recommendations of 1904 (finding 52) could not have been given any consideration because it came after January 26, 1903. However, Ryan’s recommendations and the action based thereon would similarly have been given no weight in any event. Ryan’s surveys were likewise not based upon any geological or scientific advice and he himself was not qualified to express any sound geological opinions. As shown, he based his judgments and recommendations only upon the absence of seeps, outcrops, or actual successful producing wells, as well as the common opinion among oil men working in the area.
(c) Likewise, the posting and recording of mineral locations on Section 36 and elsewhere in the Elk Hills would not have been considered of any real significance by either group. At most, it would have been treated as a caveat by any informed person. As shown, such locations were made in indiscriminate manner by uninformed speculators of diverse occupations and without any real expectation of actually making expenditures for development purposes. All of the mineral entries on Section 36 lapsed for failure to perform any assessment work. The drilling of an oil well was an *130 expensive undertaking even as of 1903, and tlie costs of undertaking sucb work in a then relatively inaccessible place (for oil development purposes) like Section 36 was prohibitive so far as the general type of speculative locator then prevalent was concerned.
.71. (a) An informed and experienced oil operator who, as of January 26,1903, would have received the recommendations referred to in findings 68 and 69, and who was considering purchasing Section 36 or a substantial part thereof, such as 160 acres, or a quarter section, would have acted reasonably had he accepted the recommendations of the geologists set forth in finding 68 and consequently took steps to acquire Section 36 or such part thereof. However, regardless of the state of his optimism, boldness, or finances, it seems quite certain that he would not have rushed out to the section and immediately commenced developing it. At that period of oil price depression in the fields on the west side of Kern County, even good wells in proved oil districts were being capped or abandoned for lack of an oil market. This was particularly true in the Midway District, which lacked transportation facilities. Hauling development materials, including water, for miles over imsurfaced roads in the desert to Section 36, and then, even if successful, hauling the oil out of the Elk Hills, would at that time have presented a very expensive situation. Unless the oil proved to be of an unusually high quality and light variety, commanding a relatively high price, the entire operation would not be a profitable one. Therefore, the oil operator quite reasonably would have elected to wait for the return of satisfactory prices and the construction of reasonably good transportation facilities. In addition, he would have been reasonably disturbed about the prospect of the oil being at reachable depth, since the recommendations indicated he might have to drill to 4,000 feet before he could reach the oil, even if he were fortunate enough to find any. He would have wisely delayed operations until such time as California drilling equipment and techniques improved so that he could drill to a depth greater than the 2,500 feet which at the time was the deepest any well in California had been drilled, or the 3,000 feet *131 which, was considered the outside limit with cable tools in this part of California. The great investment required to drill deep wells would have indicated at least this degree of caution.
However, the acquisition of prospective oil lands for subsequent development even many years later is common in this industry, especially where competent geologists reasonably advise that the possibilities of reaching oil in commercial quantities are sufficiently great as to justify drilling.
(b) It would not have been unreasonable for such an oil operator receiving both sets of recommendations as of January 26, 1903, as indicated in findings 68 and 69, to elect to adopt the recommendations set forth in finding 69 and not concern himself further with acquiring the section with a view to its development, especially considering the state of uncertainty of the geologists referred to in finding 68 as to whether the oil was at a then drillable depth. He could reasonably have concluded that, considering the depressed condition of the oil market, the then undeveloped transportation conditions in the area, the substantial risks involved in entering this unproved area, and the tremendous development costs that would be involved, the possibilities of realizing a profit were too remote, and that there were, for the reasonably foreseeable future, more likely places in relatively proved districts to which he could devote his time, energy, and finances.

 Since the hearings in this case were held, and the findings of the trial commissioner reported, prior to the opinion of the Supreme Court in Glidden Co. v. Zdarnok, 370 U.S. 530 (1962), we thinlc it proper to file this report without reference to the Supreme Court’s opinions in that case.

 Deffeback v. Hawke, 115 U.S. 392, 404-05 (1885) ; Diamond Coal & Coke Co. v. United States, 233 U.S. 236, 240 — 41 (1914) ; United States v. Southern Pacino Co., 251 U.S. 1 (1919) ; West v. Standard Oil Co., 278 U.S. 200, 208 (1929).

 The well-known case of Pan-American Petroleum & Transport Co., v. United States, 273 U.S. 456 (1927), involved a lease, in 1922, of oil lands in this reserve.

 The lands claimed by plaintiff were leased to the Standard Oil Company in 1919.

 Under the grant to the railroad, it was precluded from having or selecting mineral lands.

 Certain of the defendant’s exceptions propose additional findings of materials which can be judicially noticed or need not be set forth in the findings.

 This phase of the case is further discussed at the end of this opinion.

 Even with regard to the "equitable” phase of a congressional reference case, we should not depart from controlling Supreme Court adjudications.

 The Court also said that account must be taken “of geological conditions * * * upon which prudent and experienced men In the oil mining regions are shown to be accustomed to act and make large expenditures” (id. at 13).

 A section Is 640 acres, constituting 1 square mile. Accordingly, 2 square miles In each township were granted to the State.

 On December 6, 1935, following Secretary Iekes’ decision that Section 36 was known to be mineral in character on the date of acceptance of the survey, adverse proceedings were instituted against the State of California and its transferees relating to Section 16 in the same township and range in which Section 36 was located. These proceedings were also brought pursuant to the Joint Resoution. Hearings on charges identical to those in the Section 36 case were held and a considerable amount of evidence was introduced by both sides, including the entire record in the adverse proceedings relating to Section 36. On February 27, 1937, the Register at Sacramento, California, filed a decision sustaining the charges. The contestees appealed and on March 24, 1938, the Commissioner of the General Land Office, Fred W. Johnson, rendered a decision in which he held that Section 16 was known to be mineral in character on January 26, 1903, and that “title to section 16 has, therefore, never vested in the State of California or its transferees, but remains in the united States.” The Commissioner’s decision was affirmed by Secretary Iekes on June 19, 1940, and a motion by the contestees for a rehearing was denied September 18, 1940. The entire transcript of testimony taken in these proceedings, consisting of 597 pages, together with certain exhibits introduced therein, were also introduced in the proceedings before this court.

 The map reproduced at the end of this report is a copy of this plate.
Actually, the Elk Hills is not a single anticline. As Pack says: “Broadly considered the structure of the Elk Hills is that of an anticline or dome, the highest part or axis of which trends southeastward) from the vicinity of Mc-Kittrick to the north end of Buena Vista Lake, passing through the highest part of the hills. In reality the structure, is not that of a single fold, for there are a number of anticlines and synclines, but most of these folds are small and probably not deep, and so far as accumulation of oil is concerned the effect of them taken together is essentially the same as that of a single large upward fold. The central part of the area which this group of folds occupies — in other words, the central part of the Elk Hills — Is structurally the most favorable part for the accumulation of oil.” (p. 162)
In 1910, Arnold and Johnson stated in their report: “The two nearly parallel folds which comprise the Elk Hills are probably the southeastern continuation of the Gould Hill anticline and a parallel similar structure. These anticlines coalesce near the end of the Elk Hills and plunge to the east beneath the San Joaquin Valley.” ’(pp. 99-100)

 Section 7 of the Act of March 3, 1853 (10 Stat. 247) provides:
“That where any settlement, by the erection of a dwelling-house or the cultivation of any portion of the land, shall be made upon the sixteenth and thirty-sixth sections, before the same shall be surveyed, or where such sections may be reserved for public uses or taken by private claims, other land shall be selected by the proper authorities of the State in lieu thereof * *

 In addition to tie lots, described in finding 3, which Buffington sold to Carman, ie also purchased from the State lots 1 and 2 in the east half of the east half of the section. Buffington- conveyed these lots to Mrs. Sidney.H. Greeley, Thomas A. O’Donnell and Edward L. Doheny-.. -These persons, as owners, leased the property on October 2, 1919, to the Pan American Petroleum Company. Thus, said persons and such company also were, claimant-parties to the proceedings.

 See Burke v. Southern Pacific Co.9 234 U.S. 669, concerning an additional suit instituted by Burke in 1910.

 Similarly, the statement in, the Supreme Court’s opinion In United States v. Southern Pacific Co., 251 U.S. 1, 12, (finding 15) that “Two wells had been sank in the Elk Hills * * * ” and that “some oil was reached by one” was erroneous.

 Such deep drilling was made possible by the introduction of the rotary drill in California at about that time.

 The Tracing of the Elk Hills anticline by Pack and its extension into the McKittrick Front is shown on his map appended at the end of these findings.